UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

      - against -                              Docket No. 15 Cr. 393 (MKB)

FAREED MUMUNI,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**SENTENCING MEMORANDUM FOR FAREED MUMUNI**
(Along with Accompanying Letters of Support & Exhibits)


*Attorney for Fareed Mumuni*

*Anthony L. Ricco*
ANTHONY L. RICCO, ESQ.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 791-3919
*Tonyricco@aol.com*


Steven Z. Legon, Esq.
Kenneth J. Montgomery, Esq.
Of Counsel and on the Memorandum

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

     - against -                               Docket No. 15 Cr. 393 (MKB)

FAREED MUMUNI,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

       This Sentencing Memorandum is submitted pursuant to Rule 32 (f)(1) and (2) of the Federal

Rules of Criminal Procedure, and it sets forth Fareed Mumuni's final objections to the Presentence

Investigation Report and his Sentencing Recommendation.  Fareed Mumuni requests that the court

impose a sentence at variance with the Sentencing Guidelines, pursuant to the court's authority under

*United States v. Booker*, 534 U.S. 220 (2005) and 18 U.S.C.§ 3553(a).

## I.  Preliminary Note

       Every sentencing presents the court with a unique set of individual circumstances which must

be carefully and thoughtfully considered to impose punishment upon the offender.  Arriving at the

appropriate sentence to impose, involves a complex process which is includes an evaluation of the

nature and circumstances of the offense, along with a meaningful review of the history and character

of the offender, the likelihood of redemption, and the need to protect the public from the possibility

of future criminal conduct by the offender, *inter alia*.  In this case, there is no question that the nature

and circumstances of the offense involve consideration of serious aggravating factors.  Our nation must

protect itself from the threat of harm from terrorism and take action to thwart the ability of foreign

terrorist organizations to influence the hearts and minds of our nation's youth.  Our nation, however,

should never abandon the enormous potential of its youth, in the pursuit of imposing punishment upon

those who become influenced by the sophisticated methods of trickery and treachery employed by

terrorists organizations.  In this case, the mechanical application of the sentencing guidelines, and sentencing recommendation of the government  loses sight of these important factors.

Summary of Argument

Fareed Mumuni requests a sentence at variance with the Guidelines, since the factors which substantially contributed to his involvement in the charged offense are not considered in mitigation or otherwise accounted for in the mathematical computation, which comprises the applicable Guidelines imprisonment range of 1200 months, despite the fact that the Supreme Court has mandated the consideration of individual circumstances which have influenced a defendant's life.

Again, the charges here are, indeed, of a most serious nature.  The desire to join forces with a foreign terrorist organization such ISIL, which seeks to engage in extreme acts of violence, and to conduct a knife wielding attack against law enforcement officers engaged in the execution of their duties, are acts for which severe punishment must be imposed.  However, the length of punishment under our sentencing regime must be balanced against the life narrative of the offender and other factors.  As observed by the outstanding lawyer and law professor, Byran Stephenson, in his book "Just Mercy," Fareed Mumuni is a young man who is "far greater than the worst thing that he has done in his life." Fareed Mumuni, is a bright but mild-mannered young man. who prior to his arrest in this case, had never engaged in a single act of defiance against authority, or any act of criminal or anti-social conduct.

At the time of arrest, Fareed Mumuni, was a full-time college student, who maintained an unblemished academic record, outstanding employment in the pubic and private sector, and had never caused his hardworking, middle-class parents a single day of heartache.  In addition, no person in his family of immigrants from West Africa has ever had any negative contact with law enforcement.  These factors provide a gateway to understanding the life narrative of young Fareed Mumuni.  These mitigation factors are not presented as an excuse for his criminal conduct, but rather to help understand

how a young man with so much ability and promise found himself engaged in the charged criminal conduct in the first place.  How then was the charged criminal conduct  introduced into the otherwise law abiding, tranquil life of Fareed Mumuni?  In order gain insight, counsel has interviewed with friends, members of Fareed Mumuni's family, and religious leaders within the community, including the highly respected Imam Siraj Wahhaj of the Al Toque Mosque in Bedford-Stuyvesant Brooklyn.

Fareed Mumuni was born in the United States, as the son of first-generation, hardworking West African Immigrants.  Fareed Mumuni and his siblings were raised in the faith of Islam, the religion of choice that his parents brought with them from West Africa.  However, the family has never embraced or supported any radicalized views of Islam; and raised their children with traditional American views of education and hard work as a pathway to achievement and the promise of a better life here in America.[1]  In fact, Fareed Mumuni graduated from high school with a diploma, and was pursuing higher education at the College of Staten Island, where as a teenager he was introduced to radicalized views of Islam by other students in the Islamic Society, who exposed him to the radical sermons on the internet, as well as YouTube videos, where master propagandists seek to proselytize young minds.  As set forth by Fareed Mumuni during his extensive and truthful post-arrest interrogation, he became concerned about the loss of life of Muslims around the world, and was influenced by others to seek to travel to join the Islamic State in Syria.

Contrary to the completely uncorroborated statement set forth in the PSR, and the public statements made the government prosecutors at various stages of the court proceedings, Fareed Mumuni never agreed to join or participate in any plan to attack the United States or harm any citizens

---

[1]     The children of the family have embraced these values and have achieved.  Fareed Mumuni's sister is a high school graduate and currently a member of the United States Armed Forces, serving in the United States Navy.  See, PSR, ¶ 73, page 14.  Fareed Mumuni's first cousin, is a third year law student at the Fordham University School of Law, and is scheduled to graduate in May.

3

of our nation.[2]  As set forth below, and as extensively explained during his lengthy post-arrest statement, Fareed Mumuni is a young man without any past history of behavioral problems or acts of violence against anyone, who has never been associated with any plan to attack the United States or to harm any American citizens.

In relation to this case, the judicial wiretaps and extensive investigation reveal that Fareed Mumuni did not serve as an organizer or leader, nor did he recruit or request any person to join the Islamic State.  See, PSR, ¶ 34, page 10.  Fareed Mumuni did not have any international contacts or know any person in Turkey, Syria or the Islamic State.  The credible evidence reveals that Fareed Mumuni was young a college student (18-19 years old) who was recruited, influenced and inspired by others (including his co-defendant Munther Omar Saleh) who exploited his eagerness to join the Islamic State and his naive understanding of Islam, and encouraged him to engage in an act of violence should law enforcement prevent him from traveling overseas to join the Islamic State.

While Fareed Mumuni engaged in a knife wielding attack against law enforcement officers who entered his family's home on the morning of June 17, 2015, to execute a search (not arrest) warrant, the advisory sentence arrived at by the application of the mechanical Guidelines (1200 months imprisonment) inhumanely distorts the punishment which is necessary to impose upon a young offender like Fareed Mumuni, for his role in the offense and his conduct on June 17, 2015.     In this case, there are significant aspects of Fareed Mumuni's background and character which are not apparent from the Presentence Investigation Report, nor are they considered as mitigating factors under the Guidelines

---

[2]     Paragraph 3 of the Complaint filed in this case states: "*The investigation has uncovered that MUMUNI made efforts to participate in or support a terrorist attack in the New York metropolitan area or elsewhere on behalf of ISIL.*"  When defense counsel met with the government to obtain the basis of the statements made during the plea allocution, that Fareed Mumuni participated in a domestic terrorist attack, the government was unable provide any such information.  Ultimately, the complaint acknowledges and corroborates this lack of evidence, when it states that the conversation Saleh had with a CCI, recorded on a judicial wiretap, merely "*suggests that MUMUNI may have been involved in Saleh's planning for a terrorist attack.*"

in establishing the sentencing range of 1200 months imprisonment. For this reason, Fareed Mumuni and his parents request that this court impose a sentence at variance with the Guidelines.

In addition to the foregoing, Fareed Mumuni request for a sentence at variance with the Guidelines is based upon the following grounds: (1) that the destructive impact that the enhanced Guidelines sentence in this case would have on innocent third parties (Fareed Mumuni's family); and (2) Fareed Mumuni's post-arrest rehabilitation; his positive prison adjustment, including his participation in BOP programs. See, *Pepper v. United States*, 131 S.Ct. 1229, 1247 (2011)

As Supreme Court case law and statutory authorities clarify, mitigation evidence is not provided as an excuse or justification for engaging in criminal conduct, but rather for the purpose of mitigation as to the length of sentence or type of punishment to be imposed as a result of that criminal conduct. See, *Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); See also, 18 U.S.C. §3661. In this case, the Presentence Investigation Report (PSR) recommends a sentence, which - - if imposed - - would result in Fareed Mumuni's imprisonment for a period of 1200 months. Fareed Mumuni's objections do not impact the total offense level or the corresponding sentencing range; however, for the reasons set forth in detail below, his objections, in combination with other grounds, serve as a basis for the court to consider the imposition of a sentence at variance with the Guidelines.

