

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AAS/DMP/ICR
F. #2015R00096

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 19, 2018

By Hand Delivery (with enclosures)
<u>By ECF (without enclosures)</u>

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Fareed Mumuni
     <u>Criminal Docket No. 15-393 (MKB)</u>

Dear Judge Brodie:

  The government respectfully submits this letter to supplement its January 12, 2018 sentencing submission ("Gov't Mem.") to respond to arguments raised in defendant Fareed Mumuni's sentencing submission dated March 29, 2018 ("Def. Mem."). In his sentencing memorandum, Mumuni challenges several aspects of the Presentence Investigation Report ("PSR") and requests imposition of a non-Guidelines sentence. The government responds below to each of these arguments. Mumuni is scheduled to be sentenced on Thursday, April 26, 2018 at 2 p.m.

 A. <u>The Court Should Reject Mumuni's Challenges to the PSR</u>

  While disclaiming any request for a full evidentiary <u>Fatico</u> hearing, Mumuni contends in pertinent part that the PSR errs in (1) describing Mumuni's attempted murder of an FBI agent to consist of multiple knife thrusts to the agent's torso and a subsequent effort to seize and discharge another agent's firearm and (2) attributing to Mumuni conspiratorial acts in furtherance of a plot to conduct a domestic terror attack. Mumuni contends that he thrust a kitchen knife only one time into the torso of the FBI agent and made no efforts to use an agent's weapon, and that he played no role in plotting a domestic terror attack. These arguments are meritless.

  *First*, the evidence is clear that Mumuni stabbed Special Agent Kevin Coughlin violently and repeatedly. Agent Coughlin's statement during the sentencing of Mumuni's coconspirator, Munther Omar Saleh, confirms that Mumuni stabbed him

repeatedly ("I look down and I see the knife strike my vest on my left side, multiple times.") and that Mumuni attempted to seize and discharge another agent's firearm ("I see him reach up and grab the trigger and the handle of the M-4 of the other operator that has an M-4 kind of slung in front of him . . . . I say he is going to your gun.").[1] Agent Coughlin's statement is corroborated by photographs of the hard plastic magazine carrier worn by Agent Coughlin, which show three different stab marks in the carrier, consistent with at least three different thrusts of the knife by Mumuni. The photographs attached to the Elmore Affidavit submitted with the government's January 12, 2018 sentencing memorandum show three different indentations in the magazine carrier resulting from Mumuni's attack. (See Gov't Mem., Exhibits Bates Numbered FM 177 through FM 179). In fact, photographs of Mumuni's knife following the attack show that Mumuni struck Agent Coughlin with such violence that the tip of the knife broke off. (See id., Exhibits Bates Numbered FM 140 & FM 142).

*Second*, the evidence in this case demonstrates that Mumuni conspired with Saleh to conduct a domestic terror attack.

As an initial matter, Mumuni's attack on law enforcement in June 2015, conducted on behalf of ISIS, was itself a domestic terror attack. As described in detail in the government's January 12, 2018 sentencing memorandum, after Mumuni received guidance from Saleh—who himself sought and received such guidance from ISIS attack facilitator Junaid Hussain—that dying in an attack on law enforcement would be religiously permissible, Mumuni secreted knives in his bedroom and in his vehicle for use in a premeditated attack on members of law enforcement. Mumuni then used one of these knives in his attack on Agent Coughlin on June 16, 2015; he struck Agent Coughlin with sufficient force to break the tip of the knife. Notably, Mumuni conducted the attack the day after learning of Saleh's arrest in this case, consistent with the agreement with Saleh as described in Mumuni's post-arrest statement to "[f]ight back" and "defend [him]self" rather than being taken down by law enforcement authorities. (Mumuni Post-Arrest Tr. at 12-13).[2]

To the extent Mumuni's objection to the PSR focuses on the conspiracy between Saleh and Mumuni to use a pressure cooker bomb in an attack, there is also sufficient evidence to demonstrate Mumuni's involvement in such a conspiracy. In Saleh's communications with ISIS attack facilitator Junaid Hussain, Saleh wrote, referring to Mumuni, "i have an akh [brother] who is planning on hitting a black car cop with a pressure cooker, the black car keeps following him, and he wants to avenge our akhs [brothers] who have been raided and blocked from hijrah [migration]. Is it permissible for him to do the attack and die purposely in the process?" Mumuni admitted in his post-arrest statement that Saleh agreed to provide Mumuni a pressure cooker bomb for Mumuni to use, "if I can't go [to Syria] and you guys [the FBI] don't stop following me that I would do something with

---

[1] A copy of Agent Coughlin's statement is attached to this letter as Exhibit 1. The government anticipates that Agent Coughlin will speak at Mumuni's sentencing as well.

[2] A transcript of Mumuni's post-arrest statement is attached to this letter as Exhibit 2.

2

the pressure cooker." (Mumuni Post-Arrest Tr. at 22-26). These statements are sufficient to show Mumuni's agreement with Saleh to use a pressure cooker bomb in an attack on law enforcement.

Moreover, two cooperating witnesses who conspired with Mumuni and Saleh to provide material support to ISIS and who have provided information corroborated by other evidence in this case have similarly informed the government about Mumuni and Saleh's conspiracy to conduct a domestic terror attack in the New York area.

