1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    -----------------------------x
                                        15-CR-393(MKB)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4              Plaintiff,              Brooklyn, New York

5              -against-               April 26, 2018
                                        2:00 p.m.
6    FAREED MUMUNI,

7              Defendant.

8    -----------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
                   BEFORE THE HONORABLE MARGO K. BRODIE
10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   For the Government:       UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  ALEXANDER A. SOLOMON
                                    IAN CRAIG RICHARDSON
15                                  DOUGLAS M. PRAVDA
                               Assistant United States Attorneys
16
     For the Defendant:        ANTHONY L. RICCO, ESQ.
17                             20 Vesey Street
                               Suite 400
18                             New York, New York 10007

19   For the Defendant:        KENNETH JAMAL MONTGOMERY, ESQ.
                               198 Rogers Avenue
20                             Brooklyn, New York 11225

21

22   Court Reporter:           LINDA D. DANELCZYK, RPR, CSR, OCR
                               Phone:  718-613-2330
23                             Fax:    718-804-2712
                               Email:  LindaDan226@gmail.com

24

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    2

1          (In open court.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Please be seated.

4          THE COURTROOM DEPUTY:  Criminal cause for

5   sentencing, *USA versus Mumuni*, Docket Number 15-CR-393.

6          Counsel, please state your appearances for the

7   record, starting with the government.

8          MR. SOLOMON:  Good afternoon, Your Honor.  Alex

9   Solomon, Doug Pravda, and Ian Richardson for the government.

10  Also present in the courtroom are the two victims, Jim Wyka

11  and also Kevin Coughlin.

12         THE COURT:  Okay.  Thank you, Counsel.

13         MR. RICCO:  Yes.  Good afternoon, Your Honor.

14  Anthony Ricco for Fareed Mumuni.  Present at counsel table is

15  attorney Kenneth Montgomery, attorney Steven Legon, and

16  paralegal Leonard Rollock.  And present to Your Honor's right

17  are the parents of Fareed Mumuni, his first cousin that was

18  described in the sentencing submission, along with his

19  extended family members seated in rows three and four.

20         THE COURT:  Thank you, counsel.  Please be seated,

21  everyone.

22         In preparation for sentencing today, I've looked at

23  a number of documents.  I'm going to review them with the

24  parties to make sure I didn't miss anything.

25         I have a presentence report that was prepared on

PROCEEDINGS                                          3

1    June 29th, 2017 and filed the same day.  An addendum to that

2    presentence report that was filed on January 30th, 2018.  A

3    second addendum to the presentence report that was filed on

4    February 1st, 2018.  The Probation Department's sentencing

5    recommendation, which I'll share with the parties in a minute.

6    And that was filed on June 29th, 2017.

7              I also have from the defendant his objections to the

8    PSR that was filed on January 27th, 2018.  A sentencing letter

9    from him with several attachments filed on March 29th, 2018.

10   An April 25th, 2018 supplemental sentencing memo, also from

11   the defendant.

12             From the government, I have a January 12th, 2018

13   sentencing memorandum.  A January 29th, 2018 response to the

14   defendant's objections to the PSR.  And an April 19th, 2018

15   supplemental letter, also responding to the defendant's

16   earlier letter.

17             Am I missing anything, counsel?

18             MR. SOLOMON:  There's also the government's letter

19   to probation dated October 20th, 2017 noting certain

20   objections to the PSR.

21             THE COURT:  It was sent to probation.  It wasn't

22   sent to the Court.  But I have not reviewed that, but I have

23   reviewed the addendum, which addresses that objection.

24             MR. SOLOMON:  Thank you.

25             MR. RICCO:  Yes.  That's correct, Your Honor.  Thank

PROCEEDINGS                          4

1   you.

2              THE COURT:  Okay.  And you can may remain seated,

3   Mr. Ricco.  You don't need to stand when you address the

4   Court.

5              Have you and your client read and discussed the

6   presentence report and the addendum?

7              MR. RICCO:  Yes, Your Honor, we have.

8              THE COURT:  Okay.  According to the presentence

9   report, the guideline calculation is a total offense level of

10  43.  No criminal history points.  Criminal History Category of

11  VI pursuant to 3A1.4(b).  Guideline imprisonment term is life.

12  Restricted guideline range is 1,200 months.

13             Mr. Ricco, you submitted certain objections to the

14  PSR to the Court, and I'm going to turn to those now and

15  address them.  This is your letter dated January 27th, 2018,

16  Document Number 138.

17             Starting with your first objection, you object to

18  certain language in paragraph 14 of the PSR.  I am striking a

19  portion of that paragraph.  So that it currently reads:

20             The investigation revealed that Fareed Mumuni had

21  assisted Saleh in his efforts to the carry out a terrorist

22  attack on behalf of ISIL, and then it goes on to specify

23  certain conduct.

24             I am striking from "Fareed Mumuni" all the way

25  through "specifically."  So that the sentence should now read:

PROCEEDINGS                          5

1        The investigation revealed that members of law

2   enforcement, and it continues.

3        Later on in the paragraph, it also reads:

4        In addition, on May 12th, 2015,

5   judicially-authorized electronic surveillance revealed that

6   Saleh contacted Mumuni to indicate that he had money and

7   wanted to meet that day, stating that he had money that talks,

8   possibly referring to funding for an alleged transaction.

9        I'm deleting "possibly referring to funding for an

10  alleged transaction."

11       With regard to your second objection, paragraph 15,

12  I'm deleting the last sentence.  "According to the

13  investigative agent, the reference to motivating suggests

14  Mumuni may have been involved in Saleh's planning for a

15  terrorist attack."

16       With regard to your third objection to paragraph 21

17  of the PSR, you dispute the government's statement, which I'm

18  not going to change, but what I am going to do is to add your

19  disagreement to the PSR.

20       So that the last sentence stated under objections

21  and comments on page 3 of your objection, which reads:

22  "Fareed Mumuni asserts that upon lunging at the first agent,

23  he was taken down and immediately subdued by the agents.  He

24  denies any allegation that he reached for an agent's firearm

25  and attempted to pull the trigger."

PROCEEDINGS                          6

1        This is a disagreement with the facts as stated by

2   the government.  I'm simply having it added to the PSR.

3        As to objection number four, which is to

4   paragraph 24, I'm deleting the last two words, "to denote."

