18-1604-cr
*United States v. Mumuni*

# In the
# United States Court of Appeals
## for the Second Circuit

---

AUGUST TERM 2018

No. 18-1604-cr

UNITED STATES OF AMERICA,
*Appellant,*

v.

FAREED MUMUNI,
*Defendant-Appellee,*

MUNTHER OMAR SALEH, ALSO KNOWN AS ABU OMAR AL-RAMLI, ALSO
KNOWN AS ABU OMAR AR-RAMLI,
*Defendant.*

---

On Appeal from the United States District Court
for the Eastern District of New York

---

SUBMITTED: MAY 17, 2019
DECIDED: DECEMBER 27, 2019

---

Before: WALKER, CABRANES, and HALL, *Circuit Judges*.

———————

In this terrorism case, the Government appeals the substantive reasonableness of the sentence imposed on Defendant-Appellee Fareed Mumuni ("Mumuni"). He was convicted of, *inter alia*, conspiring to provide material support to the Islamic State of Iraq and al-Sham ("ISIS") and attempting to murder a federal agent in the name of ISIS. His advisory sentence under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") was 85 years' imprisonment. The sole question on appeal is whether the United States District Court for the Eastern District of New York (Margo K. Brodie, *Judge*) erred— or "abused its discretion"—by imposing a 17-year sentence, which constitutes an 80% downward variance from Mumuni's advisory Guidelines range. We conclude that it did. Accordingly, we **REMAND** the cause for resentencing consistent with this opinion.

Judge Hall concurs in part and dissents in part in a separate opinion.

———————

Emily Berger, Alexander A. Solomon,
Douglas M. Pravda, and Samuel P. Nitze,
Assistant United States Attorneys, *for*
Richard P. Donoghue, United States
Attorney for the Eastern District of New
York, Brooklyn, NY, *for Appellant*.

2

Anthony L. Ricco, Steven Z. Legon, and
Kenneth J. Montgomery, New York, NY, *for
Defendant-Appellee.*

———————

JOSÉ A. CABRANES, *Circuit Judge*:

In this terrorism case, the Government appeals the substantive
reasonableness of the sentence imposed on Defendant-Appellee
Fareed Mumuni ("Mumuni"). He was convicted of, *inter alia*,
conspiring to provide material support to the Islamic State of Iraq
and al-Sham ("ISIS") and attempting to murder a federal agent in the
name of ISIS. His advisory sentence under the United States
Sentencing Guidelines ("Guidelines" or "U.S.S.G.") was 85 years'
imprisonment. The sole question on appeal is whether the United
States District Court for the Eastern District of New York (Margo K.
Brodie, *Judge*) erred—or "abused its discretion"—by imposing a 17-
year sentence, which constitutes an 80% downward variance from
the advisory Guidelines range. We conclude that it did. Accordingly,
we **REMAND** the cause for resentencing consistent with this
opinion.

# I. BACKGROUND[1]

Mumuni is an American-born citizen who pledged allegiance to ISIS and pleaded guilty, without a plea agreement, to: (1) conspiring to provide material support—including services and himself—to a foreign terrorist organization, to wit ISIS, in violation of 18 U.S.C. § 2339B; (2) attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B; (3) conspiring to assault federal officers, in violation of 18 U.S.C. § 371; (4) attempted murder of federal officers, in violation of 18 U.S.C. § 1114; and (5) assault of a federal officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111. Mumuni was sentenced principally to a 204-month (17-year) term of imprisonment and 10 years of supervised release. Mumuni's statutorily restricted advisory Guidelines[2] sentence was 1,020 months, or 85 years. The Government appeals only the substantive reasonableness of Mumuni's sentence.

We conclude that Mumuni's sentence is substantively unreasonable for three reasons. First, the District Court clearly erred

---

[1] These facts are drawn from the record before the District Court, including sentencing materials in connection with Mumuni's co-defendant, Munther Omar Saleh.

[2] See U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 5G1.2(b) ("[T]he court shall determine the total punishment and shall impose that total punishment on each such count, except to the extent otherwise required by law."); id. cmt. n.3(B) ("The defendant's guideline range on the Sentencing Table may be affected or restricted by a statutorily authorized maximum sentence . . . .").

in its assessment of the evidence at sentencing. Specifically, it impermissibly second-guessed—after accepting Mumuni's guilty plea—whether Mumuni actually intended to kill his victim and whether the eight-inch kitchen knife[3] he wielded during his attack on law enforcement constituted a deadly or dangerous weapon. Second, the District Court imposed a disproportionately lenient sentence on Mumuni compared to his co-defendant, who, unlike Mumuni, did not physically attack a federal officer. Finally, the District Court placed mitigating weight on certain factors that could not bear the weight the District Court assigned to them.

*   *   *

Mumuni's offense conduct begins with his considerable efforts to provide material support to ISIS.[4] Between approximately February and June 2015, Mumuni conspired with Munther Omar Saleh ("Saleh")[5]—a self-proclaimed "full-fledged" member of ISIS

---

[3] The knife's blade was 200 millimeters, which is approximately 7.87 inches.

[4] The United States Department of State has designated ISIS a foreign terrorist organization under the name "Islamic State of Iraq and the Levant" ("ISIL"). *See* Bureau of Counterterrorism & Countering Violent Extremism, *Foreign Terrorist Organizations*, U.S. DEP'T OF STATE, https://www.state.gov/foreign-terrorist-organizations/. This opinion uses the acronyms "ISIS" and "ISIL" interchangeably.

