UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

     - against -                         Docket No. 15 Cr. 393 (MKB)

FAREED MUMUNI,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**SUPPLEMENTAL SENTENCING MEMORANDUM**
**FOR FAREED MUMUNI**
(Along with Accompanying Exhibits In support)


*Attorney for Fareed Mumuni*

*Anthony L. Ricco*
ANTHONY L. RICCO, ESQ.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 791-3919
*Tonyricco@aol.com*


Steven Z. Legon, Esq.
Kenneth J. Montgomery, Esq.
Of Counsel and on the Memorandum

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

     - against -                        Docket No. 15 Cr. 393 (MKB)

FAREED MUMUNI,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

On December 29, 2019, the United States Court of Appeals for the Second Circuit vacated the sentence imposed by this court and remanded for re-sentencing. The Second Circuit made clear that the remand for re-sentencing was to be constrained by the views that it expressed in support of issuing the remand. The court must certainly follow the instructions of the Second Circuit; however, in its decision in support of remand, the Second Circuit mis-stated and misapplied a contrary and clearly established United States Supreme Court authority, on an important factor - the application of evidence that establishes post arrest rehabilitation. Additionally, the Second Circuit completely ignored the actual arguments advanced by the defense, and mis-stated and inaccurately characterized the actual hard work and devotion that this court gave to the seriousness of the offense, and the other factors set forth in 18 U.S.C. §3553(a).

Notwithstanding the views of the Second Circuit - which inaccurately depict the actual review engaged in by this court - on remand and re-sentencing, Fareed Mumuni requests that this court, again, fully analyze all of the applicable factors, including those for which the Second Circuit has ordered on remand, along with consideration of Fareed Mumni's conduct subsequent to the April 2018 sentencing, and impose a sentence at variance with the Guidelines, similar to that imposed approximately twenty months ago. This time, on remand, the defense requests that this court engage in the same thoughtful and care review of all the submitted information, the views of the government experts, the views those

neighbors and community members who took the time to provide insight into young Fareed Mumuni's life, along with the views of the victim(s), *inter alia*, and at the re-sentencing that this court set forth a thorough and comprehensive analysis of each every factor under 18 U.S.C. §3553(a), and set forth those points from the voluminous record of insightful information submitted by both parties that were accepted and credited to support the rationale for the ultimate conclusion reached.

## I. Sentencing Recommendation on Remand

Fareed Mumuni, an extraordinary young man, with a promising future welcomes the opportunity to re-present the volumes of information and materials, in the record, supports the imposition of a sentence at various with the guidelines.  Fareed Mumuni, has additional information related to his post arrest rehabilitation, to add to the plethora of information previously submitted and adopted herein.

In reversing the sentence imposed by this court, the Second Circuit declared that this court "drastically discounted the seriousness of Mumuni's conduct based upon a sterilized and revisionist interpretation of the record."  This observation is not an accurate reflection of the actual number of hours that this court devoted to preparation for sentencing; the voluminous amount of information submitted by both the government and the defense, involving both Fareed Mumuni and co-defendant Munther Omar Saleh.

The truth is that the Second Circuit's view is not an accurate narrative of what, in truth, took place in this case, where there was extensive litigation regarding Fareed Mumuni's backround, character and role in the offense.  To conclude that this court did not consider the magnitude and seriousness of the conduct engaged in by Fareed Mumuni is simply untrue and inaccurate.  The sentence imposed in the case was the result of thoughtful, intelligent litigation involving all aspects of the factors related to Fareed Mumuni's conduct, including the court's review of the two hour post arrest interview, *inter alia*.

Not only did the Second Circuit completely fail to recognize or credit the enormous amount of

2

hard work and care that this court devoted to the interrelated issues which influenced the sentencing of both Fareed Mumuni and Munther Omar Saleh, but the Second Circuit reached its conclusion by simply not crediting or failing to recognize of the tremendous amount of information that was put forth before the district court related to Fareed Mumuni's background, history, character and the circumstances of the offense.

For example, the defense did not simply present a sterile, *pro forma* argument that the defendant's age and lack of a criminal record warranted a sentence at variance with the Guidelines.  Not at all.  First of all, the information presented to this court went well beyond simply using the term age.  Painstaking details of Fareed Mumuni's extraordinary accomplishments in his young life, along with information about the extraordinary history of a proud immigrant family was presented to demonstrate how such a promising, peace loving, and brilliant young college student was influenced to participate in such a serious offense in the first place.

This is no sterile *pro forma* record.  To the contrary, the defense presented a substantial volume of information, part of the record, to also demonstrate that because of Fareed Mumuni's achievements at such a young age, along with his prior lack of violence, his intellectual aptitude, his strong family, and the love and respect that he had from members of his community of all backgrounds and religions - notwithstanding his admitted guilt to participating in a serious crime - Fareed Mumuni was a thoughtful, caring young man capable of redemption and not deserving of the imposition of an outrageous sentence of 85 years recommended by the government. which was based upon stereotypes and the conduct of defendants from other cases (which were not part of the record in this case).