## II.  Background/Guilty Plea Without An Agreement

On August 10, 2015, Fareed Mumuni was arraigned on 5 counts of a 6 count indictment. Under count one, Fareed Mumuni, along with Munther Omar Saleh and others, were charged with a conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §2339B(a)(1). Count two charged Fareed Mumuni, along with Munther Omar Saleh and others with an attempt to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §2339B(a)(1).

Count three charged Fareed Mumuni, along with Munther Omar Saleh and others with a conspiracy to assault federal officers, in violation of 18 U.S.C. §371.  Count four did not include Fareed Mumuni; it charged Munther Omar Saleh with the June 13, 2015 assault of a federal officer, in violation of 18 U.S.C. §111(a)(1) and 18 U.S.C. §111(b) and 2.  Count five charged only Fareed Mumni with the June 17, 2015, attempted murder of a federal officer, in violation of 18 U.S.C. §1114(3).  Count six charges only Fareed Mumni with the June 17, 2015 assault of a federal officer with a deadly weapon, in violation of 18 U.S.C. §111(a)(1) and 18 U.S.C. §111(b).

Entry of the Guilty Plea

On February 9, 2017, Fareed Mumuni pled guilty before this court, to counts one, two, three, five and six of the six count indictment, without the benefit of a plea agreement with the government.

The Presentence Investigation Report and Outstanding Objections

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, the United States Probation Office conducted an interview of Fareed Mumuni and prepared a Presentence Investigation Report ("PSR"), which included, *inter alia*, a calculation of the applicable advisory Sentencing Guidelines.  On January 27, 2018, Fareed Mumuni filed his objections to the PSR and requested an evidentiary hearing to resolve materially disputed issues of fact, pursuant to U.S.S.G. § 6A1.3(b) and *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).

Remaining Miscellaneous Objections and Request For an Evidentiary Hearing

Fareed Mumuni's January 27, 2018, submission set forth objections to paragraphs 14 and 15 (page 6); paragraph 21 (page 7); paragraph 24 (page 8); paragraph 29 (page 9); paragraphs 33 and 34 (page 10) of the Presentence Investigation Report.  Counsel is of the view that resolution of the filed objections will have no impact on the PSR's Guideline calculation and recommendation of 1200 months incarceration.  However, the resolution of the above objections of the PSR may impact the court's

consideration of Fareed Mumuni's request for sentence at variance from the Guidelines pursuant to 18 U.S.C. §3553(a).

Notwithstanding Fareed Mumuni's objections, the Presentence Investigation Report stands by the conclusory factual allegations provided to the United States Probation Office by the government prosecutors.  See, Second Addendum To The Presentence Report, February 1, 2018, page 2.

Counsel is of the present view that several of the filed objections can be resolved without a full evidentiary *Fatico* type hearing.   For example in paragraphs 14 and 15 of the PSR, it is stated, *inter alia*, that "[T]he investigation revealed that **Fareed Mumuni** had assisted Saleh in his efforts to carry out a terrorist attack on behalf of ISIL," (paragraph 14) and that Munther Omar Saleh's conversation with CC1, wherein he uses the word  "motivating," "*suggests that* **Mumuni** *may have been involved in Saleh's planning for a terrorist attack.*"   Fareed Mumuni objected on the grounds that information set forth in paragraph 14, and the conclusion set forth in paragraph 15 lacks sufficient indicia of reliability to support the conjecture "*that* **Mumuni** *may have been involved in Saleh's planning for a terrorist attack.*"

In preparation of sentencing, Counsel requests that the government provide to the court those judicially intercepted telephone conversations (or the transcripts) and that the court review the videotaped post arrest interview and interrogation of Fareed Mumuni.  Upon this court's review of the videotape, it shall discover that during the lengthy, one hour and fifty minute post-arrest interrogation, Fareed Mumni both specifically and categorically denied that he participated or agreed to participate in Munther Omar Saleh's idea to engage in a pressure cooker bomb attack (as stated by Munther Omar Saleh) and/or that he never agreed to participate in an attack against the United States and/or to harm United States citizens.[3]

---

[3]        Attached herewith for the court's consideration is a chart that summarizes the post arrest interview and interrogation (memorialized on videotape) wherein Fareed Mumuni responds to specific questions about (1) Munther Omar Saleh's intention to make and use a pressure cooker bomb; and/or (2) whether anyone ever requested, at any time, that Fareed Mumuni engage in any attacks against the United

During the videotaped interrogation, Fareed Mumuni acknowledged that Munther Omar Saleh stated that he was considering a pressure cooker bomb attack, but that idea was what Munther Omar Saleh wanted to do.  See, Time Location, 9:33:55 to 9:34:28.  Fareed Mumuni informed his interrogators, that although he listened to Munther Omar Saleh's remarks and ideas during a telephone call, he (Fareed Mumuni) never agreed to join Saleh or to assist him (or anyone else) in such an attack.  See, Time Location, 9:35:42 to 9:36:10.; 10:07:20 to 10:08:10; 10:40:20 to 10:51:28; and 10:57:30 to 10:59:00.

In addition, the court can determine from a review of the Rule 16 discovery material and seized evidence, that there was no evidence that Fareed Mumuni searched the internet for information related to building bombs (pressure cooker or otherwise), nor did he have in his possession any physical evidence, literature or information on bomb building or plans to attack any domestic or international location.  In addition, neither CC1 or CC2 had any conversations with Fareed Mumuni, wherein he agreed to participate in a plan to attack the United States or to harm American citizens.  Despite this complete dearth of information, as well as Fareed Mumuni's specific denials, the government prosecutors and United States Probation concluded that Fareed Mumuni agreed with Munther Omar Saleh to carry out an attack (paragraph 14) and that a third party conversation between Munther Omar Saleh and CC1 "suggests that **Mumuni** may have been involved in Saleh's planning for a terrorist attack."

Fareed Mumuni believes that the truthful, credible information in this case supports the opposite conclusion; to wit: Fareed Mumuni did not agree or participate with Munther Omar Saleh, or anyone else, in an attack against the United States or to harm American citizens.  Were the court to review the

---

States and/or harm any of its citizens or (3) whether he was aware of any such attacks against the United States and/or harm any of its citizens.  See Summary Chart, time location (1) 9:23:50; (2) 9:24.20 to 9:24.24; (3) 9:29:00 to 9:30:09; (4) 9:31.49 to 9:30:09; (5) 9:31:49 to 9:32:15; (6)  9:31:16 to 9:33:18; (7) 9:33:55 to 9:34:28; (8) 9:35:30; (9) 9:35:42 to 9:36:10; (10) 10:07:20 to 10:08:10; (11) 10:40:20 to 10:51:28; (12) 10:57:30 to 10:59:00.

documents and Rule 16 discovery items set forth above (both classified and non-classified), counsel for Fareed Mumuni is prepared to rest upon his arguments in support of the conclusion reached by the defense.

In relation to Objection 21, the government has stated, *inter alia*, that : "*While the agents attempted to subdue* **Mumuni** *to the ground, he reached for an agent's firearm and he attempted to pull the trigger.*" Fareed Mumuni asserts that upon lunging at the first agent, he was taken down and immediately subdued by several agents. Fareed Mumuni denies any allegation that he purposefully reached for an agent's firearm and attempted to pull the trigger, or logistically or physically had an opportunity to do so, in the rapid manner in which the highly experienced, F.B.I. SWAT-trained special agents subdued and disarmed him.

In relation to Objection 24, the PSR asserts that "**Mumuni** *admitted that he and Saleh had spoken about how to make and use a bomb.*" This is an inaccurate and misleading statement, as it implies that Fareed Mumuni admitted that he and Munther Omar Saleh discussed making and using a bomb together. The only post-arrest statements of Fareed Mumuni known to counsel are those set forth and memorialized in a videotape, which were made within a few hours of his arrest on June 17, 2015. During that interview, Fareed Mumuni stated to agents that Munther Omar Saleh informed Fareed Mumuni of Saleh's interest in pressure cooker bomb attack, and that Munther Omar Saleh suggested to Fareed Mumuni that he should use a pressure cooker bomb, if the agents stopped him (Fareed Mumuni) from traveling to the Islamic State. However, Fareed Mumuni specifically told the agents that it was Munther Omar Saleh who was expressing what he, Muther Omar Saleh, wanted to do.