One cooperating witness ("CW1") informed the government that Mumuni was "planning to do something here," which CW1 understood to mean a violent attack in the United States. While speaking with CW1, Mumuni mentioned Times Square and the Freedom Tower as potential targets in an attack involving some type of explosive device, such as a propane tank bomb or other improvised explosive device, or a simpler method of attack. When CW1 stated that he did not believe that such an attack would be appropriate, Mumuni responded that, since he could not travel to Syria to join ISIS, executing an attack in the United States was "almost the same thing." During this conversation, Saleh showed communications on his phone obtained from ISIS containing instructions for constructing explosive devices to Mumuni and CW1. After Mumuni encouraged Saleh to conduct an attack with him, Saleh indicated that he could acquire the components inexpensively.

Similarly, another cooperating witness ("CW2") who met with Mumuni and Saleh confirmed that Mumuni and Saleh agreed to conduct an "Op"—meaning a domestic terror attack—if they were unable to travel to Syria to join ISIS.

Citing Mumuni's conclusory claim in his post-arrest interview that he would never have used a destructive device, Mumuni now argues that he cannot be responsible for a plot to conduct a bomb attack.[3] Given the evidence set forth above, including the electronic communications between Saleh and Junaid Hussain, Mumuni's own statements, and the information from the cooperating witnesses regarding Mumuni's involvement in the conspiracy to conduct an attack in New York, the Court should not credit Mumuni's own self-serving exculpatory statements that he made at a time when he had every incentive to minimize his criminal conduct. It was only the continuous efforts of law enforcement authorities—including the near-constant surveillance and arrest of Saleh—that caused Mumuni to resort to a cruder attack involving a kitchen knife (and the eventual attempted use of the agent's firearm).

---

[3] In his sentencing memorandum, Mumuni states that, in a meeting with the government shortly before the plea allocution, the government was unable to provide any information to his counsel regarding evidence that he made efforts to participate in a domestic terror attack. (See Def. Mem. at 4 n.2 & 29 n.14). In fact, the purpose of that meeting was for the government to share with defense counsel certain classified evidence, which the government did. The government declined to answer questions regarding these classified materials.

B. The Court Should Impose a Guidelines Sentence

While acknowledging that Mumuni's conduct at the time of his arrest "was more serious" than Saleh's because it involved an attempted murder of a federal agent (Def. Mem. at 16) and that Mumuni "must be punished severely for his conduct" (id. at 30), Mumuni argues for a non-Guidelines sentence based on, among other things, his supposed lack of sophisticated planning and the claimed lack of actual harm resulting from his attack. (See id. at 17-18).

In arguing that Mumuni's attack demonstrates a lack of sophisticated planning, Mumuni ignores that his attack was a premeditated and planned attack. As discussed in the government's January 12, 2018 sentencing memorandum, after Mumuni was subjected to law enforcement surveillance, he kept a knife in his bedroom and another in his car so that they would be there for him to use if he were stopped by law enforcement. When law enforcement came to his house to execute the search warrant, Mumuni grabbed the knife that he kept in his bedroom, knowing and planning to use it to attack law enforcement. He then carried out that attack, concealing the knife from agents as he came down the stairs from his bedroom so that the agents would not know the attack was coming. Mumuni struck Agent Coughlin with such violence that the tip of the knife broke off. Were it not for the protective gear Agent Coughlin was wearing when he entered Mumuni's residence, the Court would likely be sentencing the defendant for the murder of a federal law enforcement officer.

That Mumuni's knife attack did not pierce Agent Coughlin's body armor is not a basis for a downward departure. In United States v. Jayyousi, 657 F.3d 1085 (11th Cir. 2011), the Eleventh Circuit, citing its own and Fourth Circuit precedent, held that the district court had

> substantively erred in reducing [the defendant's] sentence based on the fact that [he] did not personally harm anyone and his crimes did not target the United States. . . . We held in a pre-Booker case that a district court may not reduce a sentence of a terrorist because the terrorist committed an inchoate crime. Mandhai, 375 F.3d [1243,] 1249 [(11th Cir. 2004)]. Post-Booker, the Fourth Circuit has held that '[t]o deviate [a sentence downward] on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct.'

657 F.3d at 1118 (quoting United States v. Abu Ali, 528 F.3d 210, 264 (4th Cir. 2008)). In Abu Ali, the Fourth Circuit reversed a downward variance (to 30 years) for a defendant convicted of material support, noting the defendant should not have benefitted "simply because his plans were disrupted [by law enforcement]," especially given the lack of evidence that he had changed his criminal mindset. Id. at 265.

So too here. Mumuni intended to commit the murder of a federal agent and attempted to carry out that murder. He should be punished accordingly. The fact that he was unsuccessful is not a mitigating factor.

4

Finally, the government notes that Mumuni incorrectly states that all of the counts to which he pleaded guilty carry a maximum supervised release term of three years, which must be imposed to run concurrently, and therefore that he cannot be sentenced to more than three years of supervised release. (Def. Mem. at 11). In fact, the maximum term of supervised release that can be imposed is life. Pursuant to 18 U.S.C. § 3583(j), the Court can impose a supervised release term of any number of years or life for any terrorism crime set forth in Section 2332b(g)(5)(B) – which includes the material support charges in Counts One and Two.[4]

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/ Alexander A. Solomon
Alexander A. Solomon
Douglas M. Pravda
Ian C. Richardson
Assistant U.S. Attorneys
(718) 254-7000

cc:   Clerk of the Court (MKB) (by ECF, without enclosures)
      Anthony Ricco, Esq., counsel for defendant Mumuni (by email, with enclosures)

---

[4] The government requests that the Court direct the Probation Department to correct Paragraph 93 of the PSR to reflect that the maximum term of supervised release on Counts One and Two is life.