5   That's it.

6        With regard to paragraph 29, objection five, I'm

7   adding again the language:  Since you disagree with the

8   government's statement as to the facts.  So the language

9   after -- that starts with "Fareed Mumuni acknowledges that he

10  lunged at a law enforcement officer with a single kitchen

11  knife, however, he denies repeatedly stabbing anyone."  That's

12  added.

13       The beginning of the next sentence is not added.

14  Again, as set forth in our objection to paragraph 21 that's

15  deleted.  The rest of that paragraph is added.

16       You state in your objection at the top of page 4,

17  Mr. Ricco, that you don't believe that the facts and

18  circumstances in this case support the use of a first-degree

19  murder guideline.  You've given me no reason to consider that

20  sentence, so I'm disregarding it.  You've not made any

21  arguments in support of that.

22       As to objection six, paragraph 33.  Again, you

23  disagree with the facts as stated.  This is the government's

24  account of what happened.  I've already included your client's

25  account.  I don't believe there's anything for me to do with

PROCEEDINGS                                    7

1    regard to that particular paragraph.

2            As to your seventh objection to paragraph 34, I'm

3    deleting the phrase, "while Mumuni was directly involved in

4    the planning to carry out terrorist attacks."  That specific

5    phrase is deleted.

6            I believe I've addressed all of your objections.

7            MR. RICCO:  Yes, you have, Your Honor.  Thank you.

8            THE COURT:  Okay.

9            In addition, the PSR incorrectly lists the

10   supervised release term for Counts One, Two and Three.  So it

11   must be amended as to paragraph 93 to say that the statutory

12   provision should reflect, as to Counts One, Two and Five, that

13   pursuant to the 18 U.S.C. Section 2332b(g)(5), the Court shall

14   impose any term of years of supervised release up to life.

15           As to Counts Three and Six, the Court may impose a

16   term of supervised release of not more than three years.  That

17   error must be corrected.

18           As to paragraph 95, the guideline provision, that,

19   too, has to be amended to reflect that as to Counts One, Two

20   and Five, the guideline requirement for a term of supervised

21   release is two years to life.

22           And as to Counts Three and Six, since the offense is

23   a Class C felony, the guideline range for a term of supervised

24   release is one to three years.

25           Consistent with the calculation of the guideline in

PROCEEDINGS                                    8

1   the PSR, I find that the total offense level is 43.  No

2   criminal history points.  Criminal History Category VI.

3   Guideline imprisonment term of life.  Restricted guideline

4   range of 1,200 months.  Supervised release term up to life on

5   Counts One, Two and Five.  And One to Three years on Counts

6   Three and Six.  The fine range is 25,000 to $250,000, and it's

7   a $500 special assessment.

8               Are there any objections for the record?

9               MR. RICCO:  None, other than previously stated, Your

10  Honor.

11              MR. SOLOMON:  Not from the government, Your Honor.

12              THE COURT:  Turning to the 3553(a) factors, I have

13  considered them.  In addition, I've considered the guidelines'

14  policy statements.  I've considered, among other things, the

15  nature and circumstances of the offense, the history and

16  characteristics of the Mr. Mumuni, the need to avoid

17  unwarranted sentencing disparities among similarly situated

18  defendants, the need to protect the public from further crimes

19  by Mr. Mumuni, the need to afford adequate deterrence.  I've

20  considered it all.  I've read all of the submissions.  I've

21  watched the video of Mr. Mumuni's postarrest statement.

22              Mr. Ricco, do you wish to be heard further on your

23  application for a variance?

24              MR. RICCO:  Yes, Your Honor.

25              THE COURT:  Okay.  Please proceed.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS                                    9

1          MR. RICCO:  Okay.  First and foremost, I noted Your

2   Honor has read and reviewed a breadth of materials here, and I

3   don't want to go over it.

4          On one hand, Your Honor, I sort of in a way

5   apologize to the Court for such a lengthy sentencing

6   submission.  The goal is always to try to communicate in an

7   effective way and sometimes we get lost in length.

8          The difficulty here, Your Honor, was the

9   circumstances that the case has and the guideline sentence

10  involved.  It really required a very serious and in-depth look

11  at who the offender was.

12         I know that the Court relies upon representations of

13  counsel at sentencing and sort of looks forward to helpful

14  information that counsel can discover with respect to the

15  offender and circumstances of the offense.

16         As set forth in the letter, the government has asked

17  for the imposition of essentially a life sentence on the

18  defendant here.  My view, Judge, is I don't see anything about

19  the circumstances of the offense, the need to protect the

20  public, anything about this defendant's background and history

21  that would even remotely suggest the imposition of such a

22  horrific sentence.

23         To say this one thing, but to then go out and meet

24  with the family and spend time listening to them about the

25  history and background, who the defendant was, their struggles

PROCEEDINGS                          10

1   in raising him, who they hoped he would be, who he is, in

2   fact, along with a very serious look at the circumstance of

3   the offense, both offenses here are very serious offenses, not

4   taken lightly by us at all, nor the defendant, nor his family.

5          So the short of this is that the defendant is young.

6   He's smart.  He's a hard worker.  He's loved by his family,

7   and he loves them.  His parents don't have one job, they have

8   two jobs.  They had Fareed working at a young age.  He was

9   working the day before he got arrested, working in a senior

10  citizen home.  Attending college, doing well.  He has a sister

11  who serves in the armed services of our nation as a officer, a

12  non-commissioned officer, in the United States Navy.  His

13  first cousin is a student in law school.  No one in the family

14  anywhere at any time has ever been arrested for a crime.  This

15  is the first offense that Fareed Mumuni has committed, and boy

16  is it serious.

17         I've had the opportunity to appear in courts in our

18  country over the last 30 years.  I've been involved in cases

19  of this nature.  I've been involved in cases involving

20  multiple murder of individuals.  And very rare do you see an

21  imposition of a life sentence on a person as young as the

22  offender before the Court, in the absence of physical injury

23  and damage to property or people.

24         And so it lends itself to how do we arrive at that.

25  We arrive there when we have lost sight of what sentencing is

PROCEEDINGS                    11

1    supposed to do in the first place, and sentencing is driven by

2    guidelines.  And when I say "We," I don't mean the defense

3    bar, I mean when our prosecutions are driven by the

4    guidelines.