[5] Mumuni met Saleh through the Islamic Society at the College of Staten Island, where he was pursuing a degree in social work.

with a "radicalizing gift"[6]—and others, to provide material support to ISIS. Mumuni and Saleh helped facilitate the travel of co-conspirator Nader Saadeh ("Saadeh") to Syria to join ISIS. Specifically, both Mumuni and Saleh accompanied Saadeh on a shopping trip to purchase items that would be useful in ISIS-controlled territories, such as hiking boots and a compass.[7] Mumuni also made plans to personally travel to Syria to join ISIS and wage jihad. Mumuni admitted that he and Saleh had been working to raise money for their travels to join ISIS, and that he had begun researching flights from New York to Turkey.

Beyond his efforts to facilitate travel to Syria, Mumuni also conspired with Saleh and others to conduct a domestic terrorist attack against law enforcement officers. Indeed, in a post-arrest statement to agents from the Federal Bureau of Investigation ("FBI"), Mumuni confirmed no less than four times that he planned to attack law enforcement were they to ever approach him or prevent him from traveling to Syria. Mumuni was offered a pressure-cooker bomb from Saleh for his attack. When Mumuni asked Saleh whether it would be permissible from a religious standpoint to die during his attack on law enforcement, Saleh contacted Junaid Hussain

---

[6] GA 245.

[7] Saadeh ultimately boarded a flight at John F. Kennedy International Airport to Jordan; upon landing, he was intercepted and apprehended by Jordanian authorities.

("Hussain"), a notorious Syria-based ISIS attack facilitator.[8] Hussain expressly authorized Mumuni's suicide attack:

> Saleh: Akhi [brother] help us out, i have an akh [brother] who is planning on hitting a black car cop with a pressure cooker, the black car keeps following him, and he wants to avenge our akhs [brothers] who have been raided and blocked from hijrah [migration].
>
> Is it permissible for him to do the attack and die purposely in the process?[9]
>
> Hussain: Yes akhi [brother] he can do an isthishadi [martyrdom] operation on the

---

[8] *See* Margaret Coker, et al., *Hacker Killed by Drone was Islamic State's 'Secret Weapon,'* WALL ST. J. (Aug. 27, 2015), https://www.wsj.com/articles/hacker-killed-by-drone-was-secret-weapon-1440718560 ("U.S. officials began to view Mr. Hussain as a top threat because he was on the leading edge of Islamic State efforts to recruit in the U.S."); *see also The American Exception: Terrorism Prosecutions in the United States—The ISIS Cases (March 2014 – August 2017)*, CTR. ON NAT'L SEC. AT FORDHAM LAW 29, 32–33 (Sept. 2017) https://news.law.fordham.edu/wp-content/uploads/2017/09/TheAmericanException9-17.pdf (describing various connections between Hussain and other ISIS terrorists and terrorism plots).

[9] GA 250.

police akhi [brother] . . . If he has no other
way to fight them he can do it.[10]

Saleh and Mumuni would regularly contact each other with
ideas for an attack. For example, on June 2, 2015, Saleh instructed
Mumuni that the best option for attacking law enforcement was to
use a bomb and fight afterwards. When Mumuni asked for further
guidance, Saleh wrote that Mumuni should first detonate a bomb,
run over the officers with a vehicle, seize their weapons, and then use
the weapons to shoot at other victims.

On June 12, 2015, Saleh texted Mumuni: "I decided to tell my
parents 'i will be gone in much less than a year, in sha Allah, you
have two choices, either you let me go to Darul Islam [ISIS-controlled
territory] or you watch me kill nonMuslims [sic] here.[']"[11] Mumuni
replied: "May Allah make it easy for you."[12] That night, Saleh
executed an attack against law enforcement.

Saleh and co-conspirator Imran Rabbani ("Rabbani") had been
driving in an SUV the evening of June 12 when they noticed an
unmarked vehicle following them. The men performed several anti-
surveillance maneuvers to evade the unmarked vehicle, including
driving at high speeds through a parking lot with their lights turned

---

[10] *Id.*

[11] Mumuni Presentence Investigation Report ("PSR") ¶ 19.

[12] *Id.*

off and running stop signs. At approximately 4 a.m. on June 13, Saleh and Rabbani stopped their vehicle at a red light at 20th Avenue, on an overpass above the Whitestone Expressway in Queens. Saleh and Rabbani exited their SUV and began walking toward the unmarked vehicle. As Saleh approached the unmarked vehicle, he placed an unopened folding knife from his hand into his pocket. Before Saleh and Rabbani reached the unmarked vehicle, they decided to turn around and re-enter their SUV. Moments later, Saleh and Rabbani again exited the SUV and began charging toward the unmarked vehicle. The FBI agent in the unmarked vehicle had to quickly reverse off the highway overpass into oncoming traffic in order to evade Saleh and Rabbani's attack.

When backup officers arrived, they arrested Saleh and Rabbani and discovered a folding knife in the SUV and a Smith & Wesson tactical folding knife in Rabbani's waistband. Rabbani's knife had been equipped with a built-in window breaker, which would have allowed Saleh and Rabbani to gain immediate access to the FBI vehicle.