In addition to the foregoing, defense counsel presented evidence and information to this court of Fareed Mumuni's post arrest rehabilitation, not as an toothless cliche, but as meaningful information to be considered in  determining whether Fareed Mumni was entitled to a sentence at variance with the

3

Guidelines  pursuant to the factors set forth in 18 U.S.C.§3553(a).

The Second Circuit opinion does not include a review, evaluation or discussion of the detailed information actually presented, on the record, in this case.  The Second Circuit ignored the actual information presented in relation to Fareed Mumni's post arrest rehabilitation, by narrowly stating that this district court relied on four mitigating factors, including "his lack of any disciplinary infractions during his three years of pre-trial and pre-sentencing."  As to this factor, which was far less than what the defense actually presented, the Second Circuit concluded that Fareed Mumni's reward for that particular mitigation factor would be to eventually receive good time credit.  The Second Circuit concluded that Fareed Mumuni post offense rehabilitation, "*his compliance with institutional regulations has no bearing on the sentencing factors must consider under 18 U.S.C.§3553(a).*"   On this issue, the Second Circuit is in conflict with United States Supreme Court case authorities regarding the broad information that a sentencing court may consider in regard to post-offense rehabilitation.  See, *Gall v. United States*, 552 U.S. 38,  57-59 (2007); *Pepper v. United States*, 562 U.S. 476, 481 (2011).  The Supreme Court has invalidated the preclusion of information of post-offense rehabilitation from consideration when imposing a sentence at variance to the Guidelines, pursuant to the factors set forth under 18 U.S.C.§3553(a).  *Pepper v. United States*, 562 U.S. at 481.

Counsel for Fareed Mumuni did not simply present, *pro forma*, that Fareed Mumuni was a "good boy" who just managed to stay out of trouble in pre-trial detention, and therefore he should be the beneficiary of a sentence at the variance with the Guidelines.  Sure, the defense brought to the attention of the court an unblemished institutional record during the 33 months that Fareed Mumuni was in the custody of the Bureau of Prisons prior to sentencing.  The actual record before this court reflects that Fareed Mumuni's unblemished was just one undeniable fact, to be considered in the combination with additional information that was presented on the issue of Fareed Mumuni's post offense rehabilitation.

The actual record clearly includes that the defense counsel brought to the attention of this court

the substantive positive activities engaged in by Fareed Mumuni - - not just his "staying out of trouble." The defense brought to the attention of this court Fareed Mumuni's positive job performance rating, along with supporting documentation.  The defense also brought to the attention of this court the fact that Fareed Mumuni had availed himself to the educational programs presented at the Metropolitan Detention Center by taking courses such as Entrepreneurship and Tutor Training.  Defense counsel made special note of the Tutoring Training, as Fareed Mumuni, who had a superb college education, was utilizing his time to assist and tutor other detainees who were studying in the BOP G.E.D. program, and helping them prepare for their re-entry into society.  Defense counsel presented the record of achievement to this court as "another sign of Fareed Mumuni's character and potential for redemption." However, the Second Circuit ignored this important evidence, and replaced it with a narrative that diminished what was truly presented, and then chided and admonished this court for granting a variance under 3553(a) based upon Fareed Mumuni having an unblemished record - - a total revisionist account of the thorough and thoughtful information and arguments that were advanced on the issue of post offense rehabilitation.

For the purposes of re-sentencing on remand, and based upon the actual argument previously advanced, it would not surprise this court to learn that since his sentence was imposed, Fareed Mumuni has continued participating in educational programs offered by the Bureau of Prisons.  Over the past 23 months since the sentencing, Fareed Mumuni taken the following educational courses offered by the Bureau of Prisons: Tutor Training, Critical Thinking, African American History, Spanish, Public Speaking, Exploring Computers, and many others.  See, Exhibit A.

The Second Circuit was wrong to restate the argument actually advanced by the defense, and to ignore the information that was actually presented, and actually considered and evaluated by this court.  And, the Second Circuit is wrong when it concluded that Fareed Mumuni's actual conduct of achievement, his tutoring of others, his post arrest rehabilitation, and now his post sentencing rehabilitation has no bearing on the sentencing factors that a sentencing court must consider under 18

5

U.S.C.§3553(a).  In *Pepper v. United States*, the Supreme Court specifically invalidated the preclusion of a sentencing court from considering post-sentencing rehabilitation for the purposes of imposing a non-Guidelines sentence.  *Pepper v. United States*, 562 U.S. 476, 481 (2011).  The logic and rationale expressed by the Supreme Court in *Pepper,* which rejected the prosecutor's argument and which reversed the Court of Appeals for the Eighth Circuit, applies to the Second Circuit's claim that evidence of Fareed Mumuni's post-offense rehabilitation must be rejected.[1]