Fareed Mumuni specifically informed that agents several times during the interview, that he did not agree to engage or participate in any such conduct. The conclusion that this was a two-way discussion on how to make and use a bomb is both inaccurate and misleading. The videotaped interview makes it absolutely clear that Munther Omar Saleh was expressing his own thoughts and ideas. Thoughts and ideas that Fareed Mumuni did not agree with, join or participate in.

In paragraph 29 of the PSR it is alleged, *inter alia*, that Fareed Mumuni  "repeatedly stabbed" a federal law enforcement agent during the execution of a search warrant at his family's home on June 17, 2015.  Fareed Mumuni acknowledges that he lunged at a law enforcement officer with a large kitchen knife; however, he denies that he "repeatedly stabbed" anyone.  A review of the photographs of the clothing, gear  and protective vest worn by the law enforcement officer do not show evidence of the infliction of "repeated stab" wounds.  This issue can be resolved without a full evidentiary hearing.  Counsel is prepared to make arguments based upon the court's review of the Rule 16 discovery materials.

In paragraph 33 of the PSR, it alleged that "*[a]s the officers attempted to restrain* **Mumuni**, **Mumuni** *repeatedly attempted to plunge the kitchen knife into the torso of an* FBI *special agent and reached out with his hand in the vicinity of a rifle used by another member of law enforcement*."  Fareed Mumuni denies this allegation, and is prepared to make argument based upon the court's review of the Rule 16 discovery materials and the affidavit filed by the government in support of sentencing.

Finally, as set forth above in our objections to paragraphs 14 and 15, the information set forth in paragraph 34 lacks sufficient indicia of reliability to support the conclusion that "**Mumuni** was directly involved in the planning to carry out terrorist attacks."  Counsel is prepared to make arguments based upon the court's review of the Rule 16 discovery materials, including the videotape of the post arrest interrogation and interview, and any other documents in possession of the government. which support the conclusory allegation in paragraph 34, that "**Mumuni** *was directly involved in the planning to carry out terrorist attacks*."[4]

In preparation of sentencing, counsel has endeavored to limit the material issues, so that the

---

[4]        Finally, it is noteworthy that on June 17, 2015, when the agents were executing a search warrant, there was no allegation or claim that Fareed Mumuni *was directly involved in the planning to carry out terrorist attacks*.  Nor did the search produce any evidence that Fareed Mumuni *was directly involved in the planning to carry out terrorist attacks*.

court's time and resources may be more effectively utilized.  As a result, Fareed Mumuni is prepared to proceed to sentencing in the absence of a full evidentiary hearing on the conditions set forth above.

Statutory Sentence on the Counts of Conviction and Supervised Release

The statutory maximum term of imprisonment on count one is 20 years, along with not more than 3 years of supervised release, pursuant to 18 U.S.C. §2339A(b) and §2339B(a)(1).  The statutory maximum term of imprisonment on count two is 20 years, along with not more than 3 years of supervised release, pursuant to 18 U.S.C. §2339A(b) and §2339B(a)(1).  The statutory maximum term of imprisonment on count three is 20 years, along with not more than 3 years of supervised release, pursuant to 18 U.S.C. §111(a)(1) and 18 U.S.C. §111(b).  The statutory maximum term of imprisonment on count five is 20 years, along with not more than 3 years of supervised release, pursuant to 18 U.S.C. §1114(3).  The statutory maximum term of imprisonment on count six is 20 years, pursuant to 18 U.S.C. §111(a)(1) and 18 U.S.C. §111(b).

Each of the five counts of conviction carries a term of supervisory release not more than 3 years, pursuant to 18 U.S.C. §3583(b)(2) and, as multiple terms, must be served concurrently with each other pursuant to 18 U.S.C. §3624(e).

The statutory fine on each of the five counts of conviction is $250,000,00.  18 U.S.C. §3571(b).  See, P.S.R., ¶99, page 18.  A mandatory special assessment of $100.00 on each count of the five counts of conviction is also required. See, 18 U.S.C. § 3013.  See, P.S.R., ¶100, page 18.

Guidelines Fail To Account For Fareed Mumuni's Individualized Background

It appears that the Probation Officer has reached its conclusion in Part E of the PSR, through the adoption of a policy of the Sentencing Commission, which fails to account for or provide any numerical value to the circumstances related to Fareed Mumuni's individual background and history, his lack of prior criminal conduct of any type, and the manner in which Fareed Mumuni, and other young, law abiding American students are corrupted and manipulated into a twisted desire to provide

material support to ISIL and to violate the laws of the United States.  A sentencing range which fails to recognize and/or give consideration to critical factors which influenced the offender's participation in the offense, and the factors related to his individual background and history in the calculation of the imposition of a sentence - is contrary to the controlling Supreme Court case authority on sentencing and other sentencing enactments of Congress, and results in the recommendation of a sentencing range which is *per se* unreasonable, and therefore, provides a basis for a sentence outside the Guidelines range. See, *Williams v. New York*, 337 U.S. 241, 247-248 (1949*), Wasman v. United States*, 468 U.S. 559, 564-565 (1984); See also, 18 U.S.C. §3553(a)(1), 18 U.S.C. §3661.

In Part E of the PSR, the U.S. Probation Officer states that she has not identified a single factor in the Fareed Mumuni's background and history, nor the circumstances of the offenses of conviction, which may warrant a departure from the sentencing guideline range of 1200 months for this first-time offender.  Not his history of academic achievement; not a more than modest history of successful employment in both the public and private sector; not his post arrest achievements; and not the circumstances by which he was recruited for involvement in the charged criminal conduct as a teenager.[5] See, P.S.R., ¶99, page 18.

However, in the post-*Booker* era, the Supreme Court has held that sentencing courts are no longer mandated to follow the policy decisions of the Sentencing Commission or its interpretations by the Probation Office.  See, *Pepper v. United States*, 131 S.Ct. 1229, 1247 (2011).  This is particularly important where a Sentencing Commission's policy decision is contrary to public policy decisions enacted into law by Congress, as set forth in 18 U.S.C. §3553(a)(1); and 18 U.S.C. §3661.  When the factors related to Fareed Mumuni's background are not considered in relation to Guidelines (Part E of

---

[5]      Notwithstanding the proliferation of case authority to contrary, and actual presence of factors in this case, the Probation Officer reached the same conclusion in Part F of the PSR, where it is stated that no factors were present that would warrant a sentence at variance with Guidelines pursuant to 18 U.S.C. §3553(a).

the PSR), and are not considered in relation to a sentence at variance with the Guidelines (Part F of the PSR), the right to individualized sentencing is violated.

Fareed Mumuni requests that the court accord meaningful consideration to the factors that contributed to his involvement in charged criminal offense, his modest achievements as a teenager and young adult, the hardship that a 1200 month sentence would impose upon his family, along with his post arrest rehabilitation. In the absence of knowledge about the life path that Fareed Mumuni has endured, he can easily be viewed as just another inner city youth who failed to make the right "choices", thereby rendering Congress' mandate that the sentencing court impose a sentence sufficient but not greater than necessary - based upon the offender's individual circumstances - an empty promise.

### III.  Defendant's Sentencing Recommendation

As stated above, Fareed Mumuni requests that the court impose a sentence at variance with the Guidelines, pursuant to the court's authority under 18 U.S.C. §3553(a). In the pre-*Booker* era, the fate of an offender like Fareed Mumuni was determined entirely based upon the application of the numerical assessments and policy statements set forth in the Guidelines. In this case, utilizing the numerical range of imprisonment suggested by the Guidelines, violates Fareed Mumuni's right to due process of law and the sentencing goals of 18 U.S.C. §3553(a), which mandates that the sentence imposed include an assessment of a defendant's individual background and history.

The numerical range deemed applicable to Fareed Mumuni under the Sentencing Guidelines fails to include (within its calculation) any numerical value or consideration of the most profound and devastating mitigation factors relevant to Fareed Mumuni's life narrative - *the method by which ISIL and its propaganda served to corrupt his understanding of Islam and lured him and other American youths into believing that its radicalized dogma is a legitimate form of Islamic religious expression.* Therefore, before turning to the individual circumstances of Fareed Mumuni's background and character, it is important to note how our nation's experts explain the proliferation of this phenomena, and the impact that it has had on

otherwise law abiding American youth.

<u>Radicalization of American Youth</u>

Over the past few years, our nation has witnessed an explosion in how foreign terrorist organizations have successfully radicalized law abiding American Youth to abandon their traditional values to adopt violent foreign ideology and engage in violent criminal behavior.  See, What Isis Really Wants"What ISIS Really Wants," published in *The Atlantic* in March 2015, by Graeme Wood.