5              It's not a criticism of the government.  It's a fact

6    that I cannot think of a defendant from a family such as this,

7    so hard working and so committed, an offender without a

8    criminal record, where we come to the conclusion that there's

9    not a single factor about his life, about his family, about

10   the circumstances of the offense here that will warrant a

11   sentence outside the guidelines.  I find that very difficult

12   to comprehend, given my experience practicing before this

13   Court and courts all over our nation and in cases far more

14   serious than this.

15             When I say "far more serious," this case is very

16   serious.  But I mean when we have an offender with a track

17   record of violence and history, and where you have the

18   horrific loss of life or serious physical injury to people.

19             The one thing that I also wanted to get out of way,

20   Judge, is this.  Your Honor gave us an opportunity to review

21   the affidavit of the officers that were submitted in this

22   case; and we did.  And Your Honor gave us the opportunity, if

23   we wanted, to hire an expert to review that affidavit.  It was

24   difficult to do.  It was very difficult to get people in law

25   enforcement to comment on what other law enforcement officers

1    are doing where they perceive their lives to be in jeopardy.

2    But we did have an opportunity to sit down with individuals in

3    law enforcement and review it.  And based upon the review, the

4    conclusion that there was nothing about that affidavit that

5    was outside the common sense of experience of a juror and

6    certainly not a judge.

7             And I want to say this.  I am not here today to

8    criticize the law enforcement officers in this case at all.

9    Because I don't have any criticism of them.  They were doing

10   their job.  They were there executing a search warrant.  And

11   if we take the facts as was reported by the officers, they

12   come in and they see a six-foot-three, 250-pound guy coming

13   down the stairs ultimately with a knife in their hand coming

14   towards them.

15            Whoever these law enforcement officers were, they

16   did what we have been screaming across this nation to do.

17   They subdued Fareed Mumuni.  They disarmed him.  They were not

18   injured.  And he had not a single scratch.  They were able to

19   take him into custody without any injury to him whatsoever.

20   He wasn't kicked.  He wasn't beaten.  Nor was he shot dead.

21   And for that, Fareed Mumuni's family has absolutely no

22   criticism of their actions at all.  Nor does Fareed.  He talks

23   about it in his letter.

24            We often think, well, what was Fareed thinking?

25   What did he think was going to happen as he ran towards law

PROCEEDINGS                                   13

1    enforcement officers fully armed.  Two with long firearms;

2    others with handguns.  With a knife in his hand, a kitchen

3    knife.  Did he think that he was going to be able to somehow

4    kill these officers, or was in his mind he wanted to be shot

5    dead?

6             When we look at the tapes in this case, and we

7    listen to his statements that's made to law enforcement before

8    he has an opportunity to get a lawyer, but his statements made

9    to the law enforcement officers within an hour of his arrest

10   where he is in their custody, he is very calm, and he's

11   talking about why he's doing what he was doing.  And what he

12   says to them is that he wanted to die.  And if it wasn't for

13   the officers involved in this case, he probably would have.

14            So there's no criticism of them at all.  They were

15   trained professionals and they did the job that we expect

16   trained professionals to do, in this situation and in all of

17   these situations where the officers do not do that.

18            So I wanted to put that out there because it is a

19   part of our sentencing submission and is something that we

20   believe in, and it's the reason why we didn't submit an

21   affidavit, although the Court gave us an opportunity to do so.

22            So how does a young man, on June 17th, where does he

23   get the idea from that he should die and die for what?  Where

24   did that come from?  Did it come from his parents?  Did it

25   come from his family?  Did it come from the education that he

1    was getting at Staten Island College?  No.

2              It didn't come in the mosque that he attends.

3    Judge, it didn't come from his neighbors that wrote to you

4    about the young man that they know.  And his neighbors

5    represent everybody.  Retired people from the military.

6    Black.  White.  All of his neighbors all said the same thing

7    about Fareed Mumuni.  They basically summed it up as saying

8    he's a nice kid.  That he helps out.  That he's respectful to

9    his parents and everyone else.

10             So where in the world did he get this idea from that

11   he wanted to die on June 17th?  It was put in his head by a

12   sophisticated operation of people in this world who go under

13   the name of ISIS and under the pretext of Islam has

14   infiltrated our country and has corrupted young people just

15   like Fareed Mumuni.  They spend millions of dollars to find a

16   way to get kids like Fareed Mumuni to want to give up their

17   lives.

18             What we know from this case, and we've done the

19   work, is found that many of the defendants who are charged

20   with these offenses are young people just like Fareed Mumuni.

21   They have no criminal record.  They attend college.  They have

22   pretty good relationships with their parents.  That people

23   generally say good things about them.

24             Everything that I know about this case, Judge, is

25   that the idea to want to go join ISIS and to participate in

1    this came from outside of our country, through the internet

2    and through operatives here in this country.  Fareed Mumuni is

3    not a leader.  He didn't recruit a single person.  He was

4    recruited.  And he wanted to go and join ISIS and he wanted to

5    go over and defend the Islamic state, so he said.  And he was

6    encouraged to do so by a defendant that Your Honor has

7    sentenced, and that individual tried to influence him in a lot

8    of ways.

9          In our city you can buy a gun anywhere.  If we left

10   here at 2:40, we could be back here at 3:40 with a whole

11   handful of them, and we don't have to go too far from the

12   courthouse to get them.

13         Fareed Mumuni decides he's going to attack law

14   enforcement with a kitchen knife.  It's as foolish as wanting

15   to lose one's life over an idea that you really don't know

16   about.

17         When we had asked a local imam to look at the video,

18   to study the video, and ask us is there any legitimate -- the

19   video of the postarrest statement -- is there any legitimate

20   Islamic principle being discussed by the defendant, the answer

21   was no.  It's a misguided understanding of what Islam is

22   perpetrated by people who are manipulating United States

23   citizens.

24         I think that the agents in this case, when they went

25   into the house on Staten Island, I think they recognized that.

PROCEEDINGS                                        16

1   I think that they wanted to protect themselves but they were

2   not interested in hurting Fareed Mumuni, because they didn't.

3   And I think when they looked at him, they had been listening

4   to the wires and they knew about the case.  And I think when

5   they looked at Fareed Mumuni, they didn't see a person they

6   needed to put down.  They knew where they were going.  They

7   knew who he was.  They took him into custody and they brought

8   him here, just the person that the government wants to send to

9   prison for the rest of his life.

10          I met him here in this courthouse.  The first thing

11  he said to me was, Mr. Ricco, am I going to get raped?  That

12  was the first thing that he said to me.  His understanding of

13  being in jail and his fear of being in jail was very high.