In a post-arrest interview, Saleh stated that he had pledged allegiance to, and was a "full-fledged" member of, ISIS.[13] In addition, he characterized Mumuni as another ISIS supporter and confirmed that Mumuni planned to travel to the Islamic State-held territory. Saleh also informed the interviewing agents that Mumuni had

---

[13] *Id.* ¶ 17.

expressed an intent to attack law enforcement officers who had been surveilling him.

*Mumuni's June 17, 2015 Attack on Law Enforcement*

Two days after Saleh's attack, the Government obtained a search warrant for Mumuni's cellular phone and residence on Staten Island. On June 17, 2015, FBI agents went to Mumuni's residence to execute the search warrant. The agents knocked on the front door and announced themselves as members of law enforcement. Mumuni's mother and sister opened the door and granted the officers permission to enter the premises.

Mumuni, aware that law enforcement officers had entered his home,[14] retrieved an eight-inch kitchen knife from his bedroom[15] and descended the stairs. With the knife concealed behind his back, Mumuni—pursuant to the agents' instructions—entered the living room and walked toward the couch. Suddenly, he began charging toward FBI Special Agent Kevin Coughlin ("Agent Coughlin"). It

---

[14] As Mumuni explained after his arrest, he knew that law enforcement was at his door "'cause no one bangs at the door like that." *See* June 17, 2015 Post-Arrest Statement Transcript ("June 17, 2015 Transcript") at 83.

[15] As Mumuni later admitted to investigating agents, he began keeping one knife under his pillow and one in his mother's car "in case [officers tried] to stop me." *Id.* at 64.

wasn't until he was within "arm's length"[16] that Mumuni revealed his knife and began stabbing the unarmed Agent Coughlin. During the ensuing tussle, as other agents rushed to Agent Coughlin's aid, Mumuni attempted to reach for the trigger of another agent's M4 carbine assault rifle.[17]

Fortunately, prior to entering Mumuni's home, Agent Coughlin made a "last-minute decision" to wear an armored SWAT vest.[18] As the Government's edged-weapons expert explained, however, SWAT vests are designed to stop bullets, not blades, and do not typically stop thrusts or stabbing attacks. What ultimately shielded Agent Coughlin from Mumuni's repeated stabs was the metal magazine carrier inside his vest. Indeed, photographs taken after the attack show Agent Coughlin's metal magazine carrier with three distinct indentations and an eight-inch kitchen knife with a missing tip.

---

[16] GA 204.

[17] While Mumuni disputes this account, the District Court declined to strike this text from the PSR, opting instead to insert the following objections: "Fareed Mumuni asserts that upon lunging at the first agent, he was taken down and immediately subdued by the agents. He denies any allegation that he reached for an agent's firearm and attempted to pull the trigger," GA 185, and "Fareed Mumuni acknowledges that he lunged at a law enforcement officer with a single kitchen knife, however, he denies repeatedly stabbing anyone," *id.* 186. The District Court did not appear to accept or reject either account of the attack. It did, however, decline to consider Mumuni's argument that the facts and circumstances did not support the use of the first-degree murder guideline. *Id.*

[18] *Id.* at 203.

After subduing and arresting Mumuni, the agents received consent from Mumuni's mother to search her car, where they recovered another large kitchen knife hidden in a duffel bag.

Mumuni pleaded guilty on February 9, 2017, to conspiring and attempting to provide material support to ISIS,[19] conspiring to attack federal officers,[20] assaulting a federal officer with a dangerous or deadly weapon,[21] and attempting to murder a federal officer.[22] The District Court accepted the guilty plea after affirming that it had been entered knowingly and voluntarily and that it was "supported by an independent basis in fact containing the essential elements of the offenses."[23]

*Mumuni's Sentencing*

Mumuni's Sentencing Guidelines calculation, as reported in his Presentence Investigation Report ("PSR") and adopted by the District

---

[19] 18 U.S.C. § 2339B.

[20] *Id.* § 371.

[21] *Id.* § 111(a)(1), (b).

[22] *Id.* § 1114(3).

[23] GA 63.

Court,[24] reflected a total offense level of 43 and a criminal history category of VI, resulting in an advisory Guidelines sentence of life imprisonment. Because life imprisonment exceeded the statutorily authorized maximum sentence of 1,020 months (85 years), the statutorily authorized maximum sentence of 1,020 months (85 years) became the Guidelines sentence.[25]

At sentencing, the Government sought the Guidelines sentence of 1,020 months (85 years). It focused on the exceptionally serious nature of Mumuni's conduct, including the fact that when Mumuni attempted to kill Agent Coughlin, he was engaged in an act of terrorism for which he had received advance authorization from Junaid Hussain, a Syria-based ISIS operative. It also compared Mumuni's case to those of similarly-situated terrorism defendants who, like Mumuni and Saleh, had been recruited by Hussain to commit domestic terror attacks in the United States.[26] Finally, the

---

[24] The District Court did not identify any errors in the PSR's Guidelines calculations. It did, however, correct errors, not relevant here, in the PSR's supervised release calculations.

[25] *See* U.S.S.G. § 5G1.2(b) ("[T]he court shall determine the total punishment and shall impose that total punishment on each such count, except to the extent otherwise required by law."); *id.* cmt. n.3(B) ("The defendant's guideline range on the Sentencing Table may be affected or restricted by a statutorily authorized maximum sentence . . . .").