Fareed Mumuni's Post Arrest Statement

In addition to the foregoing, the defense argued that Fareed Mumuni's post arrest statement was a factor to be considered under 18 U.S.C. §3553(a), as gigantic positive step towards his rehabilitation and redemption.  Defense counsel argued that the depth, care and expressions of contrition, as well as Fareed Mumuni's sincere and genuine effort to provide law enforcement with information to help protect Americans from a domestic ISIS attack was evidence of his character and rehabilitation, and therefore a factor for the court to consider, in combination with other factors, in determining that a sentence outside the Guidelines was warranted pursuant to 18 U.S.C.§3553(a).  By cabining Fareed Mumuni's post rehabilitation into a depiction of an unblemished record, the Second Circuit failed to acknowledge or consider the arguments advanced in support, and the many hours this court actually dedicated to the review of these materials, in order to arrive at its ultimate decision to grant a sentence at variance with the Guidelines.

In order to demonstrate this point, and in preparation for sentencing, defense counsel provided this court with a substantial amount of information concerning Fareed Mumuni's post arrest statement including a video recording of the post arrest statement, a full transcript of the interview, along with a summary chart which highlighted those portions of the interview which supported the imposition of

---

[1]       In *Gall v. United States*, the Supreme Court recognized that the district court, in its discretion, can consider post offense rehabilitation when determining whether to sentence the defendant to a non-guidelines sentence applying the factors in 18 U.S.C. 3553(a).  See, *Gall v. United States*, 552 U.S. 38,  57-59 (2007)

a sentence at variance with the Guidelines.[2]  It was clear - - not revisionist history - - that the videotape did not capture a "routine" question and answer of a suspect taken into custody.  To the contrary, the interview memorialized the humble thoughtfulness and effort by young Fareed Mumuni to assist law enforcement agents who were sincerely interested in obtaining information and insights, in order to protect the lives of innocent Americans.  The video memorialized the remarkable response by young Fareed Mumuni and was part of a robust record that this court evaluated and considered in reaching its determination to sentence the defendant at variance with the guidelines.

The video recording memorialized that on June 17, 2015, just moments after lunging at law enforcement officers and, according to the government, grabbing for their firearms, Fareed Mumuni sat quietly in the custody of law enforcement.  Fareed Mumuni was subsequently administered his *Miranda* warnings and proceeded to wave his 6th Amendment right counsel and his 5th Amendment right against self incrimination.  Fareed Mumuni then engaged law enforcement in a candid conversation about the circumstances of his arrest and his relationship and conversations with co-defendant Munther Omar Saleh.

Fareed Mumuni engaged the agents in an insightful, candid and truthful question and answer session over the next one hour and fifty minutes.  During the nearly two hour question and answer session, the law enforcement agent posed questions well beyond Mumuni's criminal conduct; whether he had knowledge of any imminent threats or any planned attacks against the United States and/or to harm its citizens.  Fareed Mumuni fully understood the urgency of such questions and responded candidly, thoughtfully, thoroughly and most important, truthfully.  As a result, defense counsel argued that Fareed Mumuni took a giant step forward towards his redemption.

---

[2]     This court did, in fact, carefully review Fareed Mumuni's one hour and fifty minute interrogation and interview in preparation for his sentencing.  During this lengthy interview, the court had the opportunity to assess the quiet demeanor and responsiveness to the serious questions posed by law enforcement agents, and gain insight into Fareed Mumuni's character.  There insights were corroborated by Fareed Mumuni's college record, employment history and the observations of his character as described by this friends and neighbors who wrote to the court.

This court, in fact, reviewed the interview, the transcripts and the summary charts, and had an opportunity to observe the demeanor of Fareed Mumni, within minutes of the attack, and to make an assessment of this state of mind, his overall demeanor and character (a 3553(a) factor).  In addition, this court had an opportunity to compare his demeanor on the video with the quiet and respectful manner in which Fareed Mumuni appeared in court over the 33 months leading to his sentencing, along with his thoughtful submission and statements made in open court at the time of sentencing.

Defense counsel argued to this court that Fareed Mumuni's expansive, important and thoughtful responses to his interrogation were another example of his character, and a positive first step towards his rehabilitation and redemption.

Although this court reviewed a lengthy videotape interview (nearly two hours), along with substantial direct, response and reply arguments in consideration of whether the videotape interview qualified for consideration of Fareed Mumuni's post arrest rehabilitation and redemption, and credited the arguments advanced by the defense, the Second Circuit's decision fails to recognize that arguments were even advanced, let alone to give credit to this court for the substantial amount of time and effort that the court considered this evidence, not only in connection with Fareed Mumuni's likelihood of redemption, but in relation to disputing claims in the PSR and the government's complaint that Fareed Mumuni agreed to participate in Munther Omar Saleh's desire to launch a "pressure cooker" bomb attack against American citizens.