Most scholars, terrorist experts and federal investigative agencies agree, that the successful radicalization is based upon the foreign terrorist organization successful identification and manipulation of a vulnerable youthful mind-set and profile.   At the time of his arrest, Fareed Mumuni had the classic personality that experts such as University of Maryland Professor of Social Psychology and terrorism expert Arie Kruglanski have identified as subject to manipulation into acts of violence.[6]   Professor Kruglanski has observed:

> These young people seem to have what psychologists call a very strong "need for cognitive closure," a disposition that leads to an overwhelming desire for certainty, order, and structure in one's life to relieve the sensation of gnawing—often existential—doubt and uncertainty. . . this need is something everyone can experience from time to time.

*See*, "Here Are the Psychological Reasons Why an American Might Join ISIS," published in Mother Jones Magazine (Online Edition) by Psychologist Arie Kruglanski.   During an another interview,

---

[6]     Arie W. Kruglanski is one of our nation's leading terrorism expert.  He is a Distinguished University Professor of Social Psychology at the University of Maryland; a recipient of numerous awards, and is a Fellow of the American Psychological Association and the American Psychological Society.  Professor Kruglanski has served as editor of the Journal of Personality and Social Psychology: Attitudes and Social Cognition, editor of the Personality and Social Psychology Bulletin, and associate editor of the American Psychologist. His work in the domains of human judgment and belief formation, the motivation-cognition interface, group and intergroup processes, and the psychology of human goals.  Professor Kruglanski also conducts research with the support of grants from the Department for Homeland Security and from the Department of Defense on the psychological processes behind radicalization, de-radicalization, and terrorism.

Professor Kruglanski explained the motivational factors which may lead radicalized individuals to engage in suicidal behavior, just like Fareed Mumuni did on the date of his arrest. According to Professor Kruglanski, "personal significance is a motivation that has been recognized by psychological theorists as a major driving force of human behavior. Terrorists feel that through suicide, their lives will achieve tremendous significance. They will become heroes, martyrs. In many cases, their decision is a response to a great loss of significance, which can occur through humiliation, discrimination or personal problems that have nothing to do with the conflict in which their group is engaged."[7]

Radicalization of American Youth has occurred throughout the United States, as master manipulators scour the internet and social media platforms looking for vulnerable young individuals whom they can brainwash into doing unthinkable acts of violence. Professor Kruglanski offers valuable insight - - from a psychological perspective - - about the types of individuals who may succumb to radicalization. Unfortunately, there have been many impressionable and misguided individuals who have become radicalized over the internet, and carried out or attempted to carry out acts of violence, despite having no history of violence or prior arrest.[8]

The Impact of Radicalization on Fareed Mumuni

After reviewing all of the facts of this case, the Rule 16 discovery materials (including the videotape of the post arrest interrogation) and considering all of the social/psychological motivations, the question that looms large is what is the court to do with a young offender like Fareed Mumuni?

---

[7]    See, Pacific Standard Magazine (Online Edition); The Mind of a Terrorist; Written by Tom Jacobs; February 24, 2010.

[8] Of the 144 ISIS-related cases prosecuted by the U.S. Department of Justice, statistics show that 118 of the defendants had no prior history of arrest; See, The America Exception: Terrorism Prosecutions in the United States - The ISIS Cases (March 2014 to August 2017); Karen J. Greenberg, Editor; Center on National Security at Fordham Law School.

Certainly, Fareed Mumuni must be punished for his serious crimes but in accordance with the sentencing goals of Congress as expressed in 18 U.S.C. §3553(a).   However, Fareed Mumuni must be punished only for the crimes that he actually committed.  Not for crimes the government argues he could have done, not for the crimes the government argues he wanted to do, and not for crimes his co-defendant, Munther Saleh, tried to enlist him to do.

If we analyze the comparative roles of Fareed Mumuni and Munther Saleh in the conspiracy to provide material support to a terrorist organization, it is obvious that Munther Saleh was a manipulator who took advantage of Fareed Mumuni's devotion to his faith.  After all, it was Munther Saleh who introduced Fareed Mumuni to ISIL propaganda web sites and videos; it was Munther Saleh who "recruited" Fareed Mumuni for ISIL; it was Munther Saleh who had direct contact with overseas ISIS recruiters; it was Munther Saleh who told Fareed Mumuni when and where to meet; it was Munther Saleh who told Fareed Mumuni what to do; it was Munther Saleh who mentioned a pressure cooker bomb to Fareed Mumuni; and it was Munther Saleh who told Fareed Mumuni that it was considered acceptable to die fighting law enforcement if they prevented Fareed Mumuni from traveling to join ISIL in Syria.  Clearly, Munther Saleh was a leader of the conspiracy, while Fareed Mumuni was a "recruit".

As for the co-defendants' conduct at the time of their respective arrests, Fareed Mumuni's conduct was more serious, resulting in a charge of attempted murder of a federal agent.  However, everything that we now know about Fareed Mumuni - - both before and after his arrest - - demonstrates how truly unlikely it would have been for Fareed Mumuni to have found himself in that situation and to have engaged in such dangerous conduct, had it not been for the acquaintance, influence and encouragement of co-defendant Munther Saleh.

There is no dispute that federal agents faced substantial danger when they entered Fareed Mumuni's home to exercise a search warrant.  In fact, upon their entry, a radicalized Fareed Mumuni

16

lunged toward one of the agents with a kitchen knife in hand, in an unsuccessful attempt to commit suicide by cop.   In so doing, Fareed Mumuni committed the offense of attempted murder of a federal agent.

This court has wide statutory discretion and latitude to sentence Fareed Mumuni for up to twenty years imprisonment for the attempted murder of a federal agent.   In arriving at a reasonable sentence for this inchoate offense, there are a number of considerations that Fareed Mumuni asks the court to take into account.

First, is Fareed Mumuni's mental state at the time he committed the crime.   Fareed Mumuni was radicalized, which has become the popular term of art for someone who has been brainwashed by a terrorist organization.   While his mental state did not rise to the level of legal incompetency or insanity, it deviated greatly from societal norms.   As Fareed Mumuni told agents during his post-arrest statement, he was prepared to die that day.   Clearly, Fareed Mumuni was a very troubled young man, who did not see any future for himself, so he chose to engage in conduct which was entirely likely to result in his own death.

Second, is a lack of sophisticated planning.   Although Fareed Mumuni discussed the possibility of attacking law enforcement agents if they attempted to prevent him from traveling overseas to join ISIS, he did not go out looking for agents to attack, and his weapons of choice were two old kitchen knives, which he took from his kitchen cupboard.   While counsel fully realizes that those knives could have proven deadly, indeed, the reality is that they were not machetes, or tactical knives, or a gun.

Third, is the actual harm that resulted from Fareed Mumuni's actions.   Fareed Mumuni is aware of Special Agent Kevin Coughlin's victim impact statement during the sentencing of his co-defendant, Munther Saleh, and today, almost three years later, Fareed Mumuni thanks God for the agents' restraint, and the fact that they were highly trained and highly skilled agents who were able to disarm and arrest

him without serious injury or death to himself or any of the agents, themselves.  In fact, upon learning of Special Agent Coughlin's statement during our most recent meeting, Fareed Mumuni discussed how truly sorry he was for any emotional trauma he may have caused, and how important it was for him to be able to thank Special Agent Coughlin, as well as the other agents present, for saving his life.

Consideration of the actual harm is very important, because attempted murder comes in many different forms, and may result in a wide range of consequences to the intended victims.  For instance, if an assailant stands over a victim and empties a firearm into the victim's body, but the victim miraculously survives - - despite being in a coma and/or suffering catastrophic injuries, paralysis, loss of organs/limbs, blindness, etc. - - a legitimate argument could be made that such conduct calls for the imposition of a maximum sentence.  If an assailant opens fire at an intended victim who is standing in the middle of a crowd of people, but nobody is shot, a legitimate argument could be made that it would be appropriate to impose a high sentence, because of the incredible danger and callous nature of the act. If an assailant shoots or stabs a victim, but the victim is able to get away and suffers only non-life threatening injuries, a legitimate argument could be made that the appropriate sentence may be lower down along the continuum, perhaps closer to the middle of the sentencing range.  And in a case where an assailant attempts to stab a victim with a knife, but the knife does not penetrate the victim's body, a legitimate argument could be made that the appropriate sentence is even lower down along the continuum.