14          He's been in prison now almost -- he's been in

15  detention now almost three years.  It will be three years in

16  about six weeks.  He looks much better than he did the first

17  day I met him, which I'm happy about.  He has spent his time

18  doing what he did before he was arrested, pursuing education

19  and helping others learn to read and write so that they can

20  reenter into society more productive.

21          Judge, Fareed Mumuni has a life worth giving an

22  opportunity to.  The agents knew it when they saw him.  They

23  brought him here for the court to ultimately decide what's the

24  appropriate punishment to impose.

25          We did not recommend a sentence to impose.  We had

PROCEEDINGS                                    17

1   confidence that the Court would look at the factors and impose

2   a sentence that is sufficient but not greater than necessary

3   to reach the many objectives that Congress has set forth in

4   3553(a).  Our hope was that no judge would be bound by the

5   guidelines in a case such as this, with an offender such as

6   Fareed, where you have the absence of injury.

7          The charge of attempted murder is a very serious

8   charge.  And the charge of attempted murder against a law

9   enforcement officer is an even more serious charge, in my

10  mind.  The time is the same whether you try with a knife or

11  try with a bulldozer or a gun or an AR15.  So how does the

12  Court decide, if the sentence is closer to 20 or zero, or

13  wherever in between?  I think all of those factors in 3553(a)

14  helps the court.

15         We would ask that the Court sentence the defendant

16  at variance with the guidelines.  Fareed Mumuni is a young

17  person who is capable of redemption.  And everyone who is not

18  tied to the guidelines or policy considerations is aware of

19  that.  He was a follower here and it cost him.  He did

20  something that all parents fear their children would not do,

21  get involved with the wrong people.

22         Thank God the agents were not hurt.  Thank God

23  Fareed Mumuni wasn't hurt.

24         He now has to pay a price for what he allowed

25  himself to believe in while he was a college student, and boy

PROCEEDINGS                                          18

1    am I glad I don't have to, but he has to.  He will grow,

2    Judge, and learn.  You can be sure of that.  He has learned

3    over the last 36 months.

4           We ask that the Court impose a sentence that doesn't

5    take away from him hope, and doesn't take away from him the

6    hope and expectations of his family for a young man that they

7    had so much hope and faith in.

8           I could go on, but I will not.  I'm not, Judge,

9    going to have a debate as to whether or not in two or three

10   seconds Fareed Mumuni's hand went towards an officer's trigger

11   or not.  I think I'm okay with the fact that it did not happen

12   and that he was not injured and officers were not injured.

13          With respect to the other issues, Your Honor,

14   related to the government's persistence that he was involved

15   in a domestic attack through the use of a pressure bomb, I

16   have never seen any evidence of that, I have, though not

17   mentioned in our sentencing submission, I had the opportunity.

18   Ms. Colson provided me with a copy of her client's postarrest

19   statement that Your Honor has seen and evaluated in connection

20   with the sentencing of Mr. Saleh.  And there is not one word

21   in that 546 pages where Munther Omar Saleh says that Fareed

22   Mumuni agreed to participate with him in a pressure cooker

23   bomb attack.  In fact, what he says at at least a dozen pages

24   is that he did not agree to that.

25          Somehow the government wants that to be the truth of

PROCEEDINGS                                    19

1    its case in the absence of evidence.  And they want the

2    defendant sentenced as if he did it, even when there is no

3    evidence, that he did not.

4           I would ask the Court to take it all into

5    consideration.  His assertion that he did not.  The

6    government's claim that he did.  And the various statements of

7    Fareed Mumuni where he denied it, and the postarrest extensive

8    statements of Mr. Saleh where he admitted his own criminal

9    conduct, but specifically said that Fareed Mumuni did not

10   agree with him in it.

11          It is uncontroverted that Saleh tried to get him

12   interested in that.  That's not disputed.  What is disputed is

13   whether or not the Defendant Fareed Mumuni ever agreed to it.

14   Our position is that he did not.

15          To the extent that the Court finds that Mumuni did

16   participate in the conspiracy he did, the facts that support

17   his plea, legally, the facts that would support his plea, and

18   I would ask that the Court sentence him according to that

19   level of his role during, and those acts that were reasonably

20   foreseeable to him balanced with who he is as a young person,

21   and to keep the issue of hope viable in his life and the life

22   of his family.  Thank you very much, Your Honor.

23          THE COURT:  Thank you, Mr. Ricco.

24          I am going to share with you the Probation

25   Department's sentencing recommendation and give you a few

PROCEEDINGS                                    20

1    minutes to review it with your client.  (Proffering.)

2                (Pause.)

3                THE COURT:  Have you had an opportunity to review

4    that with your client?

5                MR. RICCO:  Yes, Your Honor, we have.

6                THE COURT:  Okay.

7                Mr. Mumuni, you have a right to make a statement to

8    the Court, if you want.  It is up to you.  And I have read

9    your letter you submitted.

10               THE DEFENDANT:  Thank you, Your Honor.

11               First and foremost, I would like to apologize to my

12   family over there, my mother.  I'm sorry for putting you

13   through all of this.  My whole family sitting there.  I

14   understand how much what I've done has affected you all.

15               And I would like to apologize to the Court and to

16   the special agents who came to my house that day.

17               Three years is a long time, and every day thinking

18   about what's happened and feel like I'm finally waking up from

19   a trance.  And all I can say is I'm sorry.  I'm changing.  I'm

20   trying to change.  I'm trying to become a better person.  I

21   want to go out there and help people to understand that this

22   isn't the way to live.  And I want to apologize again for

23   everything that I've done.  And I just want to grow and become

24   a better person.  I want to thank the Court, the Judge, for

25   taking the time to hear what I have to say.

PROCEEDINGS                                21

1              I got arrested when I was 21 years old.  I followed

2    some people thinking they were my friends and they were giving

3    me the right answers.  But believe it or not, since being

4    incarcerated, which is forcing me to be around a lot of

5    different people, I got to understand and see different points

6    of views, different people, different insights.  I feel like I

7    really have grown and I can't explain how sorry I am for what

8    I've done.  I understand saying sorry won't take back what

9    happened, all I can say is I'm sorry, and I apologize.  Thank

10   you.

11             THE COURT:  Thank you, Mr. Mumuni.

12             Does the government want to call the victims in this

13   case?