[26] The Government focused on two cases in particular: the David Wright ("Wright") case and the Justin Sullivan ("Sullivan") case. In 2017, a district court in the District of Massachusetts sentenced Wright to 28 years, following a trial, for encouraging his co-conspirator, Usaamah Rahim ("Rahim"), to "go after" the

Government presented testimony from Agent Coughlin, who
described in vivid detail the premeditated and extremely violent
nature of Mumuni's attack.[27]

By contrast, Mumuni's counsel sought a sentence at variance
with the Guidelines. He highlighted several mitigating factors,
including Mumuni's young age at the time of his arrest (21 years
old), his lack of criminal history, the letters of support he had

---

"boys in blue." GA 260. Rahim had received instructions from Hussain to behead
Pamela Geller, the organizer of the Prophet Muhammad contest in Garland,
Texas. Rahim was killed after lunging towards police officers and FBI agents with
a large fighting knife and refusing to drop his weapon. Another co-conspirator,
Nicholas Rovinski ("Rovinski"), was sentenced to 15 years' imprisonment—just
two years fewer than Mumuni—after pleading guilty and testifying as a
cooperating witness at Wright's trial.

Similarly, in 2015 in the Western District of North Carolina, Sullivan was
recruited by Hussain to conduct attacks on behalf of ISIS. Sullivan agreed to buy
an AR-15 rifle at a gun show and to shoot to death as many people as possible at a
club or concert in North Carolina. After a silencer Sullivan ordered was delivered
to his house and opened by his parents, Sullivan asked an undercover FBI agent
to kill his parents. When agents subsequently searched Sullivan's house, they
discovered a .22 Marlin rifle loaded with 14 rounds and a travel bag containing a
black ski mask and lock picking tools. Unlike Mumuni, Sullivan never actually
conducted a terror attack. Nevertheless, he was sentenced to life imprisonment.

[27] *See, e.g.*, GA at 204 ("I also think it's important to point out that when
Mr. Mumuni came down those stairs that day, that he came down those stairs
with the intent of trying to kill one of us. And I say that because it's not like he
grabbed that knife from the kitchen on his way down. He had that knife with him
in his room when he came out and he concealed it until the last possible minute.
He did not walk down those stairs [waving] that knife around, because if he had,
we would have shot him before he got to the bottom of the stairs.").

14

received from friends and family members, and the fact that, unlike Saleh, he was not a leader and did not recruit anyone to join ISIS. Mumuni's counsel further noted the "absence of physical injury and damage to property or people,"[28] and repeatedly characterized Mumuni's attack as an attempt to commit "suicide by cop,"[29] *i.e.*, an attempt to provoke a lethal response from law enforcement.

The District Court ultimately sentenced Mumuni to a cumulative 204-month term of incarceration—80% below the advisory Guidelines sentence. Specifically, Mumuni received concurrent 120-month terms on the two material support charges; concurrent 60-month terms on the two assault charges; and a concurrent 204-month term of imprisonment for the attempted murder charge. In effect, Mumuni received only 84 months (7 years) for attempting to murder Agent Coughlin.

---

[28] *Id.* at 190.

[29] Dist. Ct. Dkt. No. 153 at 16–17 ("[U]pon [law enforcement's] entry, a radicalized Fareed Mumuni lunged toward one of the agents with a kitchen knife in hand, in an unsuccessful attempt to commit suicide by cop. In so doing, Fareed Mumuni committed the offense of attempted murder of a federal agent."); *see also* GA 192–93 ("What did [Mumuni] think was going to happen as he ran towards law enforcement officers fully armed. Two with long firearms; others with handguns. With a knife in his hand, a kitchen knife. Did he think that he was going to be able to somehow kill these officers, or was [it] in his mind [that] he wanted to be shot dead?").

## III. DISCUSSION

While district courts have broad discretion at sentencing, this discretion is not unlimited. Not only must district courts abide by specific procedural requirements, but they must faithfully evaluate the record to ensure that the sentence imposed accurately and adequately reflects the seriousness of the offense conduct. Here, the District Court drastically discounted the seriousness of Mumuni's offense conduct based on a sterilized and revisionist interpretation of the record. This clearly erroneous assessment of the evidence leaves us with the definite and firm conviction that a mistake has been committed—a mistake that resulted in a shockingly low sentence that, if upheld, would damage the administration of justice in our country.

### A. Standard of Review

The Government has challenged only the substantive reasonableness of Mumuni's sentence on appeal, and we have not independently identified any procedural error. Accordingly, we conduct only a substantive review of Mumuni's sentence.

We note at the threshold that our Court has not yet decided the standard of review that applies to unpreserved challenges of substantive unreasonableness. We need not do so here because we would hold Mumuni's sentence substantively unreasonable even under the most demanding standard of review, plain error.

Our substantive review of a sentence is "akin to review under an 'abuse-of-discretion' standard."[30] We have repeatedly emphasized that "abuse of discretion" is a "distinctive term of art that is not meant as a derogatory statement about the district judge whose decision is found wanting."[31] "It is more properly understood as referring to occasions where, after examining trial court records, an appellate court reaches the informed judgment that a ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence," or the district court has rendered "a decision that cannot be located within the range of permissible decisions."[32]

In the context of sentencing, a district court's evaluation of the evidence is "clearly erroneous" when we are left with the "definite and firm conviction" that the district court has misinterpreted the record and, as a result, has misweighed certain aggravating or mitigating factors.[33] The length of a sentence is outside "the range of

---

[30] *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009).