The Second Circuit ignored the actual arguments advanced; the extensive amount of time that the this court actually devoted to resolution of the many issues presented, and concluded "*the District Court drastically discounted the seriousness of Mumuni's offense conduct based on a sterilized and revisionist interpretation of the record.*"  In order to support such a statement, the Second Circuit simply ignored this court's hard work, considerable effort and thoughtful review of the Rule 16 materials (including, *inter alia*, summaries of the recorded telephone conversations, the allegations in the complaint and Fareed Mumuni's substantial post arrest interview), along with a plethora of scholarly information presented, which

demonstrated how American teens and young adults are manipulated and corrupted to embrace the deadly rhetoric espoused by ISIS.

This court's approach and preparation for sentencing was not based upon a "sterilized' record upon which this court engaged in revisionism.  The exact contrary is true.  While perhaps not fully articulated on the record at the time of sentencing, the court devoted hours of review in consideration of the sentence imposed.  This is an undeniable truth, as demonstrated by the information submitted to the court that is part of the record in this case.

In connection with the actual sentencing of Fareed Mumuni, this  court fully reviewed and considered the substantial briefing and arguments advanced by the government, the government's experts and the prolific amount of information submitted by counsel for Munther Omar Saleh.  In connection with Fareed Mumuni's sentencing, the government and Fareed Mumni' counsel provided this court with a substantial volume of information and briefing on issues of fact in controversy and the issues of law.

During the sentencing proceedings, Fareed Mumuni objected to conclusions in the Presentence Report and the government argument that he  agreed to join and participate with Munther Omar Saleh's plan for a domestic "pressure cooker" bombing attack.

The Second Circuit Stated That This Court Failed To Consider The Seriousness of the Mumuni's Conduct

Again, in order to support its conclusion, the Second Circuit stated *"By ignoring Mumuni's significantly more violent assault, the District Court treated Mumuni and Saleh as if they had engaged in comparable conduct, which is simply not true."*  To reach this conclusion, the Second Circuit ignored what the District Court did, in fact, consider, and then supports that error with a self-serving conclusion.

The truth is that a great deal of information and arguments were presented on the relationship between Fareed Mumuni and Munther Omar Saleh.  That information was not presented for the purpose of arguing that the act of attempted murder was comparative to the conduct of Munther Omar Saleh.

A great deal of focus was made by defense counsel on the fact that Munther Omar Saleh was a leader; a person who possessed ISIS propaganda, had ordered bombing materials on the internet, and was actively recruiting young American students to join the cause of ISIS. The comparison was made for the purpose of establishing that Fareed Mumuni was a follower and not a leader nor organizer for ISIS, and that he did not possess ISIS propaganda on his computer, and did not engage in the recruitment of others. This is another indisputable fact. This information was submitted to suggest to this court that but for Saleh's influences, a young student with Fareed Mumuni's exceptional record of achievement and history of employment (including his outstanding letter of recommendation from the Richmond County District Attorneys' Office), there was a strong likelihood that Fareed Mumni would not have had the state of mind to attempt to murder a federal law enforcement officer. To support this view, defense counsel requested that this court review and evaluate the thorough post arrest interrogation, and consider Fareed Mumuni's total lack of prior violence in his life, his exemplary record of achievement, letters of support and the extraordinary support of a remarkable immigrant family.

Fareed Mumuni always acknowledged his conduct of attempting to murder a federal law enforcement with a kitchen knife, and provided a thorough and complete explanation for his conduct, and the reasons for his actions. At no time has the government taken the view that Fareed Mumuni's acceptance of responsibility and his explanation for his conduct was not sincere, accurate or untruthful.

In addition to the foregoing, a great deal of scholarly information was provided by defense counsel and counsel for Munther Omar Saleh, explaining how ISIS spent millions of dollars to corrupt and influence American young adults. Defense counsel pointed out that our nation has witnessed a proliferation of foreign terrorist organizations that successfully radicalized law abiding American youth to encourage them to abandon their traditional values, to adopt violent foreign ideology, and to engage in violent criminal behavior.

Defense counsel noted that scholars, terrorist experts and federal investigative agencies all agree that successful radicalization is based upon a foreign terrorist organization's successful identification and

manipulation of a vulnerable youthful mind-set and profile, and that at the time of his arrest, Fareed Mumuni had the classic personality that experts, such as University of Maryland Professor of Social Psychology and terrorism expert Arie Kruglanski, have identified as subject to manipulation into acts of violence.[3]

The Second Circuit's conclusion that this court failed to consider the foregoing for the purposes which the information was, in fact, presented, and somehow engaged in comparative conduct, is an unfair assessment of the actual arguments presented and the great care and thoughtfulness that this court actually engaged in to arrive at the imposition of a sentence at variance with Guidelines.