In our case, where Fareed Mumuni attempted to stab an agent with a knife, but the knife did not penetrate the agent's body armor, the court is left to decide where along the continuum such conduct falls and what type of sentence is sufficient but not greater than necessary to punish Fareed Mumuni.

Today, Fareed Mumuni's outlook is a far cry different than it was on that fateful day.  According to family members, his personality now resembles that of the aspiring young student he was before he met up with Munther Saleh and other wicked individuals who infected his consciousness with evil and hate.  During the course of many meetings with Fareed Mumuni, over the course of several years, counsel has observed this transformation, which continues to be a work in progress.  The person who shall appear before the court for sentencing is a bright young man who is both deeply ashamed and remorseful for his actions, but at the same time he is someone who knows that he cannot change the past or take back what he did.  Fareed Mumuni realizes that all he can do now is seek redemption and pray that this court will impose a sentence that is both reasonable and just.

Family History and Background - Beginnings In West Africa

The Mumuni family, on both his maternal and paternal side, have their roots and origins in the West African nation of Ghana.  Fareed Mumuni's father, Mohammed Habeeb Mumuni, was born and raised near the town of Kumasi, Ghana.  Fareed Mumuni's mother, Sala Mumuni (nee Van Dyke), was born near the infamous town of Cap Coastal or Cabo Corso.

Kumasi, the second-most-populous metropolitan area in Ghana, is the capital city of the Ashanti Region, in southern Ghana.  Although, Kumasi is known as a center for Ashanti culture and its famously huge, open-air markets, life in this West African nation remains a struggle.  Cape Coast is the capital of the Central Region, in southern Ghana.  Cape Coast, home to the Fanti, is mostly known for its role in the infamous transatlantic slave trade.  Overlooking the Gulf of Guinea, Cape Coast and Elmina are several large castles or forts built in the 17th century.  These forts were later used by the British slave traders as holding prisons for captured and enslaved Africans.  These majestic forts marked the beginning of an enslaved African's perilous journey during the era of the slave trade.  These fortresses were the last memory slaves had of their homeland before being shipped off across the

19

Atlantic Ocean to the so-called "New World," never to return again.[9]

Not only did the slave trade doom the lives of the enslaved, but ultimately served to decimate the economies of the once prosperous Ghana, known as the Gold Coast. Well into the post-colonial era and its independence, Ghana like many West African nations, continues to suffer from the enduring legacy of the transatlantic slave trade.

It is as a result of the economic struggles and lack of educational opportunities present in Ghana, that young Mohammed Mumuni immigrated to the United States in the late 1970's, to be later followed by his bride, Sala Mumuni, who immigrated to the United States in 1991. Immigrants from West Africa share the same goals as immigrants who come to this country from other nations around the world. Mohammed and Sala Mumuni decided to travel to the United States before having children. The young couple wanted their children to benefit from the great promise that life in the United States afforded to immigrants in the late 20th Century. And, it is out of this understanding of the sad legacy of the transatlantic slave trade, and its enduring impact on the lives of many West Africans, that young Mohammed and Sala journeyed to the United States and hoped to someday inspire their children.

Life in the United States (Mainland)

Upon their arrival in the United States, the young couple immediately found employment and began working to fulfill the promise of their new life in America. Most family members migrated to Staten Island, a place that has been their home for more than twenty five years. Mohammed Mumuni immediately found employment as a taxi driver, and has driven a taxi since he migrated to our nation.

Sala Mumuni has been a great beneficiary of the decision to migrate to the United States, as she

---

[9]      It is estimated that six million slaves had been shipped through the west African coastal area of Cape Coast/Elmina into an eternity of unspeakable brutality, horror and human misery. It is estimated that millions of enslaved Africans perished at sea during the so-called Middle Passage, never reaching their final destination. Patrick Manning, "The Slave Trade: The Formal Demographics of a Global System" in Joseph E. Inikori and Stanley L. Engerman (eds), *The Atlantic Slave Trade: Effects on Economies, Societies and Peoples in Africa, the Americas, and Europe* (Duke University Press, 1992), pp. 117-44, online at pp. 119-20

has found economic opportunities and social freedom denied to young girls born into the Muslim faith during her generation in Ghana. Sala Mumuni immediately found work as a Home Attendant, but she was not satisfied. So, she worked a full time job, studied at night and ultimately obtained her LPN in nursing, which, at the time, was a milestone of academic achievement for any woman in her family dating back to the time of slavery. Today, through her hard work and savings, Sala is the lawful owner of her family's home on Staten Island.

Although the children of their marriage benefitted from having both parents at home and working, it was Sala Mumuni who worked to ensure that her children benefitted from the promise of life in the United States. Both of their children, born in the United States (Maryam in 1991 & Fareed in 1994), were raised to have pride in their traditional West African history and culture, but were also inspired by the promise of education and hard work in the United States. Today, Maryam is a college graduate who serves in the United States Armed Forces as a Petty Officer Third Class in the United States Navy. On the morning of June 17, 2015, which was the date of his arrest, Fareed Mumuni was a graduate of Curtis High School in Staten Island, and a full-time student who was enrolled at the college of Staten Island.

As stated above, both children were raised in a traditional Islamic home to become productive citizens, to embrace acts of kindness, and above all, to respect authority and maintain faith in God. Prior to his arrest, Fareed Mumuni had an excellent, unblemished reputation as a "good kid." A quiet, kind and gentle young man, who never had any behavioral problems at school or within his community, nor any negative contact with the criminal justice system.[10] The letters from his family, friends and neighbors, (from all backgrounds, races and religions), are resolute and replete with praise for Fareed's

---

[10]     While in high school, Fareed Mumuni had a student-internship at the Richmond County District Attorney's Office, where he performed admirably. The letter of commendation, written long before his arrest in this case, provides insight into the outstanding qualities possessed by Fareed Mumuni prior to the corruption of his views and the influence of ISIL.

gentle, caring personality, as well as his generosity and reputation for peacefulness.  See, Exhibit A-1 through A-13.

All of the letters, including one submitted by a prior member of the United States Armed Forces, attest to Fareed Mumuni's good character and gentle personality.  It is, indeed, frightening, that out of this remarkable narrative of family achievement and individual success and character, the Probation Officer was not able to fins any evidence which would warrant a departure from the Guidelines (Part E) or a sentence a variance with the Guidelines (Part F), and that the government prosecutors are of the view that the offender is incapable of redemption, warranting the imposition of a sentence of 1200 months incarceration.

It is perplexing that the government has taken such a view in a case where, thankfully, not a single person was harmed; and where the offender has a college education, no prior history of violence whatsoever, and who within an hour of his arrest waived his rights and provided the government a full, accurate and truthful account of his involvement in the charged criminal conduct.  It is precisely this type of insensitivity to the life narrative of offenders such as Fareed Mumuni and his family, and the adherence to the robotic application of the guidelines, which has led to the modern phenomena known as *"Mass Incarceration."*  See, *United States v. Bannister*, 617 F.Supp.2d 617, 649-652 (EDNY 2011)(Weinstein, J).

Post Arrest Interview of Fareed Mumuni

On June 17, 2015, just moments after lunging at law enforcement officers, and according to the government, grabbing for their firearms, Fareed Mumuni sat quietly in the custody of law enforcement. Fareed Mumuni was later given his *Miranda* warnings and proceeded to wave his 6th Amendment right counsel and his 5th Amendment right against self incrimination.   Fareed Mumuni then engaged law enforcement in a candid conversation about the circumstances of his arrest, and his relationship and

conversations with co-defendant Munther Omar Saleh.  Agents informed Fareed Mumuni that in their experiences, "*people who help themselves in the beginning and come forward and speak with us, they usually fair the best in the long term.*"  (9:08:38 to 9:08:48; and 9:14:10)[11]   With that admonition and advice, Fareed Mumuni engaged the agents in an insightful, candid and truthful question and answer session over the next one hour and fifty minutes.

During the lengthy interview, Fareed Mumuni took full responsibility for his conduct which led to his arrest in this case, as well as his relationship with Munther Omar Saleh.  He also responded truthfully to the agents inquiry about whether Fareed Mumuni had participated in any planned action to attack the United States or harm its citizens and/or whether he was aware of any such plan by any individuals.  Fareed Mumuni denied that he participated in such plans, and stated that he had no knowledge of any person who was involved in the planning of such an attack.[12]

From the very outset of the interview, Fareed Mumuni candidly informed the agents that he had met Munther Omar Saleh at the College of Staten Island, and that they had conversations about Islam and events related to the Islamic State.  Fareed Mumuni informed the agents that they had only met perhaps six times over a three year period, but that they kept in contact by telephone and text messaging. (9:10:00 -17).  Fareed Mumuni explained how he became interested in the Islamic State (due to the loss of life of fellow Muslims in Syria and other places), and that he later pledged allegiance to the Islamic State "*to himself*" (9:11:59 to  9:12:10-43), and was inspired to join the Islamic State.