14             MR. SOLOMON:  I believe Special Agent Coughlin would

15   like to address the Court.

16             THE COURT:  Okay.

17             Please come forward.

18             Please state your name for the record.

19             SPECIAL AGENT COUGHLIN:  Yes, Your Honor.

20             Kevin Coughlin, C-O-U-G-H-L-I-N.

21             THE COURT:  Please proceed.

22             SPECIAL AGENT COUGHLIN:  Thank you, Your Honor.

23             Your Honor, as I said, my name is Kevin Coughlin,

24   I'm a special agent with the FBI.  I've been at the FBI here

25   in New York for ten years, on the FBI's NYPD violent crime

PROCEEDINGS                                    22

1   task force, and I've been in the FBI SWAT team for about the

2   past six years.

3          THE COURT:  I'll just ask you to slow down so that

4   the court reporter can keep up with you.

5          SPECIAL AGENT COUGHLIN:  I know you've heard from me

6   previously in Mr. Saleh's sentencing, so --

7          THE COURT:  I did.

8          SPECIAL AGENT COUGHLIN:  -- I'm not going to repeat

9   everything I said, Your Honor, at that time.  But I would like

10   to cover a couple of key points that I think are important

11   today to bring out with regard to Mr. Mumuni's case and to

12   have an opportunity to address Mr. Mumuni specifically.

13          There was a couple of key decisions that led up to

14   the days leading up to the operation and to the search

15   warrant, and some decisions that were made that day that I

16   think had they not been made or somebody made a different

17   decision, then somebody or myself or someone else may have

18   been killed.

19          As you know, this was not an arrest warrant.  This

20   was a search warrant.  The first decision, I think, was made

21   is when the ASAC, the CT ASAC, of the squad that covered this

22   case had made a decision that he was going to ask for a couple

23   of SWAT operators to come assist the squad in clearing the

24   house before they went in to execute that search warrant.

25          That decision, I think, saved lives because had he

1    not done that, then the case agents from the squad would have

2    been the ones knocking on that door that day, and they would

3    have been the ones that were facing a six-foot, 250-pound

4    terrorist with a nine-inch knife, as opposed to six members of

5    the SWAT team who are better trained in handling and dealing

6    with subjects with deadly weapons.  So had he not made that

7    call, who knows what could have happened.

8            Had my SWAT section leader not made that last-minute

9    decision to tell me to just bring my M-4, my long gun, at the

10   last minute, because I was going to be the first person in

11   that door, had he not made that last-minute decision, that

12   would have made a difference.  And I say that because up until

13   that point we were just going to wear our soft vests and have

14   our pistols, because, like I said, it was a search warrant and

15   not something we were expecting.

16           So that decision caused me to decide to bring my

17   SWAT kit and wear my SWAT kit.  And the significance of that

18   is the SWAT kit or the plate carriers are very different.

19   They have metal plates in the front and back.  They have extra

20   layers of Kevlar.  I had the old vest that had the extra

21   protection on the sides, which was overlapping Kevlar with a

22   hard layer of plastic that went from the back to the front.

23   So it was that extra protection that I think also made a

24   difference.

25           Had it not been for the quick response of my fellow

PROCEEDINGS                          24

1    teammates that were behind me in their force of action when

2    Mr. Mumuni stabbed me, it could have had a different outcome.

3              So I also think it's important to point out that

4    when Mr. Mumuni came down those stairs that day, that he came

5    down those stairs with the intent of trying to kill one of us.

6    And I say that because it's not like he grabbed that knife

7    from the kitchen on his way down.  He had that knife with him

8    in his room when he came out and he concealed it until the

9    last possible minute.  He did not walk down those stairs

10   waiving that knife around, because if he had, we would have

11   shot him before he got to the bottom of the stairs.

12             He made it seem like he was compliant when I asked

13   him -- when I identified ourselves as FBI and I said we were

14   there for a search warrant and I asked him to sit down on the

15   couch.  He came down the stairs, he made it seem he was

16   compliant as he walked across the room, and it wasn't until he

17   was halfway across the room that he then ran at me.

18             And at point he still hadn't shown us.  Nobody had

19   seen a knife.  It wasn't until he was an arm's length away

20   from me, when I had already let go of my M-4, because I felt

21   we were about to fight and going hands on and I was preparing

22   to take him down to the ground.  So at that point when I

23   finally saw the knife, when he was arm's length away, coming

24   from around his back, I didn't have my hand on a weapon at

25   that point.  And it was too late to try to grab my M-4 or go

1  to my pistol on my side.  So my best chance was to try to go

2  to try control his arm, and that's when he stabbed me multiple

3  times in the vest.

4            And if it wasn't for the force and quick response of

5  the agents that were behind me as they pushed us into the

6  room, and we started to fight with him, who knows what would

7  have happened.  And had it been case agents from the squad

8  instead of the SWAT team, who knows what could have happened.

9            And it's also important to point out that even when

10  we were fighting with him, he still didn't give up.  Even

11  after we got the knife out of his hand, he still fought with

12  us.

13            And it was -- I remember holding one of his arms

14  down, and the other squad operator that had his M-4 hanging in

15  front of him, because we were fighting with him, so his hands

16  were on his weapon; and I remember seeing Mr. Mumuni's hand go

17  up and grab the handle of the M-4 or the trigger guard of the

18  M-4 that he had.  At that point I said, He's going for your

19  gun, and the operator grabbed his gun and swung it behind his

20  back as we continued to fight with him.

21            And it wasn't until we got the one cuff on and he

22  still fought with us.  And it wasn't until we got the second

23  handcuff on that he finally stopped.  And it was like a switch

24  got turned off.  He stopped moving.  He looked up at us and

25  was he was like now what.  Very matter of factually.  No

PROCEEDINGS                                26

1    emotion, nothing.

2              I think that people in today's day they think of,

3    you know, law enforcement, that we assume a certain amount of

4    risk when we go after criminals, that we assume the risk that

5    they may try and kill us.  And that's not what we sign up for.

6    We don't sign up to be killed or stabbed.  We sign up to

7    enforce the rule of law.

8              I've been in the FBI for over ten years, the SWAT

9    team for six, and this the first time this has happened to me.

10   I don't think Mr. Mumuni should get the benefit of the fact

11   that although he tried his hardest to try to kill me or kill

12   one of us, that he was unsuccessful.