[31] *United States v. Park*, 758 F.3d 193, 199–200 (2d Cir. 2014); *see also In re The City of New York*, 607 F.3d 923, 943 n.21 (2d Cir. 2010) (explaining that "abuse of discretion" is a nonpejorative "term of art").

[32] *Park*, 758 F.3d at 200 (internal quotation marks and alterations omitted).

[33] *Id.* (internal quotation marks omitted). *See generally United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it.").

permissible decisions" when "affirming it would damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law."[34] In other words, a sentence is outside the range of permissible decisions when it is manifestly unjust or when it "shocks the conscience."[35]

"[T]he measure of what is conscience-shocking is no calibrated yard stick."[36] We have observed that we "use as our lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)—namely, retribution, deterrence, and incapacitation."[37] Ultimately, what "shocks the conscience" depends on the "informed intuition of the appellate panel."[38] It is a "highly contextual"[39] standard that

---

[34] *Park*, 758 F.3d at 200 (internal quotation marks omitted).

[35] *Rigas*, 583 F.3d at 123 (internal quotation marks omitted).

[36] *United States v. Aldeen*, 792 F.3d 247, 255 (2d Cir. 2015) (internal quotation marks omitted).

[37] *Park*, 758 F.3d at 200 (internal quotation marks and alterations omitted).

[38] *Rigas*, 583 F.3d at 123.

[39] *Id.*

"involves some degree of subjectivity"[40] in its application and provides relief "only in the proverbial 'rare case.'"[41]

Finally, while a sentence outside the advisory Guidelines range is not presumptively unreasonable,[42] a significant departure or variance from the recommended Guidelines range "should be supported by a more significant justification than a minor one."[43]

In sum, in reviewing a sentence for substantive reasonableness, we are "not disparaging the person of a trial judge, but simply concluding, after careful review, (1) that a sentence lacks a proper basis in the record, (2) that a trial judge's assessment of the evidence leaves the reviewing court with a definite and firm conviction that a mistake has been committed, or (3) that the reviewing court has reached the informed judgment that a sentence is otherwise unsupportable as a matter of law."[44]

---

[40] *Park*, 758 F.3d at 199 (internal quotation marks omitted).

[41] *Rigas*, 583 F.3d at 123. Notwithstanding the inherent difficulty in defining the precise boundaries of the "shock-the-conscience" standard, a reviewing court must not relegate itself to functioning as a mere rubber stamp for any sentence the district court may impose. *See id.* at 122 ("'[R]easonableness' is not a code-word for 'rubber stamp.'" (quoting *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006))).

[42] *See Gall v. United States*, 552 U.S. 38, 47 (2007).

[43] *Id.* at 50.

[44] *Park*, 758 F.3d at 200–01.

### B. Application

Upon review of the record, we identify three errors that render Mumuni's sentence substantively unreasonable.

First, the District Court relied on a sterilized account of the attack that is unsupported by the record and that contradicts the District Court's own findings at Mumuni's guilty plea hearing. The District Court's inability to accurately assess the record, in turn, resulted in its underappreciation of the materiality of the assault as an attempt to murder Agent Coughlin.

Second, the District Court's rationale for the disparity between Mumuni's sentence (17 years) and Saleh's sentence (18 years) is also unsupported by the record and appears to contradict the District Court's earlier suggestion[45] that, in light of the violent attack on a law enforcement agent, a more severe sentence than Saleh was fully justified.

Third, the District Court placed undue weight on factors that cannot bear the weight assigned to them under the totality of circumstances. Jointly and severally, these errors caused the District

---

[45] *See* GA 174 (Saleh sentencing) (Court: "I know the Government is arguing to me that he shouldn't get a break because they thwarted what he was trying to do, but I can't sentence him for what he might have done. His co-conspirator, Mr. Mumuni, did attack law enforcement . . . .").

Court to render a sentence that is shockingly low and unsupportable as a matter of law.

> **1. The District Court impermissibly second-guessed whether Mumuni intended to kill Agent Coughlin and whether his eight-inch kitchen knife constituted a dangerous or deadly weapon.**

It is well-established that a district court cannot accept a guilty plea unless it is satisfied that there is a factual basis for the plea.[46] Here, Mumuni pleaded guilty to, *inter alia*, attempted murder of a federal officer, in violation of 18 U.S.C. § 1114(3), and assault of a federal officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b). "[A]n attempt to commit murder requires a specific intent to kill."[47] Moreover, the question of whether an object constitutes a dangerous weapon hinges, in part, on "the manner in which the object is used," as "many objects, even those seemingly innocuous, may constitute dangerous weapons."[48]

---

[46] *See* FED. R. CRIM. P. 11(b)(3); *see also North Carolina v. Alford*, 400 U.S. 25, 35 n.8 (1970).

[47] *See United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994) ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." (internal quotation marks omitted)).

[48] *United States v. Matthews*, 106 F.3d 1092, 1095 (2d Cir. 1997) (internal quotation marks omitted).