The Second Circuit also accused this court of "selectively" relying upon a factor and ignoring the fact that Fareed Mumuni participated in a serious act of violence. Such a conclusion is simply not true. This court devoted many hours in both preparation and review of the seriousness of the attempted murder and the many materials provided in support. This is an indisputable fact, which took place in this case, but was completely ignored by the Second Circuit, which concluded that the record in this case was sterile. There was nothing sterile about the arguments advanced by defense for this court to assess and evaluate in regard to the severity of the conduct engaged in by Fareed Mumuni.

In addition to the foregoing, defense counsel noted that Congress granted this court a wide range of discretion with which to sentence a defendant upon conviction for the attempted murder and

---

[3]  Defense counsel brought to the attention of this court the scholarly work of Arie W. Kruglanski, one of our nation's leading terrorism expert. Professor Kruglanski is a Distinguished University Professor of Social Psychology at the University of Maryland; a recipient of numerous awards, and is a Fellow of the American Psychological Association and the American Psychological Society. Professor Kruglanski has served as editor of the Journal of Personality and Social Psychology: Attitudes and Social Cognition, editor of the Personality and Social Psychology Bulletin, and associate editor of the American Psychologist. His work in the domains of human judgment and belief formation, the motivation-cognition interface, group and intergroup processes, and the psychology of human goals. Professor Kruglanski also conducts research with the support of grants from the Department for Homeland Security and from the Department of Defense on the psychological processes behind radicalization, de-radicalization, and terrorism.

assault of a federal officer with a deadly weapon.[4]  Defense counsel presented extensive arguments, a three step process and a number of suggestions for this court to consider, evaluate and to determine where within the range of up to twenty years, this court should exercise its discretion and arrive at a sentence that was sufficient but not greater than necessary to reach the sentencing goals and objectives of 18 U.S.C.§3553(a).  This was hardly done upon a sterile record.  To the contrary, defense counsel asked this court to consider Fareed Mumuni's mental state at the time he committed the crime.  Not the state of mind of some other defendant in some other case in which the defendant was not a participant.

Defense counsel requested this court to consider that Fareed Mumuni was radicalized, which is a term that many experts, including those at the Department of Justice, have utilized to explain how otherwise middle class American students have become brainwashed by a terrorist organization. Defense counsel argued that while Fareed Mumuni's mental state did not rise to the level of legal incompetency or insanity, it represented a *bona fide* explanation to demonstrate how Fareed Mumuni's conduct deviated greatly from societal norms.  It was noted that Fareed Mumuni told agents during his post-arrest statement that he was prepared to die that day.  Clearly, Fareed Mumuni was a very troubled young man, who did not see any future for himself, so he chose to engage in conduct which was entirely likely to result in his own death.

The second prong or step that defense counsel requested this court to consider was the lack of sophisticated planning of the attempted murder.  On this score, defense counsel noted that during his lengthy interview, Fareed Mumuni discussed the possibility of attacking law enforcement agents, but only if they attempted to prevent him from traveling overseas to join ISIS.  It was noted and suggested that Fareed Mumuni did not go out looking for agents to attack, and his weapons of choice were two old kitchen knives, which he took from his kitchen cupboard.  While counsel acknowledged that a

---

[4]        This court was certainly aware that count five charged only Fareed Mumni with the June 17, 2015, attempted murder of a federal officer, in violation of 18 U.S.C. §1114(3), and that count six charged only Fareed Mumni with the June 17, 2015 assault of a federal officer with a deadly weapon, in violation of 18 U.S.C. §111(a)(1) and 18 U.S.C. §111(b).

kitchen knife could prove to be deadly, the reality is that Fareed Mumuni did not search the internet or otherwise purchase a deadly weapon such machete, a tactical knife or a firearm.  In addition, Fareed Mumuni, by all accounts, a previously peaceful college student, had no special training in the use of a knife as a deadly weapon.

The third step or prong that defense counsel asked this court to consider, along with the other suggested factors,  the actual harm that resulted from Fareed Mumuni's conduct.  Consideration of the actual harm is very important, because defense counsel pointed out that the act of attempted murder comes in many different forms, and may result in a wide range of consequences to the intended victims.  Defense counsel argued:

> For instance, if an assailant stands over a victim and empties a firearm into the victim's body, but the victim miraculously survives - - despite being in a coma and/or suffering catastrophic injuries, paralysis, loss of organs/limbs, blindness, etc. - - a legitimate argument could be made that such conduct calls for the imposition of a maximum sentence.  If an assailant opens fire at an intended victim who is standing in the middle of a crowd of people, but nobody is shot, a legitimate argument could be made that it would be appropriate to impose a high sentence, because of the incredible danger and callous nature of the act.  If an assailant shoots or stabs a victim, but the victim is able to get away and suffers only non-life threatening injuries, a legitimate argument could be made that the appropriate sentence may be lower down along the continuum, perhaps closer to the middle of the sentencing range.  And in a case where an assailant attempts to stab a victim with a knife, but the knife does not penetrate the victim's body, a legitimate argument could be made that the appropriate sentence is even lower down along the continuum.