---

[11]     Fareed Mumuni requests that the court review the one hour and fifty minute interrogation and interview in preparation for his sentencing.  During this interview, which is approximately one hour and fifty minutes, the court will have an opportunity to assess the quiet demeanor and responsiveness of Fareed Mumuni to the questions posed to him by the agents.  The time references are to those time locations where the quoted language can be found on the videotape (a copy can be provided by defense).

[12]     Fareed Mumuni responded to specific questions about (1) Munther Omar Saleh's intention to make and use a pressure cooker bomb; and/or (2) whether anyone ever requested, at any time, that Fareed Mumuni engage in any attacks against the United States and/or harm any of its citizens or (3) whether he was aware of any such attacks against the United States and/or harm any of its citizens.  See, Exhibit B, Summary Chart, time location (1) 9:23:50; (2) 9:24.20 to 9:24.24; (3) 9:29:00 to 9:30:09; (4) 9:31.49 to 9:30:09; (5) 9:31:49 to 9:32:15; (6)  9:31:16 to 9:33:18; (7) 9:33:55 to 9:34:28; (8) 9:35:30; (9) 9:35:42 to 9:36:10; (10) 10:07:20 to 10:08:10; (11) 10:40:20 to 10:51:28; (12) 10:57:30 to 10:59:00.

Fareed Mumuni informed the agents that his long term goal and plan was to travel to the Islamic State.  (9:14:00 to 9:15:25)  However, Fareed Mumuni explained that although he looked up the price for air travel by selecting random dates, and that he wanted to travel to Turkey, and from Turkey to Syria, there was "nothing set in stone," as he did not have any money for the plan or to travel.  (9:55:49 to 9:56:10)  In addition, Fareed Mumuni informed the agents that he did not know any person who actually traveled to the Islamic State, and that he did not know of any person who could help him travel (9:20:35).  Other than looking up dates, and saving for his trip, Fareed Mumuni informed the agents that he did not do anything further to reach the goal of traveling abroad to join the Islamic State.  (9:19:40; 9:20:30 to 9:21:00)

Fareed Mumuni fully discussed his meeting with a friend of Munther Omar Saleh, named Sam Topaz.  (9:16:20 to 9:17:00)  It is from this meeting and others with Munther Omar Saleh that the government and the PSR engages in the conjecture that Fareed Mumuni "*may have been involved in Saleh's planning for a terrorist attack*."  See, PSR, ¶ 15, page 6.  However, Fareed Mumuni fully explained his interaction with Sam Topaz (who Fareed only met on one occasion through Munther Omar Saleh).  Fareed Mumuni explained that when they met in downtown Manhattan with Sam Topaz - only one time [9:49:38 - they were just hanging out, and they talked about Islam, and the struggles that he had as a Muslim in the United States, and what they could do.  (9:16:20)  Fareed Mumuni explained that he took Munther Omar Saleh's acquaintance to Dick's Sporting Goods (Staten Island), and Payless to buy boots and sandals.  Fareed Mumuni stated that he was not aware of Topaz's intentions, but that he could only assume, since he was a believer.  Fareed Mumuni informed the agents what they talked about, that there was no plan, and that they were just talking about what each person wanted to do.  (9:17:59)(9:19:29)

No Plans For An Attack Against Americans

Fareed Mumuni informed the agents that "no person ever gave me any guidance (information) or advice to do anything in the United States."  (9:23:53)  Fareed Mumuni repeatedly informed the

agents that the only thing he discussed with Munther Omar Saleh, was that he (Fareed Mumuni) wanted to travel to the Islamic State, and that he intended to fight back and defend himself, if law enforcement tried to prevent him from doing so. Fareed Mumuni explained that there was no plan, other than to fight back if he was stopped, and agreed with the agents that "that was what he did" earlier that morning (during the law enforcement search of his family home). (9:24:50).

The agents specifically and repeatedly asked Fareed Mumuni, whether Munther had discussed taking any action in the United States. Fareed Mumuni, stated that other than his intention to fight back if stopped, there was no discussion of any plans to do anything in the United States. (9:29:49 to 9:26:10) Fareed Mumuni explained to agents that he and Munther Omar Saleh discussed "if they come after me, fight back and to die fighting back;" (9:27:00) that "I was willing to die today . . . To become a member of the Islamic State or to die trying." (9:27:24)

In relation to Munther Omar Saleh's intentions, Fared Mumuni informed the agents that Munther Omar Saleh had previous talked about how to make a bomb (9:29:19), and that "Munther said he knew something about how to build a bomb. That was it." (9:32:50 to 57 ) Munther Omar Saleh never discussed any details, nor showed him anything about bomb making. (9:33:10 to 17) Fareed Mumuni informed the agents, truthfully, that there was never any joint plan, agreement or offer to participate in Saleh's plan. Munther Omar Saleh was just telling him (Fareed), what Munther (could and would do).

Fareed Mumuni explained to the agents that "*He would die not as a Martyr. In all honesty acted to protect myself, from the humiliation of going to jail on bogus charges.*" (9:36:40 - 9:38:40) In response to the agents inquiry in relation to a search warrant being executed at his home, Fareed Mumuni stated that he was <u>not</u> in possession of any materials to show that he supported the Islamic State, nor was he in possession of instructions to build pressure cooker bombs or any other similar items. Fareed stated there was

25

nothing other than a flash drive containing Tails - popular security software program.[13]   (9:56:18 - 9:57:00)   Fareed provided the agents with the password for entry into his phone  (10:01:55 to 10:02:22) and informed them that nothing would be found there.  (10:08:10)

Fareed Mumuni admitted to the agents that he agreed to being a supporter of the Islamic State. (9:47:10 to 9:47:30) and that he was being encouraged by a person on line how to make Hijrah. (9:54:00)  Fareed Mumuni candidly told the agents about the knife, and exactly what he did as the agents entered his home with guns.  (10:03:24 to 10:04:26)  Fareed Mumuni honestly told the agents that he kept the kitchen knife in his bedroom in "preparation," and that he attacked the agents when they entered the home with guns drawn. (9:38:40).

In response to his quiet demeanor and cooperativeness, the agents remarked about Fareed behavior once taken into custody: "*You have been nothing but respectful and cooperative, since we placed you in the car.  It will only help you.*"  (10:05:10 to 10:06:20)  Fareed Mumuni wanted to know if he could pray in prison.  (10:06:05)

Out of a sense of urgency and obvious importance, towards the end of the interview, Fareed Mumuni was again specifically asked if he was aware of anyone who was planning or trying to harm the United States.  Fareed Mumuni specifically responded that "*Nobody has never asked me to do harm to the US or any of it's citizens.*"  (10:07:20 to 10:07:36)  Fareed stated that he did not even hang out with anyone who discussed, amongst themselves, harming the United States or its citizens.  (10:07:50)

When Fareed lost internet contact with the person talking to him about Hijrah, Fareed informed the agents that he contacted Munther Omar Saleh, on June 14, and asked if Munther Omar Saleh knew anyone else who could help him get there (Islamic State).  (10:09:30 to 10:10:20)  Fareed Mumuni,

---

[13]     *Tails* or The Amnesic Incognito Live System, is a state-of-the-art internet security-focused cryptographic tool to encrypt computer files, emails and instant messaging for preserving privacy and anonymity.

however, completed the interview by informing the agents that while Munther Omar Saleh talked about a pressure cooker bomb, he did <u>not</u> talk about or discuss with Fareed Mumuni a plan to use such a device here in the United States, if he was unable to get to go overseas.  (10:57:50 through 10:59:00)

<u>Method of Interrogation Designed to Seek the Truth</u>

During the interview, the agents engaged in several tactics to obtain information from Fareed Mumuni.  Of special interest was the line of inquiry about a pressure cooker bomb.  Unknown to Fareed Mumuni was, that as a result of judicially authorized electronic surveillance and physical surveillance, the investigating agents had discovered that Munther Omar Saleh and another co-conspirator (not Fareed Mumuni or a person connected Fareed Mumuni) had searched online for items associated with components for constructing an explosive device, (See, PSR, ¶12, page 5) and that Munther Omar Saleh had emailed himself information from the internet on how to construct a pressure cooker bomb (See, PSR, ¶11, page 5).