13             To Mr. Mumuni himself, I took an oath to protect and

14   serve everyone in the United States, to include you and your

15   family.  I think you showed a complete disregard for that and

16   a disregard for the core values that make our country great.

17   I've never met you.  I've never wronged you.  I've never did

18   anything to you.  Yet you tried to kill me.

19             At the time of the incident, I had a two-year-old

20   daughter who would have grown up without a father.  My wife,

21   who is sitting in the courtroom here today, she would have

22   been a widow and a single mom.  I now have a one-year-old son

23   that would not have been born.

24             It's sad that the mindset you had and the mindset

25   that individuals have that think like this, they tear at the

PROCEEDINGS                                    27

1    fabric of our society.  You attacked the foundation of law and

2    order that makes our country great, to try to spread the

3    terror and hatred that you had believed in.

4              This was not a battlefield.  This was the city of

5    New York, and I was not your enemy.  The irony is, is even

6    though you did what you did, I would gladly and happily defend

7    and protect your family, even though you gave no regard to me

8    and mine, because that's what we do, we protect people.

9              Thank you, Your Honor, I appreciate the opportunity

10   to make my statement here, and I hope it's helpful in

11   determining what an appropriate and just sentence is in this

12   case.

13             THE COURT:  Thank you, Agent Coughlin.

14             SPECIAL AGENT COUGHLIN:  Thank you.

15             THE COURT:  Does the government wish to be heard?

16             MR. SOLOMON:  Just very briefly, Your Honor.

17             We agree with the special agent that what you're

18   fundamentally sentencing here not is a failed attempt to kill

19   someone.  And Mr. Mumuni acted with premeditation.  He

20   secreted two knives, one in the car and one under his bed and

21   prepared to kill a member of law enforcement, if someone

22   showed up at his door either seeking his arrest or executing a

23   search warrant, and we think that merits exceptionally severe

24   punishment.

25             In terms of proportionality, something you

PROCEEDINGS                              28

1    referenced in the sentencing of the codefendant Munther Omar

2    Saleh, I would like to point Your Honor to two cases that, I

3    think, are especially relevant.

4            The two cases are the Justin Sullivan case, out of

5    North Carolina, and also the David Wright case, out of the

6    District of Massachusetts.

7            Both those cases involved ISIS-directed threats

8    involving the same coconspirator in this case, Junaid Hussain.

9            In the case of David Wright, David Wright instructed

10   a codefendant -- I'm sorry, a coconspirator, to attack the

11   members -- the boys in blue.  That person, Rahim, approached

12   law enforcement in Boston with a knife and was shot dead.

13           David Wright proceeded to trial with respect to his

14   conduct, was found guilty on all charges and was sentenced to

15   28 years.  We think at a minimum David Write's conduct is less

16   serious than the conduct in this case, where this defendant

17   came very close to killing a member of law enforcement.

18           Similarly, in the Western District of North

19   Carolina, the court sentenced Justin Sullivan, who was

20   preparing to conduct a large-scale attack on behalf of ISIS.

21   Specifically, he had acquired a rifle with 14 rounds and a

22   travel bag containing material to escape.  In that case, the

23   court sentenced Justin Sullivan to life imprisonment.

24           In all these cases, the defendants who are absorbing

25   the poison that's spread by ISIS are very young.  The

PROCEEDINGS                                              29

1    government doesn't dispute that, and it's something the

2    courts, like the Court in this case, have been struggling

3    with.

4              I think it's important for the purpose of

5    deterrence, both specific and general, to impose a harsh

6    sentence here so that youthful potential offenders know that

7    if they absorb this poisonous rhetoric and act upon it, they

8    will be dealt with very severely by the court.

9              That's it.  Thank you, Your Honor.

10             THE COURT:  Thank you, counsel.

11             Anything else from the defendant?

12             MR. RICCO:  Yes, Your Honor.

13             It would have been good to know these cases before

14   we got here today.  But I would ask -- I would just say the

15   following.

16             THE COURT:  I think they were referenced in --

17             MR. RICCO:  I think they were, Judge.

18             THE COURT:  -- in the government's paperwork.

19             MR. RICCO:  Yes.

20             Judge, the comparison from David Wright's case is

21   that Mumuni would have been the person who would have been

22   shot and killed.  And Saleh -- hold on a second.  And Saleh

23   would have been the person, like David Wright, who influenced

24   Junaid to go out and attack people with a knife.  This is what

25   happened here, which is why we say we're thankful no one was

PROCEEDINGS                                    30

1    killed here.  We are not asking the Court to sentence him for

2    an unsuccessful anything.  We're asking the court to sentence

3    him in connection to what he pled guilty to, which is an

4    attempt.

5            And in that case, the person who sent the young

6    person out to his death didn't take any responsibility for it,

7    went to trial, and was sentenced to 28 years.

8            Justin Sullivan is a guy who had plans to kill

9    hundreds of people.  He was an organizer and a leader.  And in

10   that case, the sentencing judge found that those threats to

11   kill hundreds of people warranted a life sentence.

12           We don't -- we believe that this case is different

13   from those cases, certainly for the purposes of sentencing.

14   And I would ask the Court to look to the relationship between

15   the defendant and his codefendant in this case, how they

16   influenced each other, what ultimately happened, and that the

17   Court sort of stay within the confines of what is before this

18   Court, the sentencing submissions here, not those in another

19   case where we don't have those submissions, and sort of make

20   this comparison based upon bits and pieces of what folks want

21   to focus in on.  We have everything here, Judge.

22           Your Honor has sentenced the codefendant in this

23   case, who was a leader, an organizer, and had direct contact

24   with people in ISIS to recruit young people, just like Fareed

25   Mumuni.  That's not disputed.  And I would ask the Court to

PROCEEDINGS                                    31

1    sentence him for his role and what he did in this case in all

2    respects, the Court consider all the factors, and impose a

3    sentence that is sufficient but not greater than necessary.

4              Thank you very much, Your Honor.

5              THE COURT:  Thank you, Mr. Ricco.

6              Before I pronounce sentence in this case, I want to

7    talk a little bit about what the facts are here, since some of

8    it is disputed amongst the parties.

9              I have before me Mr. Mumuni, who is now 23 years

10   old, will be 24 in two months, who was 21 at the time he

11   committed the crimes charged here.