Case 1:15-cr-00393-MKB   Document 163-1   Filed 01/21/20   Page 22 of 37 PageID #: 2580

Accordingly, before accepting Mumuni's guilty plea, the
District Court was required to ensure that the following essential
elements were supported by an independent basis in fact: (1)
Mumuni intended to kill Agent Coughlin when he lunged at him
with an eight-inch kitchen knife; and (2) either the eight-inch kitchen
knife was an inherently dangerous weapon or the manner in which
Mumuni wielded the knife rendered it a dangerous weapon.
Mumuni's allocution provided an ample basis for each of these
determinations:

> Mumuni: Between May 2015 and June 2015 .
> . . I knowingly and intentionally agreed
> with others to forcibly oppose and impede
> any law enforcement officer who would
> prevent me from traveling overseas to join
> ISIL in the Middle East by use of [a]
> dangerous or deadly weapon. In June 2015, I
> lunged at a law enforcement officer with a
> knife. . . .
>
> I did deliberately and intentionally attempt
> to kill a law enforcement officer by
> [lunging] at him with a knife knowing that
> if I succeeded in my attempt I could kill
> him.
>
> Court: Was that your intent?

Mumuni: Yes, your Honor.[49]

What's more, after the Government prudently expressed some concern about the sufficiency of Mumuni's allocution regarding his intent to kill Agent Coughlin, the District Court actually revisited this element:

Government: Your Honor, I believe there are a couple of elements which we need to address. . . .  [W]ith respect to Count Five, attempted murder of federal officers, we would have to prove that the defendant acted with malice aforethought and that he acted with premeditation. . . .

Court: I thought he allocuted to that also, the attempted murder. So Mr. Mumuni, it sounds like you were planning to go abroad to assist ISIS. You knew that you were being surveilled by law enforcement. Correct?

Mumuni: Yes, your Honor.

---

[49] GA 55–56.

23

Court: And at some point, did you make plans to prevent law enforcement or to attack them in some way, [thereby] preventing them from stopping you, as you indicated?

Mumuni: Yes, your Honor.

Court: You allocuted that it was your intent to murder them, if necessary; is that accurate?

Mumuni: Yes, your Honor.

Court: And, so, when you lunged at law enforcement on June 17, 2015, did you do so with the intent to murder them if necessary? And you can take a minute and speak to your attorney if you need to. The issue, [counsel], is whether or not he acted with premeditation, planning, and deliberation and, also, whether it was willful.

Mumuni: I knew by lunging with them at a knife [sic], if I succeeded in my attempt I could kill them.

Court: Okay. I believe that satisfies all of the
elements.[50]

The District Court thereupon accepted Mumuni's guilty plea.[51]
Nevertheless, at sentencing, the District Court appeared to second-
guess whether Mumuni actually had the intent to kill Agent
Coughlin during his attack and whether he wielded the knife in a
manner capable of inflicting serious bodily injury:

Court: My understanding of what your
intent was at that point in time, on that day
when you were arrested, that you planned
on defending yourself, even if it meant that
you would die. Did you intend to kill the
agent? It's not clear to me that you did. You
had a knife, a kitchen knife. . . .

Did Mr. Mumuni really think he could do
damage with that knife? I don't know.

---

[50] *Id.* at 60–63.

[51] *Id.* at 63 ("I find that the defendant is fully competent and capable of
entering an informed plea, that he is aware of the nature of the charges and the
consequences of the plea, and that his plea of guilty to each count is a knowing
and voluntary plea and is supported by an independent basis in fact containing
the essential elements of the offense.").

> But I heard Agent Coughlin's testimony,
> and I understand that he was threatened
> and that he believed under the
> circumstances that, yes, you could have
> killed him. And I'll credit his statement that
> that could have been the outcome whether
> you intended it or not. Maybe your intent
> was only that you would die, but you could
> have killed him.[52]

Not only are these musings plainly contradicted by the record, but they are also unsupportable as a matter of law. First, the only legally permissible inference to be drawn from Mumuni's guilty plea is that he had the specific intent to kill Agent Coughlin. Second, Agent Coughlin's testimony and the physical evidence of the attack confirm, beyond any reasonable doubt, that Mumuni intended to kill Agent Coughlin. Had Mumuni's intent been merely to injure Agent Coughlin, he would not have stabbed Agent Coughlin repeatedly or struck him with enough force to break the tip off the knife and dent Agent Coughlin's metal magazine carrier. Finally, the District Court, having accepted Mumuni's plea of guilty to assault of a federal officer with a deadly or dangerous weapon, was not entitled to second-guess the potential lethality of an eight-inch kitchen knife. Of course, if the District Court did have reasonable second thoughts

---

[52] *Id.* at 214–15.

about its own earlier findings, it was required to vacate the guilty
plea that it had accepted the first time around.

Any speculation by the District Court that Mumuni may have
only sought to "defend himself" is also unsupportable as a matter of
law. Mumuni was the initial aggressor in the altercation with Agent
Coughlin; as such, he could not, as a matter of law, have been acting
in self-defense.[53] Nor is it relevant that Mumuni claims to have been
merely committing "suicide by cop."[54] His alleged ulterior motive in
attacking Agent Coughlin does not negate his specific intent to kill.
Put differently, even if Mumuni wanted to be shot, his intent to kill
Agent Coughlin is irrefutable. After all, Mumuni kept his weapon
concealed behind his back until the last minute, when it was too late
for Agent Coughlin to take any defensive action. Had his intent been
strictly to provoke a lethal response, he could have, as Agent
Coughlin suggested during his testimony, come downstairs
"[waving] that knife around . . . [and law enforcement] would have
shot him before he got to the bottom of the stairs."[55]

The District Court's clearly erroneous findings and legal error
resulted in its improper discounting of the seriousness of Mumuni's

---

[53] *See United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2008) ("It has long
been accepted that one cannot support a claim of self-defense by a self-generated
necessity to kill." (internal alterations and quotation marks omitted)).