Defense counsel requested that the court consider Fareed Mumuni's statements made during the extensive videotaped interview; consider the summary of audio telephone recordings; and consider all of the information that the government investigators had learned about Fareed Mumuni during the course of their investigation, in order to arrive at a proper sentence and to help evaluate his conduct during commission of this serious offense.  In order to balance the defendant's conduct, in a matter required under 3553(a), defense counsel also asked the court to consider Fareed Mumuni's conduct in the offense, along with his background and character.  In this regard, defense counsel asked this court

to not simply consider Fareed Mumuni's age, as stated by the Second Circuit, but the impressive and extraordinary quality of his young life, as reflected by his employment (successful internship at the Richmond County District Attorney's Office), and the perspectives and insights provided by his neighbors, who were from many different backgrounds (including military), and from different racial, ethnic and religious groups.

Without such a balance, this court could never achieve the goal of individualized sentencing, which is the mandate of the post-*Booker* era, and the controlling Supreme Court case authorities. The government desperately wants to strip Fareed Mumuni of his individuality, his true character, his true accomplishments, his true background, and to sentence him based upon the qualities and conduct of defendants in other cases. This is a position that the government still maintains; strip Fareed Mumuni of his individual characteristics and apply a one size fits all terrorism application to the sentencing of defendant. Such an approach is not only contrary to the law, but it also deprives this court of its broad discretion under 18 U.S.C. §3553(a).

In addition, during his post arrest statement, his sentencing recommendation, and again at the time of sentencing, Fareed Mumuni acknowledged the seriousness of his conduct while he also expressed true, heartfelt remorse, and an appreciation to the agents for exercising a profound level of restraint by sparing his life when they were confronted by his serious attack. Fareed Mumuni clearly recognizes that the agents could have shot him dead on the spot.

Based upon the expanded arguments, and the many exhibits provided by both the government and the defense, including information provided by government tactical experts, it is simply inaccurate and unfair of the Second Circuit to state that this court rendered a decision on Fareed Mumuni's acts of violence on revisionism based upon a sterile record. The proliferation of information provided and the high level of advocacy advanced can hardly be considered sterile and the great time, care  and attention that this court devoted to the sentencing of both Fareed Mumuni and Munther Omar Saleh

14

(as there were many interrelated issues) can hardly be deemed revisionist.  To the contrary, this court exhibited an extraordinary level of care, review, and thoughtfulness - - not leaving out any single factor under 18 U.S.C. §3553(a) - - and arrived at a substantial sentence, which totaled 17 years in prison for a once young and promising student without any past bad or criminal behavior, who was recruited and brainwashed into participating in very serious and dangerous acts.

<u>This Court's Hardwork Was Simply Not Set Forth on The Record at the Time of Sentencing</u>

Defense counsel would agree that at the time of sentencing, this court did not detail how it applied each statutory factor to the actual facts presented in the Presentence Report, and as provided by both the government and defense.  The government took advantage of this fact by focusing in on single isolated remarks, and successfully arguing to the Second Circuit the exact opposite of what actually occurred in this case.  It is from this standpoint that Fareed Mumuni welcomes the remand for re-sentencing.  It permits defense counsel to reargue his extraordinary background, the extraordinary support he receives from a remarkable immigrant family, how he was exploited and manipulated by Munther Omar Saleh and other ISIS operatives who prey on American college students, and to again address the seriousness of his conduct, the great risk of death that his actions caused, and again for him to demonstrate his genuine, heartfelt remorse - - a powerful step towards redemption.

In addition, re-sentencing provides Fareed Mumuni an opportunity to demonstrate that his court was correct in its prior assessment that he was a young man capable of redemption, as since his sentencing, Fareed Mumuni has involved himself and participated in a variety of educational programs offered by the Bureau Prisons.  Although the Second Circuit has instructed this court not to consider his post offense rehabilitation, we are requesting that this court reject that direction and consider Fareed Mumuni's post offense rehabilitation, even post sentencing rehabilitation, as the Supreme Court has instructed is entirely proper under 3553(a).  See, *Pepper v. United States*, supra, 546 U.S. at 481.