Since Fareed Mumuni was not part of these discussions, email trail or internet search, the agents peppered him with many questions about this subject matter.  The agents inquired as to whether Munther Omar Saleh's statements to Fareed Mumuni, that he had knowledge of a pressure cooker bomb, was part of a concerted plan to conduct a domestic pressure cooker bomb attack.  The agents further suggested to Fareed Mumuni driving Munther Omar Saleh's friend Sam Topaz to buy a pair of boots and sandals for a planned trip to visit family in Iran, was part of a plan to assist Topaz with equipment for travel to join the Islamic State.  Fareed Mumuni assured the agents that he was not part of any such plan; that he did not discuss any such plan; and finally that he was not aware of any persons (including Munther Omar Saleh) who were actually contemplating or planning a domestic attack against the United States or to harm American citizens.  See, Summary Chart, time location (1) 9:23:50; (2) 9:24.20 to 9:24.24; (3) 9:29:00 to 9:30:09; (4) 9:31.49 to 9:30:09; (5) 9:31:49 to 9:32:15; (6)  9:31:16 to

9:33:18; (7) 9:33:55 to 9:34:28; (8) 9:35:30; (9) 9:35:42 to 9:36:10; (10) 10:07:20 to 10:08:10; (11) 10:40:20 to 10:51:28; (12) 10:57:30 to 10:59:00.

The effort by agents, though understandable and entirely lawful, only served to reveal the indisputable truth.  No individual, including Munther Omar Saleh, ever requested that Fareed Mumni agree to participate in any domestic plot against the United States or to harm any American Citizens.  The only activity that Fareed Mumuni stated he would do, was that if arrested, he would fight back, and was prepared to die, rather than face the humiliation of being arrested, on what he described as bogus charges.  (9:36:40)  In the absence of any proof, the PSR and government have stood behind conjecture, and now request that this court impose a sentence of 1200 months based, in substantial part, upon claims without any evidence of reliability.

Fareed Mumuni's Statements are Corroborated

It is inescapable that Fareed Mumni's statements during his interrogation are supported by the other objective evidence in this case.  First, a review of the Rule 16 materials, in this case, including the information disclosed in the complaint report, demonstrate that when the agents appeared at his home on the morning of June 17, 2015, they were in possession of an search warrant, not an arrest warrant.

Other than a kitchen knife seized from the trunk of the Fareed Mumuni's vehcile, after a search of his home and automobile, the agents did not uncover any documents, information, literature, ingredients, plans, manuals or materials for the planning or execution of a domestic attack and the United States or to do harm to American citizens.   The search of the automobile and family home, was entirely consistent with the truthful statements made by Fareed Mumuni during his lengthy and engaging interrogation.  From this complete lack of information, the government has made unsupported and uncorroborated conclusions to the contrary.   Fareed Mununi stated that he would not have associated with anyone who requested that he engage in such a plot (10:08:10).

The evidence and truthful information known to the investigating agents supports and corroborates Fareed Mumuni's clear statement that he did not agree or associate with any person who requested or suggested that he participate in a plan to engage in an attack against the United States or to harm American citizens.[14]

Finally, the defense requests that the court review the interrogation of Fareed Mumuni to reach its own conclusions. The defense is of the view that the statements made by Fareed Mumuni were candid and truthful.[15]   In addition, the court a review of the video interview will provide the court with an opportunity to observe and evaluate the demeanor of Fareed Mumuni, as a young college student with no prior history of any violence whatsoever, within hours of the knife wielding attack upon law enforcement.   And, even the idea of the knife attack did not originate with Fareed Mumuni; it was the result of the guidance and instruction that Fareed Mumuni was given, in substantial part, by Munther Omar Saleh.   (9:24:00 to 9:24:24)

Throughout the interview, Fareed Mumuni is neither hostile, nor belligerent, nor spewing invectives against the United States or its citizens. To the contrary, Fareed Mumuni's quiet, respectful demeanor is seen throughout the nearly two hour interrogation, as he answered the many questions put to him by the agents. Fareed Mumuni is seen on the video quietly listening to questions and thoughtfully, and thoroughly responding to the questions and suggestions being put to him by the

---

[14]     At various stages of these proceedings (the complaint and during the entry of the guilty plea), the government has asserted that Fareed Mumuni agreed to join and participate in a domestic attack against the United States, and/or to harm citizens of the United States.   See, Complaint, ¶ 3, page 2.   After meeting with the government to specifically address the source of the allegations in the complaint and the statements made by, and objected to by the defense, at the time of the entry of the guilty plea, the defense has yet to be presented with this information.   Fareed Mumuni has no objection to the court reviewing the Classified information to determine for itself whether there is any basis for (1) the allegations in paragraph 3 of the complaint, (2) the statement made by government prosecutors at the time of the entry of the guilty plea and (3) the conclusory conjecture proclaimed in the PSR that Fareed Mumuni "*may have been involved in Saleh's planning for a terrorist attack.*"  See, PSR, ¶ 15, page 6.

[15]     There is no suggestion that Fareed Mumuni's statements were false or misleading thereby serving as a basis for a violation of 18 U.S.C § 1001. To the contrary, the agents stated to Fareed Mumuni that they appreciated that he was candid and truthful during the interrogation.   (10:07:20)

interrogating agents.

This observation is corroborated by the agents themselves, who remark to Fareed Mumuni that "*since he was place into the car, he has been respectful.*" (10:05:10)  Fareed Mumuni's demeanor and willingness to answer critical and urgent questions posed to him is entirely inconsistent with the view that Fareed Mumuni is irredeemable, and should be sentenced to 1200 months in prison as recommended by the government prosecutors.

Fareed Mumuni recklessly engaged in intentional conduct that put our law enforcement agents (and himself) at great risk of harm, and he must be punished severely for his conduct.  However, Fareed Mumuni's quiet, responsive and respectable demeanor during his interview begs the question of how did this quiet, respectful young college student, without any prior history of violence, come to this point in his life?  How did he get here, wanting to attack officers and die rather than being arrested on "bogus" charges?

Imam Siraj Wahhaj, the outstanding and highly respected Imam at the *Al-Taqwa* mosque in Bedford-Stuyvesant, Brooklyn, New York, and the leader of The Muslim Alliance in North America, offered an explanation, upon consultation by defense counsel.  Imam Shiraj Wahhaj has indicated that many young Muslims living in the United States are given an inaccurate view of Islam.  That a genuine interest in Islam by many young people has and continues to be corrupted by those, both domestically and internationally, who have a political agenda to exploit and convert genuine and sincere interest into support for a radical political agenda.  Imam Siraj Wahhaj has stated that many American youth, like Fareed Mumuni, who are good kids from solid families, have been targeted by those who wish to exploit them to advance an agenda of hatred and destruction, under the guise of Islam.  After reviewing the lengthy videotape, Imam Siraj Wahhaj observed: "Fareed Mumuni, who appears to be a peaceful young man,  has a very confused and inaccurate view of Islam."  Fareed Mumuni's reasons for wanting to

make Hijrah to assist Muslims who are being killed is admirable, and to date, is a genuine expression of the Islamic faith.  However, his desire to "die" if prevented from traveling on bogus charges, and to attack law enforcement, has no foundation in Islamic philosophy.  According to Imam Siraj Wahhaj, such a conclusion is a corruption of Islam, which he (as an Imam in an urban inner city community) as well as other Imams, struggle mightily to confront and overcome through their interactions with young Muslims.

The idea of attacking police officers engaged in their duty is an aversion, which others inspired and encouraged this otherwise law abiding young college student to engage in.  After nearly 3 years in detention, and having has ample opportunity to reflect upon his thoughts and actions leading up to June 17, 2015, Fareed Mumuni deeply regrets his decisions and has begun to understand how others had corrupted and influenced him, and many other young Americans to engage in conduct completely contrary to their upbringing.

The Life Journey Ahead - Rehabilitation and Redemption

Many years ago, as a young lawyer at the very beginning of my career, I appeared before the Hon. Leroy Kellum, a long retired and now deceased state court judge, who observed in his consideration of an appropriate sentence for a first time offender, that the "first step towards rehabilitation is recognizing that you have made a mistake and taking steps to correct that mistake."

In this case, Fareed Mumuni has taken that important first step, by recognizing that he made an awful mistake in judgment which jeopardized the lives of law enforcement officers, as well as his own life and safety, and he took a big step to correct this mistake by accepting early responsibility and cooperating with the government investigators on the date of his arrest.