12             As counsel points out, you were a law-abiding young

13   man.  You graduated from high school and you were attending

14   college.  Then you met the codefendant, Mr. Saleh.  You became

15   radicalized.  You expressed interest in traveling to the

16   Islamic state to support ISIL.  You researched flight routes

17   to get there.  And you started saving money so that you could

18   buy a ticket to go do what you indicated you intended to do.

19             You talked to Saleh, your coconspirator, about

20   traveling to ISIL -- ISIS, to support ISIS, to go to the

21   Islamic state.  And you also discussed with him if you failed

22   to make it abroad, and if you were stopped by law enforcement,

23   that you would attack law enforcement.  And within those

24   discussions, you even discussed with him the fact that, if

25   need be, you were willing to die attacking law enforcement.

1          You met Saleh's friends.  You knew most of them

2    supported ISIS also.  You watched the ISIS propaganda videos

3    with him.

4          When you were arrested in this case, you told the

5    agents continuously that your only interest was in traveling

6    abroad, but if you failed to do so, you would attack law

7    enforcement.

8          The dispute between the parties as to the relevant

9    facts here are -- I guess there are a few disputes -- whether

10   or not Mr. Mumuni had intent, along with Mr. Saleh, to either

11   assist, help or build a bomb to be used in the United States

12   for an attack.

13         Having watched the video of your postarrest

14   statement and having read all the submissions from the

15   government, Mr. Ricco is correct, I don't have any evidence

16   before me that that was ever your intent or that you engaged

17   in any planning with Mr. Saleh to build a pressure cooker bomb

18   to attack the United States in any way.

19         You did, however, make it clear that if you couldn't

20   travel abroad to support ISIS, you would attack law

21   enforcement, and that's exactly what you did on the morning

22   that you were arrested.

23         Unlike your codefendant, Mr. Saleh, the government

24   has no evidence that you were surveilling or visiting

25   monuments.  That you were conducting searches for bomb-making

PROCEEDINGS                                          33

1   material.  What the government has presented to me are

2   statements from Mr. Saleh, which I know very well, having

3   sentenced him, and your postarrest statements, which I've

4   reviewed both the hard copy and the video.

5          And in those statements where the agents were

6   questioning you extensively, you kept saying to them, I wanted

7   to go abroad, I wanted to support ISIS.  If I couldn't do

8   that, then my plan was to attack law enforcement.

9          And some of the statements that you made in response

10  to the agent's questions as to whether or not you had any

11  intent to use a bomb within the United States, I understood

12  the agent's concern about that, the need to know whether any

13  attacks were planned, and to prevent them.  And you kept

14  insisting that there wasn't any attack that you knew about.

15  You never planned to do anything with a bomb, although at one

16  point you admitted that if Saleh had given you the pressure

17  cooker bomb, you would have used it against law enforcement,

18  if law enforcement approached you.

19         The agents tried to get you to explain.  They

20  understood that you wanted to go abroad.  But what's the

21  significance of the pressure cooker bomb?  And you tried to

22  explain to them, as best as I can tell from watching the

23  video, that there wasn't anything that was set in stone, it

24  was something that Saleh mentioned to you, you knew and you

25  understood that you wanted to attack law enforcement if you

PROCEEDINGS                                                34

1    couldn't go abroad and if they attacked you.

2              Some of the statements you made, and I'm quoting

3    now, "Well, I knew you guys were following me 24/7.  I was

4    frustrated, so I said if I don't get to go to Islamic state

5    and you guys try to stop me, I'm going to defend myself."

6    That's on page 12 of your statement.

7              On page 19 you said, "The thing was, I knew you guys

8    were like watching me.  So I knew you guys were behind me or

9    whatever.  My intention was always to go to the Islamic state,

10   no matter what.  But I said, I know you guys were one day you

11   will bust in my door, like you did, and that's when I fought

12   back."

13             On page 20 you said, "I told you the same thing

14   again.  I told you my intent was to make it to the Islamic

15   state.  I know you guys would come after me.  I didn't go

16   after you.  That's how it was."

17             And the agents at one point said to you, "So only if

18   we came knocking at your door would you do something?"  And

19   you said "Yeah," on page 28.

20             In fact, the agents asked you, "Well, did you

21   consider the attack to be in the name of the Islamic state?"

22   And you said, "No, it was done in self-defense mostly for

23   myself."

24             My understanding of what your intent was at that

25   point in time, on that day when you were arrested, that you

PROCEEDINGS                                    35

1    planned on defending yourself, even if it meant that you would

2    die.  Did you intend to kill the agent?  It's not clear to me

3    that you did.  You had a knife, a kitchen knife.

4              How many inches was the blade, counsel?

5              MR. SOLOMON:  I believe it was nine inches.

6              THE COURT:  Was the blade nine inches or the knife?

7              MR. SOLOMON:  I believe the blade was seven inches.

8              THE COURT:  I believe I have a picture of it with a

9    ruler that you submitted to the Court, measuring the blade.

10             MR. SOLOMON:  Your Honor, it's 200-millimeters.

11   We've been trying to convert that.

12             THE COURT:  It's a kitchen knife, right, that

13   Mr. Mumuni went after armed agents with.  Did Mr. Mumuni

14   really think he could do damage with that knife?  I don't

15   know.

16             But I heard Agent Coughlin's testimony, and I

17   understand that he was threatened and that he believed under

18   the circumstances that, yes, you could have killed him.  And

19   I'll credit his statement that that could have been the

20   outcome whether you intended it or not.  Maybe your intent was

21   only that you would die, but you could have killed him.

22             For all of these actions, Mr. Mumuni pled guilty to

23   conspiracy to provide material support to a terrorist

24   organization, attempt to do the same, conspiracy to assault

25   law enforcement officers, attempting murder of federal

PROCEEDINGS                                          36

1    officers and assaulting federal officers.

2              And the government is asking me to sentence

3    Mr. Mumuni to what, Mr. Solomon?  What is your recommended

4    sentence here?

5              MR. SOLOMON:  Hold on a second, Your Honor.

6    Eighty-five years.

7              THE COURT:  Unlike Mr. Saleh, your codefendant, you

8    were not the leader of any group.  In fact, you were recruited

9    to participate in this group.

10             There is no evidence that you recruited anyone else

11   to follow ISIS.  There's no evidence that you praised ISIS'

12   heinous actions, as your codefendant did, or that you

13   translated any ISIS propaganda for others, as Mr. Saleh did.