[54] *See supra* note 29.

[55] GA 204.

offense conduct. Mumuni's attack was not a spontaneous assault of a federal officer amid a heated altercation. Nor was it an act of self-defense. Mumuni's violent attack against Agent Coughlin was indisputably a premeditated, willful, and deliberate attempt to murder a federal officer in the name of ISIS. In short, it was a pre-authorized ISIS terrorist attack on American soil.

We are confident that if the District Court had fully appreciated the heinous nature of this offense—including its terrorist design—it would have reconsidered the weight ultimately accorded several aggravating factors, such as: (1) the nature and circumstances of the offense; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and (4) the need to protect the public from further crimes of the defendant.

## 2. Mumuni's 17-year sentence was disproportionately lenient compared to Saleh's 18-year sentence.

In downplaying the significance of Mumuni's assault, the District Court overlooked one of the most salient distinctions between Mumuni and Saleh. To wit, Saleh, unlike Mumuni, was convicted only of simple assault and was never charged with attempted murder of a federal officer. This charging distinction explains why Mumuni's advisory Guidelines range was 85 years,

while Saleh's was only 53.[56] Yet the District Court never so much as mentioned this aggravating factor at Mumuni's sentencing. Instead, it treated Mumuni and Saleh as if they had been convicted of similar conduct, and narrowed the scope of its comparison between the two defendants to their respective roles within the conspiracy to provide material support to ISIS:

> Unlike Mr. Saleh, your codefendant, you
> were not the leader of any group. In fact,
> you were recruited to participate in this
> group. There is no evidence that you
> recruited anyone else to follow ISIS. There's

---

[56] Both Mumuni and Saleh were charged with, and pleaded guilty to, conspiracy to provide material support to a foreign terrorist organization, 18 U.S.C. § 2339B(a)(1), attempt to provide material support to a foreign terrorist organization, *id.*, and conspiracy to assault federal officers, *id.* § 371. These three charges collectively carry a statutory maximum sentence of 45 years' imprisonment.

Both defendants also pleaded guilty to assault of a federal officer, *id.* § 111, but only Mumuni pleaded guilty to assault with a dangerous or deadly weapon under § 111(b). By contrast, Saleh pleaded guilty to the lesser-included offense of forcibly impeding federal law enforcement officers, which does not include as an element the use of a dangerous or deadly weapon. Accordingly, the statutory maximum for Mumuni's assault charge was 20 years, while Saleh's was only 8 years.

Finally, only Mumuni pleaded guilty to attempted murder of a federal officer, *id.* § 1143(3), which carries a statutory maximum of 20 years' imprisonment.

> no evidence that you praised ISIS' heinous
> actions, as your codefendant did, or that
> you translated any ISIS propaganda for
> others, as Mr. Saleh did. Unlike Mr. Saleh,
> when you were arrested, you gave a full
> statement. . . .[57]

By ignoring Mumuni's significantly more violent assault, the District
Court treated Mumuni and Saleh as if they had engaged in
comparable conduct, which is simply not true.

Perhaps more concerning, however, is that the District Court
relied on the comparison between Mumuni and Saleh's conduct only
when it served as a mitigating factor. At Saleh's sentencing, for
example, the District Court noted that while it could not sentence
Saleh "for what he might have done," Mumuni, by contrast, "did
attack law enforcement."[58] Yet at Mumuni's sentencing eleven weeks
later, where his comparatively violent conduct served as an
aggravating factor, there was no mention of this distinction. Where,
as here, a sentencing court opts to compare the relative culpability of
co-defendants, it cannot selectively rely on a factor when it serves a
mitigating function in one case, but then ignore the same factor when
it serves an aggravating function in the other case.

---

[57] GA 216.

[58] *Id.* at 174.

In sum, the District Court substantively erred by imposing a sentence that does not adequately reflect Mumuni's more serious conduct. While Saleh may have been higher in the ISIS pecking order than Mumuni, it was Mumuni—not Saleh—who pleaded guilty to a violent act of terrorism that, but for a fortuity beyond his control, could easily have resulted in Agent Coughlin's death.

### 3. The mitigating factors relied on by the District Court cannot bear the weight assigned to them.

The District Court principally relied on four mitigating factors in support of its decision to impose a sentence 80% below the advisory Guidelines range: (1) Mumuni's relative youth at the time he committed the offense; (2) his lack of an existing criminal record; (3) his lack of any disciplinary infractions during his three years of pre-trial and pre-sentencing incarceration; and (4) letters of support from family members and friends that "describe a very different Mumuni than the one who was arrested that morning."[59] An 80% downward departure from the Guideline range is remarkable, especially considering the totality of circumstances in this case. Without applying any presumption, rigid formula, or specific proportionality requirement, we echo the "uncontroversial" proposition that a District Court's "major departure [from the Guidelines] should be supported by a more significant justification

---

[59] GA 216.

31

than a minor one."[60] We conclude that, in light of the totality of circumstances, the first three factors cannot bear the weight assigned to them by the District Court.