At the re-sentencing Fareed Mumuni requests that this court not only inform the Second Circuit of the extensive level of work that was performed by both parties and the court, in preparation for the sentencing of Fareed Mumuni on the first occasion, but that it now doubles down and painstakingly sets forth on the record each and every document, factor and exhibit that it relied upon to render its ultimate decision, along with a detailed explanation of each and every stand-alone and interrelated fact.  In consideration for the re-sentencing, Fareed Mumuni is requesting that this court adopt and incorporate with this submission each and every chart, exhibit, and letter of recommendation, as well as his sentencing prior sentencing submission and reply sentencing submission, along with each and every exhibit, as if it was set forth herein.[5]

Finally, Fareed Mumuni is requesting that court consider all of the relevant and proper arguments advanced by the government at the first sentencing, including the opinions of its experts, its charts and many exhibits, along with the statements of the victims at the sentencings of both Fareed Mumuni and Munther Omar Saleh.

Fareed Mumuni continues to resist the government's attempt to strip him of his individuality, and to see to it that he be sentenced upon the conduct, background and character (or lack thereof) of defendants who are not before this court.

Fareed Mumuni also rejects the argument that this court should weigh mitigation factors (related to the defendant's background and character) differently in terrorism cases.  There is no Congressional statute or Supreme Court authority which permits such a proposition.  To the contrary, even in authorized death penalty cases, a death qualified jury still must consider the defendant's individualized background and character.  See, See, *Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir*

---

[5]     In addition, Fareed Mumuni is requesting that the court incorporate those arguments advanced by counsel for Munther Omar Saleh, as they were relevant to any factors or issues required in the sentencing of Fareed Mumuni.

*v. Quarterman*, 550 U.S. 233, 246  (2007); See also, 18 U.S.C. §3661.

In *Pepper v. United States*, 562 U.S. 476, 487  (2011), the Supreme Court observed:

> "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).

A sentencing scheme (the Guidelines) which focuses only on the offense, but does not include, in its calculation, the individual characteristics of the defendant is unreasonable.  See, *United States v. Olhovsky,* 562 F.3d 530, 549 (3rd Cir. 2009).  This court had a duty to consider the full range of specific characteristics of defendants, along with a consideration of the circumstances of the offense, in determining an appropriate sentence.  This is precisely what occurred in this case.  See *Pepper v. United States*, 131 S.Ct. at 1240; *Williams v. New York*, 337 U.S. 241, 247 (1949).   We are requesting that this court do the same on remand, but this time, at sentencing, set forth a detailed analysis of the factors considered and reasons supporting the conclusion reached.

Response to the Government's Supplemental Sentencing Letter

The government places great reliance upon *United States v. Meskini,* a pre-*Booker* case which addresses the validity of U.S.S.G. § 3A1.4(b).  In regard to its deterrence argument, the government states:

> In this case, both general and individual deterrence support imposition of the statutory maximum sentence.  As the Second Circuit has repeatedly noted, terrorism is a crime with high recidivism rates, and rehabilitation is notoriously difficult.  See, e.g., id. at 112-13 (citing United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003)).  In Meskini, the Second Circuit held that "Congress and the Sentencing Commission has a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters  should be incapacitated for a longer period of time." Meskini, 319 F.3d at 92.  The sentence imposed should

17

strongly discourage individuals from conducting attacks on law enforcement on behalf of a foreign terrorist organization and from traveling to join or helping to facilitate the travel of other foreign fighters to join such organizations.

The government further states:

As the Second Circuit explained in <u>Meskini</u>, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incarceration." 319 F.3d at 92.

However, the defense is at a loss to find other cases wherein the Second Circuit has <u>repeatedly noted</u> that terrorism is a crime with high recidivism rates, and rehabilitation is notoriously difficult. In *Meskini*, the court stated: "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation," but there is no indication, whatsoever, that the court's broad generalization is based upon any scholarly study of the recidivism of those convicted of terrorism related offenses or any other empirical evidence.

In *United States v. Awan*, No. CR-06-0154, 2007 U.S. Dist. LEXIS 51772 *5-6 (E.D.N.Y. 2007), Judge Sifton observed that "U.S.S.G. § 3A1.4 took effect in November 1995, and there is limited legislative or administrative history discussing how and why this sentencing enhancement came into being."[6]

Aside from the lack of any data to support the court's broad generalizations in *Meskini*, it is

---

[6]    See, James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51 (2010) (U.S.S.G. Section 3A1.4's presumption is not based on a study of the recidivism of those convicted of material support or any other empirical evidence. The United States Sentencing Guidelines section 3A1.4 went into effect November 1, 1995. U.S. SENTENCING GUIDELINES MANUAL § 3A1.4, historical n. Pre-1997 statistics on terrorism cases are not readily available or reliable.)

important from a contextual standpoint to recognize that the scope of the Second Circuit's *Meskini* decision was to address the constitutionality of creating a uniform criminal history category for all terrorists under § 3A1.4(b). However, for both its general and individual deterrence arguments, the government restates the same broad generalizations, which were used by the court in *Meskini* for a different purpose. Here, in the post-*Booker* era, the court's broad generalizations are clearly incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify his or her sentence.