According to the interrogating agents, Fareed Mumuni became cooperative from the moment he was handcuffed and placed in the vehicle, and was being transported to law enforcement offices for

31

to be processed for arrest.  At those offices, Fareed Mumuni waived his right to counsel and candidly and truthfully responded during a nearly two hour question and answer session wherein the agents were not just concerned with Fareed Mumuni's conduct, but whether he had any knowledge of any imminent threats of any planned attacks against the United States and/or to harm its citizens.  Fareed Mumuni, fully understood the urgency of such questions, and responded candidly, thoughtfully, thoroughly and most important: truthfully.   In so doing, Fareed Mumuni took a giant step towards his redemption.

History of Employment/Post Arrest Rehabilitation

Counsel is of the view that Fareed Mumuni remains a work in progress, and that he is capable of seeking his redemption and becoming a positive influence in our society.  Counsel's view is based upon Fareed Mumuni's modest history of employment during his young adult life, and his post arrest achievements while detained with the BOP.

As the court can determine from the PSR, Fareed Mumuni maintained employment during high school and college years, including an impressive internship with the Richmond County District Attorney's Office, and later as a Home Health Care Worker, while attending College.  See, PSR, ¶ 83 to ¶ 86, page 16.  Fareed Mumuni is proud of these accomplishments, which may seem marginal to many.  However, his employment as a teen and later young adult clearly demonstrates that his parents were successful in providing him with the tools for success in the American culture (education and hard work), and also represents that Fareed Mumuni possesses the requisite skill set for seeking his redemption.

In addition to the foregoing, since the time of his arrest, Fareed Mumuni has maintained an unblemished institutional record while in the custody of the Bureau of Prisons.  Over the past 33 months, Fareed Mumuni has a positive job performance rating ("He is well organized, dependable, timely, and brings a positive attitude to his work"), and has utilized his time taking courses, which include "Entrepreneurship" and "Tutor Training".  Fareed Mumuni is interested in using his college

education to assist and tutor other detainees who are studying in the BOP G.E.D. program, and helping them prepare for their re-entry into society. A positive influence, and another sign of Fareed Mumuni's character and potential for redemption.

Finally, hardship to family members is usually reserved for those circumstances where the defendant's incarceration shall impact the economic stability of a family, where the defendant is the primary care-giver of young children or for a disabled or elderly family members.[16] However, in this case, imposing a Guideline sentence of 1200 months will create an unfathomable hardship upon the spiritual well being of a family that has worked so hard to overcome the economic deprivation endured in West Africa, for the promise of life in the United States. Sala Mumuni struggled mightily to provide her children which educational opportunities and positive spiritual and moral guidance. The reality that her only son, a well loved and admired college student, faces 1200 months prison is a devastating possibility that has left Sala Mumuni searching for an understanding of how such a promising life could be so swiftly derailed. And, while such a factor may not resonate with government prosecutors, it is indeed a powerful hardship and consequence of the imposition of a substantial prison sentence, which Congress did not exclude when it enacted 18 U.S.C. §3661.

In addition to the letters of support, Fareed Mumuni has written to the court and has expressed his true remorse. Indeed, Fareed Mumuni, at age 21, made a terrible mistake in judgment. A mistake in judgment which, thankfully, due to the professional response of a highly trained group of agents, did not result in any further injury to anyone - including Fareed Mumuni. At this juncture, counsel is certain that Fareed Mumuni, a quiet and intelligent, but rather naive young man, has begun the long journey towards his redemption. However, Fareed Mumuni cannot make the journey alone. He desperately requires the wisdom and judgment of this court to assist him. Fareed Mumuni understands that he must

---

[16]     The pre-*Booker* era, the Second Circuit did not support a departure from the guidelines based upon family hardship in the absence of extraordinary compelling circumstances. See, *United States v. Madrigal*, 331 F.3d 258, 260 (2d Cir. 2003)( other relatives could meet the family's needs); *United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003)(defendant was not the sole care giver of the children); *United States v. Faria*, 161 F.3d 761, 762-63 (2d Cir. 1998); *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997).

be punished for his crimes, but he also needs hope for the future.

Fareed Mumuni prays for a sentence at variance with the Guidelines that will not destroy in him the precious aspiration which has survived and motivated the mighty narrative of this family of West African immigrants seeking promise in the United States - "*hope*." A sentence at variance with Guidelines can more than appropriately and adequately to punish Fareed Mumuni and to protect the public from the diminishing likelihood of his future criminal conduct.

The government's over-reaction, only contributes to the phenomena of "Mass Incarceration" and warehousing, which is finally being exposed as an ineffective method of addressing criminal conduct and fulfilling the sentencing goals of Congress. The "lock me up" and "throw away the key" concept is a draconian view of punishment that has lost its viability in modern society - - particularly, where, as here, the conduct, though serious, involves a first time offender, college educated offender, with absolutely no prior history of violence, from an outstanding law abiding family, which has the capacity to contribute and guide him beyond the worst moment of his young life.[17]

Therefore, on behalf of Fareed Mumuni, his parents, and his extended, law abiding family, it is requested that court impose a sentence at variance with the horrific guideline calculation, which, if imposed, would destroy the life of this young, first time offender.

## IV. Application of Law at Sentencing

In the post-*Booker* era, however, the Supreme Court has made clear that sentencing courts must consider the individualized circumstances of a defendant's background, and that they are no longer mandated to follow the policy decisions of the Sentencing Commission. See, *Pepper v. United States*, 131 S.Ct. 1229, 1247 (2011). This is particularly important where the Sentencing Commission's policy decision is contrary to public policy decisions enacted into law by Congress as set forth in 18 U.S.C.

---

[17]     It should not escape notice that young Fareed Mumuni is at the threshold of his life journey. Fareed Mumni does not have any children and has yet to establish a romantic interest. Fareed Mumuni is presently interested in completing his college education and helping others in BOP custody to transition back into society, through academic tutoring.   See, Exhibit A-17.

§3553(a)(1); 18 U.S.C. §3661.  When the powerful factors related to Fareed Mumuni's history and character are not considered in relation to the Guidelines, and are not considered in relation to a sentence at variance with the Guidelines, his right to individualized sentencing is violated.

In *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011), the Supreme Court held that a sentencing court may consider conduct specifically prohibited by the Guidelines.

The Supreme Court observed

> "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).

A sentencing calculation (the Guidelines) which focuses only on the offense, but does not include, in its calculation, the individual characteristics of the defendant is unreasonable.  See, *United States v. Olhovsky*, 562 F.3d 530, 549 (3rd Cir. 2009).  Sentencing courts have a duty to consider the full range of specific characteristics of defendants, along with a consideration of the circumstances of the offense, in determining an appropriate sentence.  Therefore, the presentment of the fullest information possible concerning the defendant's life and characteristics is highly relevant, if not essential, to the selection of an appropriate sentence.  *Pepper v. United States*, 131 S.Ct. at 1240; *Williams v. New York*, 337 U.S. 241, 247 (1949).

Inclusion of the widest breadth of information concerning the offender's background and history ensures that the punishment will suit not merely the offense (as is the primary focus, and perhaps responsibility, of the government) but also the individual characteristics and background of the defendant (which is the mandate of Congress).  *Pepper v. United States*, 131 S.Ct. at 1240; *Wasman v. United States*, 468 U.S. 559, 564 (1984); See also, 18 U.S.C. §3661.

## V.  Conclusion

The information about Fareed Mumuni's life narrative is not provided as an excuse, nor as an

attempt to shift blame.  As stated above, Supreme Court case law and statutory authorities clarify that mitigation evidence in relation to the background and history of an offender is not offered as an excuse or justification for engaging in criminal conduct, but rather as important information supporting mitigation of the length of sentence or type of punishment to be imposed as a result of the defendant's criminal conduct; and for showing his potential for redemption.  See, *Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246  (2007); See also, 18 U.S.C. §3661 and 21 U.S.C. §850.  The conditions present in Fareed Mumuni's life, and the historical facts which influenced his life, are relevant to the length of the sentence or type of punishment to be imposed as a result of his criminal conduct.

For the reasons set forth above, it is requested that the court impose a sentence at variance with the Guidelines pursuant to 18 U.S.C. §3553(a).   It is clear to counsel, who for the past three decades has represented young men and women in over 50 death eligible cases across our nation, that with guidance, direction and hope, Fareed Mumuni is a person who is well capable of redemption, and deserving of leniency in this case.

Dated: New York, New York
        March 29, 2018

Respectfully submitted for *Fareed Mumuni*

*Anthony L. Ricco*

Anthony L. Ricco, Esq.

Steven Z. Legon, Esq.
Kenneth J. Montgomery, Esq.
Of Counsel and on the Memorandum