14             Unlike Mr. Saleh, when you were arrested, you gave a

15   full statement.  You were interviewed for over an hour.  You

16   told the agents what you knew.  There's no question here that

17   your conduct is grave, reprehensible, and that it deserves

18   serious punishment.  You attacked law enforcement.  And as you

19   heard from Agent Coughlin, you could have killed him.

20             I do, however, have to consider all of the facts

21   before me, including your age, your lack of criminal history,

22   the letters from your family members and friends who describe

23   a very different Mumuni than the one who was arrested that

24   morning.

25             You've had no disciplinary infractions since you've

PROCEEDINGS                                    37

1   been incarcerated for almost three years.  I have to balance

2   all of these factors in determining what is an appropriate

3   sentence here.  I do believe that the sentence the government

4   is asking for is excessive.  Sentencing you to 85 years for

5   what you did, to me, is not a reasonable sentence.

6           I believe under the circumstances that a variance is

7   warranted.  And so I am sentencing you to 120 months on Counts

8   One and Two.  That's the conspiracy and the attempt to provide

9   material support to a foreign terrorist organization.  Both to

10  run concurrent with each other.

11          This is less of a sentence than I gave your

12  codefendant because of the difference in your situation.  He

13  was the leader.  He recruited others.  He was involved in

14  planning and attack on the United States, in fact, visiting

15  monuments, and had looked up how to put together a pressure

16  cooker bomb.  I have no evidence that you did any of those

17  things.

18          On Count Three and Count Six, conspiracy to assault

19  a federal officer and assault of a federal officer with a

20  deadly weapon, I'm sentencing you 60 months, to run

21  concurrently with each other, and with Counts One and Two.

22          The attempted murder of a federal officer, that is

23  the most serious, in my mind, of the crimes that you've

24  committed.  And on that count, I'm sentencing you to 204

25  months in custody; 120 of them will run concurrent with all

PROCEEDINGS                                          38

1    other sentences, but you will serve an additional 84 months

2    for that crime.  It will be consecutive to all of the

3    sentences.

4              I find that this sentence is sufficient.  It is not

5    greater than necessary to comply with all of the purposes of

6    sentencing.  I believe it sufficiently punishes you for the

7    crimes that you've committed, and that it does provide

8    specific and general deterrence.

9              I'm also sentencing you to a supervised release

10   term.  On Counts One, Two and Five, ten years.  On Counts

11   Three and Six, three years.  All supervised release terms will

12   run concurrently.

13             I'm also imposing several special conditions.  For a

14   period of six months, you shall comply with a curfew by

15   electronic monitoring, as directed by the Probation

16   Department.  You will remain at your place of residence from

17   7 p.m. to 7 a.m.  The Probation Department may designate

18   another 12-hour respective time period, if your employment,

19   education or observance of religious services preclude the

20   specific times that I've indicated.

21             The curfew by electronic monitoring shall commence

22   on the date approved by the Probation Department.  During the

23   curfew period, you shall wear an electronic monitoring

24   bracelet or a similar tracking device and follow all

25   requirements and procedures established for the curfew via

PROCEEDINGS                                39

1    electronic monitoring by the Probation Department.

2           Mr. Ricco, these conditions are all set forth in the

3    recommended sentence from the Probation Department, if your

4    client would like to follow along.

5           In addition, Mr. Mumuni, you shall pay all costs,

6    including the price of the electronic monitoring equipment, to

7    the degree that you're reasonably able to do so.

8           You shall disclose all financial information and

9    documents to the Probation Department to assess your ability

10   to pay.

11          You shall not associate in person, through mail,

12   through electronic mail, internet, social networking, or a

13   telephone with any individual with an affiliation to any

14   organized crime groups, gangs, or any criminal enterprise, nor

15   shall you frequent any establishment or location where these

16   groups may meet, pursuant but not limited to a prohibition

17   list provided by the Probation Department.

18          You shall cooperate with the Probation Department's

19   computer and internet monitoring program.  Cooperation shall

20   include, but not be limited to, identifying computer systems,

21   internal-capable devices, similar electronic devices that you

22   have access to, and allowing the installation of monitoring

23   software, hardware, on those devices at your expense.

24          You may be limited to possessing only one personal

25   David Wright case, out of the District of Massachusetts.

PROCEEDINGS                                          40

1    Internet-capable device in order to facilitate the

2    department's ability to effectively monitor your

3    internet-related activities.

4            You shall permit random examinations of said

5    computer systems, and all similar devices, including CDs that

6    are under your control.

7            You shall also submit your person, property, house,

8    residence, vehicle, papers, computers, other electronic

9    communications or data storage devices, or media, or office to

10   a search conducted by the United States Probation officer.

11   Failure to submit to a search may be grounds for revocation of

12   your release.

13           You shall warn any other occupants that the premises

14   may be subject to searches pursuant to this condition.  An

15   officer may conduct a search pursuant to this condition only

16   when reasonable suspicion exists that you have violated the

17   condition of your supervision, and that the areas to be

18   searched contain evidence of this violation.

19           Any search must be conducted at a reasonable time

20   and in a reasonable manner.

21           And, obviously, you cannot possess a firearm,

22   ammunition, or any such device.

23           I do not impose a fine.  I find that you are not

24   capable of paying a fine.

25           I am imposing a $500 special assessment, which must

PROCEEDINGS                                    41

1    be paid.

2              Mr. Mumuni, you can appeal your conviction.  You can

3    also appeal your sentence.  Any notice of appeal must be filed

4    within 14 days of the filing of the entry of a judgment, or

5    within 14 days of the filing of a notice of appeal by the

6    government.

7              If requested, the clerk will prepare and file a

8    notice of appeal on your behalf.  If you cannot afford to pay

9    the cost of an appeal or for appellate counsel, you have the

10   right to apply to have the fee waived, and on appeal you can

11   request appointed counsel.

12             Are there any other matters to be resolved?

13             MR. SOLOMON:  No, Your Honor.

14             MR. RICCO:  No, Your Honor.  Thank you.

15             THE COURT:  Mr. Mumuni, I do wish you the best of

16   luck.  I hope that while you're incarcerated, you will take

17   advantage of all the materials provided to you, including

18   finishing your education, so that when you're released, you

19   can, in fact, become a contributing member to society.

20             We're adjourned.

21             (Whereupon, the matter was concluded.)

22   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
23

24   s/ Linda D. Danelczyk                    April 30, 2018

25     LINDA D. DANELCZYK                         DATE

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*