First, no substantially mitigating weight can be borne here by the fact that Mumuni did what was plainly required of him—that is, behaving himself in prison. Mumuni may, in due course, receive a reward for his compliance with institutional disciplinary regulations through good time credit.[61] Moreover, his compliance with institutional regulations has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a). By contrast, had Mumuni failed to abide by institutional regulations, his continued disrespect of the rules would suggest a greater need to protect the public from further crimes and to deter future criminal conduct.

Similarly, we conclude that Mumuni's age and lack of prior criminal record cannot bear the mitigating weight assigned to them. In this case involving terrorism and such serious offense conduct, the District Court's reliance on these mitigating factors produced a

---

[60] *Gall v. United States*, 552 U.S. 38, 50 (2007).

[61] *See* 18 U.S.C. § 3624(b)(1) (providing that "a prisoner who is serving a term of imprisonment of more than 1 year . . . may receive credit toward the service of [that] sentence . . . of up to 54 days at the end of each year of the prisoner's term of imprisonment" if the Bureau of Prisons determines that "during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations").

sentence that shocks the conscience and cannot be located within a permissible range of decisions. Although we owe deference to sentencing judges, it is also our duty to assess the totality of circumstances and "patrol the boundaries of reasonableness."[62] The District Court's sentence here exceeded those boundaries.

In sum, three of the four factors relied upon by the District Court as mitigating cannot serve as a justification for so lenient a sentence.

\*       \*       \*

We conclude by underscoring that the Guidelines, while only advisory,[63] appropriately reflect Congress's considered judgment that

---

[62] *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008).

[63] *See United States v. Booker*, 543 U.S. 220 (2005).

terrorism is different from other crimes.[64] [65] "[T]errorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal."[66] Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission "plainly intended for the punishment of crimes of terrorism to be significantly enhanced

---

[64] *See, e.g.*, Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, § 120004, 108 Stat. 1796, 2022 (directing the United States Sentencing Commission to create an "enhancement" for prison sentences resulting from felonies involving or intending to promote international terrorism); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730, 110 Stat. 1214, 1303 (extending the enhancement to domestic terrorism offenses); U.S.S.G. § 3A1.4 (enforcing the aforementioned congressional directives by directing district courts to increase a defendant's offense level by 12 and his criminal history category to VI if his felony "involved, or was intended to promote, a federal crime of terrorism"); *id.* app. C, amend. 637 (2002) (imposing base offense Guidelines for crimes of terrorism, including providing material support or resources to a designated foreign terrorist organization) ("This amendment is a six-part amendment that responds to the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001, Pub. L. 107–56.").

[65] *See, e.g.*, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Pub. L. No. 107–56 § 810, 115 Stat. 272, 380 (amending 18 U.S.C. § 2339B(a)(1)—which criminalizes the provision of material support or resources to designated foreign terrorist organizations—to increase the statutory maximum sentence from 10 to 15 years and authorizing a life sentence if the death of any person results); Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015, Pub. L. No. 114–123, § 702, 129 Stat. 268, 300 (amending 18 U.S.C. § 2339B(a)(1) again to increase the statutory maximum sentence from 15 to 20 years).

[66] *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences."[67] Thus, in determining what constitutes a "sufficient"[68] sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.[69]

---

[67] *United States v. Stewart*, 590 F.3d 93, 175 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part).

[68] 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary . . . .").

[69] Recently, in *United States v. Pugh*, 937 F.3d 108 (2d. Cir 2019), we vacated the statutory maximum sentence of 420 months' imprisonment for a defendant who had been convicted, following a jury trial, of attempting to provide material support to a foreign terrorist organization (ISIS) and obstruction of justice. Because the sentence was vacated on grounds of *procedural* unreasonableness only, *Pugh* does not preclude or affect a sentencing court's ability to impose the maximum sentence for a terrorist defendant. It merely requires that the court, as always, articulate its reasons for imposing the maximum sentence.

# III. CONCLUSION

To summarize, we hold as follows:

(1) Mumuni's sentence of 17 years' imprisonment—which constitutes an 80% reduction from his recommended Guidelines range of 85 years—is substantively unreasonable in light of his exceptionally serious conduct involving a domestic terrorist attack against law enforcement in the name of ISIS.

(2) Where a district court has accepted a defendant's guilty plea and his allocution to the elements of each charged offense, it cannot make findings of fact during sentencing that contradict or otherwise minimize the conduct described at the defendant's plea hearing.

(3) Where a sentencing court opts to compare the relative culpability of co-defendants, it cannot selectively rely on a factor when it serves a mitigating function in one case, but then subsequently ignore the same factor when it serves an aggravating function in the other case.

(4) A defendant's legally-required compliance with institutional regulations during his term of pre-trial and pre-sentencing detention is not a substantially mitigating factor for purposes of sentencing.

(5) At Mumuni's resentencing, the District Court, on the basis of the record that supported Mumuni's guilty plea, shall accord substantially greater weight to the following 18 U.S.C. § 3553(a) factors:

    (a) the nature and circumstances of the offense;

    (b) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (c) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

    (d) the need to protect the public from further crimes of the defendant.

For the foregoing reasons, Mumuni's sentence is substantively unreasonable. Accordingly, we **REMAND** for resentencing in accordance with this opinion.

In the interest of judicial economy, any subsequent appeal in this case shall be directed to this panel.