Most recently, in connection with a defendant's sentencing in the ISIS related case of *United States v. John Doe*, 14-CR-00612-001 (E.D.N.Y. 2018), Senior Judge Jack B. Weinstein issued a 43 page decision entitled "Reasons for Sentence Pursuant to 18 U.S.C. § 3553(c)(2)," which also acknowledged the lack of data on terrorist recidivism rates, a full 15 years after the Second Circuit's decision in *Meskini*. Judge Weinstein stated:

> "[n]oting the lack of data on terrorist recidivism rates, the experts stressed that any prediction of a former extremist's likelihood for recidivism is highly individualized and should be assessed on a case-by-case basis. Hughes Report at 8–9; Hr'g Tr. 20:15–21:4, June 27, 2018; see also Nicole Hong, Terrorists' Lives After Jail in Focus, Wall Street J., Apr. 25, 2018 ("[W]ith limited data on recidivism for terrorism-related crimes, experts say the current system is inadequate in assessing how much of a risk these defendants pose.").

Accordingly, even after the passing of 17 years since the Second Circuit's decision in *Meskini*, it is clear that there still does not exist sufficient data on terrorism recidivism rates to assess the risk of recidivism posed by defendants convicted of terrorism-related crimes, which should come as little surprise, since most of the defendants who have been convicted of terrorism-related crimes in the United States have received steep sentences and remain incarcerated. Anecdotally, of the numerous terrorism-related defendants that counsel has represented during the past 30 years, all of them remain incarcerated

## II.  Conclusion

To conclude that this court decided its initial sentence based upon revisionism and a sterile record simply ignores and marginalizes the great effort put forth by both the government and defense, and the great care and effort, and many hours of review of records, Rule 16 materials and other information that this court evaluated in arriving at the sentence imposed.  While it may be true that when looking down from the Circuit, the record on the date of the sentencing does not reflect the extraordinary effort by this court, the truth is that such a review, evaluation and analysis did absolutely occur in this case.  In so doing, this court found Fareed Mumuni to be an individual, not a guideline; that he was a remarkable young man who was far greater than his serious conduct and attack against the agents inside his home, and that Fareed Mumuni took giant step forward towards his redemption.

This court's decision, and hopefully its re-sentencing, will demonstrate and reflect not a sterile record, but a robust record full of detailed information.  This court did not abandon or shirk its obligation to thoroughly and thoughtfully consider the §3353(a) factors simply because it did not discuss each one individually, or did not expressly parse or address every argument to the factors advanced by both parties, or because the court opined about the defendant's state of mind, given his substantial history of past law abiding conduct.  See, *United States v. Fernandez*, 443 U.3d 19, 30 (2d Cir. 2006).

This court performed its duties consistent with the high standards of the Second Circuit and United States Supreme Court case authorities, and discharged it obligation accordingly.  On remand, Fareed Mumuni is again requesting that ths court consider all the factors set forth in 18 U.S.C. §3553(a), as suggested by Judge Hall, in joining the decision for remand by the Second Circuit

Notwithstanding the views of the Second Circuit, which inaccurately depict the actual review engaged in by this court, on remand and re-sentencing, Fareed Mumuni requests that this court again fully analyze all the applicable factors, including those for which the Second Circuit has ordered on remand, along with consideration of Fareed Mumni's conduct subsequent to the April 2018 sentencing,

and impose a sentence at variance with the Guidelines similar to the sentence that was imposed twenty months ago.

The information about Fareed Mumuni's life narrative is not provided as an excuse, nor as an attempt to shift blame. As stated above, Supreme Court case law and statutory authorities clarify that mitigation evidence in relation to the background and history of an offender is not offered as an excuse or justification for engaging in criminal conduct, but rather as important information supporting mitigation of the length of sentence or type of punishment to be imposed as a result of the defendant's criminal conduct; and for showing his potential for redemption. See, *Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); See also, 18 U.S.C. §3661. The conditions present in Fareed Mumuni's life, and the historical facts which influenced his life, along with his post offense rehabilitation are all relevant to the length of the sentence to be imposed as a result of his criminal conduct.

For the reasons set forth above, it is requested that the court impose a sentence at variance with the Guidelines pursuant to 18 U.S.C. §3553(a). Fareed Mumuni remains a person who is well capable of redemption, and deserving of leniency in this case.

Dated: New York, New York
         March 9, 2020

Respectfully submitted,

*Anthony L. Ricco*

Anthony L. Ricco, Esq.

Steven Z. Legon, Esq.
Kenneth J. Montgomery, Esq.
Of Counsel and on the Memorandum